**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

REALTIME DATA LLC d/b/a IXO,

          Plaintiff,

    v.

ACRONIS, INC.,

          Defendant.

C.A. No. 1:17-cv-11279-IT

**<u>ACRONIS, INC.'S PRELIMINARY INVALIDITY DISCLOSURES</u>**

## TABLE OF CONTENTS

Page

I.     RESERVATIONS .................................................................................................... 1
  A.  General Reservations ......................................................................................... 1
  B.  Ongoing Discovery ........................................................................................... 2
  C.  Claim Construction ........................................................................................... 4
  D.  Plaintiff's Infringement Contentions ............................................................... 5
  E.  The Intrinsic Record ......................................................................................... 6
  F.  Rebuttal Evidence ............................................................................................. 6
  G.  Contextual Evidence ......................................................................................... 7
  H.  Invalidity Under Section 102(f) Prior Art ....................................................... 7
  I.  Priority And Effective Filing Date ................................................................... 8
  J.  No Patentable Weight ....................................................................................... 8
II.    IDENTIFICATION OF PRIOR ART .................................................................... 9
  A.  Prior Art Patents And Published Applications ................................................. 10
  B.  Prior Art Non-Patent References ...................................................................... 12
  C.  Prior Art Offered For Sale And/Or Publicly Used Or Known .......................... 12
  D.  Admitted Prior Art ........................................................................................... 13
  E.  The Applicants' Own Prior Patent And Published Applications ...................... 17
III.   PRIOR ART CLAIM CHARTS ............................................................................ 18
IV.    PRIOR ART UNDER 35 U.S.C. § 102 WHICH ANTICIPATES THE ASSERTED
       CLAIMS OF THE ASSERTED PATENTS ........................................................... 19
V.     PRIOR ART UNDER 35 U.S.C. § 103 WHICH RENDERS OBVIOUS THE
       ASSERTED CLAIMS OF THE ASSERTED PATENTS ...................................... 24
VI.    MOTIVATION FOR COMBINING IDENTIFIED PRIOR ART ......................... 24
VII.   ADDITIONAL BASES FOR OBVIOUSNESS UNDER 35 U.S.C. § 103 .................. 34
  A.  The State Of The Art ......................................................................................... 34
  B.  The Admitted Prior Art ..................................................................................... 38
  C.  Secondary Considerations ................................................................................. 38
VIII.  INELIGIBILITY UNDER 35 U.S.C. § 101 ........................................................... 39
IX.    INVALIDITY UNDER 35 U.S.C. § 112(1/a) ........................................................ 40
  A.  All '204 Patent Asserted Claims Are Invalid Under §112(1/a) ........................ 42
  B.  All '728 Patent Asserted Claims Are Invalid Under §112(1/a) ........................ 45
  C.  All of the '530 and '908 Patents Asserted Claims Are Invalid Under §112(1/a) .............. 51
X.     INVALIDITY UNDER 35 U.S.C. § 112(2/b) ........................................................ 55

A.  All '204 Patent Asserted Claims Are Invalid Under § 112(2/b)........................................ 56

B.  All '728 Patent Asserted Claims Are Invalid Under § 112(2/b)...................................... 59

C.  All '530 Asserted Claims are Invalid Under §112(2/b).................................................... 64

D.  All '908 Asserted Claims are Invalid Under §112(2/b).................................................... 64

XI.     ACCOMPANYING DOCUMENT PRODUCTION ...................................................... 65

Pursuant to the Court's Amended Scheduling Order (Dkt. No. 40), Defendant Acronis, Inc. ("Defendant" or "Acronis") hereby provides Plaintiff Realtime Data LLC d/b/a IXO ("Plaintiff" or "Realtime") with notice and disclosure of Defendant's preliminary invalidity contentions ("Invalidity Contentions") with respect to those claims Plaintiff asserts against Acronis in its October 20, 2017 Preliminary Infringement Disclosures (Dkt. No. 41), collectively being claims 12-14, 20, and 21 of U.S. Patent No. 8,717,204 ("the '204 Patent"); claims 1, 2, 4-6, 9, 10, 15, 20, 24, and 25 of U.S. Patent No. 9,054,728 ("the '728 Patent"); claims 1-4, 18, and 19 of U.S. Patent No. 7,415,530 ("the '530 Patent"); and claims 1, 2, 4, 6, 21, 22, and 25 of U.S. Patent No. 9,116,908 ("the '908 Patent") (collectively, "the Asserted Patents").[1]

## I.   RESERVATIONS

### A.   General Reservations

Acronis relies on and incorporates by reference, as if originally set forth herein, all invalidity contentions, invalidity positions, and all associated prior art and claim charts, set forth in any reexamination proceeding, post-grant proceeding (including any and all *inter partes* review proceedings), other lawsuit involving Realtime, trial,[2] by any party in any proceeding involving or related to one or more of the Asserted Patents, including, without limitation, Case Nos. 6:15-cv-463 (E.D. Tex.), 6:17-cv-84 (E.D. Tex.), 6:17-cv-120 (E.D. Tex.), 6:17-cv-421 (E.D. Tex.), and 1:17-cv-11279 (D. Mass.), or by potential or actual licensees to one or more of the Asserted Patents. Moreover, Acronis reserves the right to supplement these Invalidity Contentions based on prior art and/or invalidity grounds currently known to but not disclosed by Plaintiff, including

---

[1] On October 26, 2017, Plaintiff by way of email to counsel for Defendant withdrew assertion of claim 17 of the '728 Patent, claim 20 of the '530 Patent, and claim 3 of the '908 Patent.

[2] For example, Defendant incorporates the jury's finding of invalidity of the '530 Patent in *Realtime Data LLC v. Riverbed Technology*, Case No. 6:15-cv-468 (E.D. Tex.).

1

documents responsive to the mandatory disclosures contained in the Court's Amended Scheduling Order (Dkt. No. 40) and prior art identified or provided to Plaintiff by any defendant or any third party, including without limitation present or former defendants in Case Nos. 6:15-cv-463 (E.D. Tex.), 6:17-cv-84 (E.D. Tex.), 6:17-cv-120 (E.D. Tex.), 6:17-cv-421 (E.D. Tex.), and 1:17-cv-11279 (D. Mass.) or any other lawsuits involving Realtime involving or related to one or more of the Asserted Patents.

Consistent with the Amended Scheduling Order, Acronis reserves the right to amend these Invalidity Contentions. The information and documents that Acronis is producing in connection with these disclosures are provisional and subject to further revision. Acronis further reserves the right to amend or supplement these disclosures and the document production if Plaintiff: 1) provides any information that it failed to provide in its Preliminary Infringement Disclosures; 2) amends its Preliminary Infringement Disclosures in any way; and/or 3) attempts to rely upon any information at trial, in a hearing or during a deposition that it failed to provide in its Preliminary Infringement Disclosures.

Acronis provides the information below, as well as the accompanying production of documents, for the sole purpose of complying with Preliminary Invalidity Disclosures. The information provided shall not be deemed an admission regarding the scope of any claims or the proper construction of those claims or any terms contained therein. Nothing contained in these Invalidity Contentions should be understood or deemed to be an express or implied admission or contention with respect to the proper construction of any terms in the asserted claim, or with respect to the alleged infringement of that claim.

**B.    Ongoing Discovery**

Because only limited discovery has occurred and because Acronis continues to search for and analyze relevant prior art, Acronis reserves the right to revise, amend, and/or supplement the

information provided herein, including identifying, charting, and relying on additional references, should defendants' (including without limitation present or former defendants in Case Nos. 6:15-cv-463 (E.D. Tex.), 6:17-cv-84 (E.D. Tex.), 6:17-cv-120 (E.D. Tex.), 6:17-cv-421 (E.D. Tex.), and 1:17-cv-11279 (D. Mass.) or any other Realtime lawsuit involving or related to one or more of the Asserted Patents) further search and analysis yield additional information or references, consistent with the Local Rules and the Federal Rules of Civil Procedure.

These Invalidity Contentions are based upon information reasonably available to Acronis as of the date of these contentions. Because discovery is ongoing, Defendant expressly reserves the right to clarify, alter, amend, modify, or supplement these Invalidity Contentions, to identify additional prior art, and to rely on additional information, tangible things, and testimony obtained during discovery, including discovery obtained from third parties and/or other defendants, including without limitation those defendants who have been in and who are in Case Nos. 6:15-cv-463 (E.D. Tex.), 6:17-cv-84 (E.D. Tex.), 6:17-cv-120 (E.D. Tex.), 6:17-cv-421 (E.D. Tex.), and 1:17-cv-11279 (D. Mass.) or any other Realtime lawsuit involving or related to one or more of the Asserted Patents.

Discovery is in its infancy and is ongoing, and Acronis's prior art investigation and third-party discovery is therefore not yet complete. Defendant reserves the right to present additional items of prior art or invalidity grounds under 35 U.S.C. §§ 102(a)-(g) and/or 103 located during the course of discovery or further investigation. For example, Defendant may issue subpoenas to third parties believed to have knowledge, documentation, and/or corroborating evidence concerning some of the prior art listed herein and/or additional prior art. These third parties include without limitation companies, authors, inventors, users, customers, designers, engineers, managers, attorneys, or assignees related to the references listed in these disclosures.

3

Similarly, in this case, Acronis has not had the opportunity to take any depositions of the patent applicants or inventors named on the face of the Asserted Patents or other persons having relevant information. Defendant reserves the right to revise, amend or supplement these contentions to the extent appropriate in light of further investigation and discovery regarding the defenses, the review and analysis of expert witnesses, or any subsequent contentions by Plaintiff. Indeed, for example, at the time of these disclosures, Plaintiff has failed to produce to Defendant any expert reports, deposition transcripts, and related materials regarding one or more of the Asserted Patents from other cases Plaintiff was or is in involving such one or more of the Asserted Patents. Acronis expressly reserves the right to amend or supplement its Invalidity Contentions based on information in Plaintiff's possession which it has failed to provide Defendant at the time of these disclosures.

C.      **Claim Construction**

Acronis reserves the right to revise the ultimate contentions concerning the invalidity of the asserted claims of the Asserted Patents, which may change depending upon any findings as to the priority date of those claims and/or positions that Plaintiff or expert witness(es) may take concerning infringement and/or invalidity issues. Acronis does not waive the right to contest any claim constructions or to take positions during claim construction proceedings that have yet to occur that may be inconsistent with the Invalidity Contentions herein. Consequently, Defendant also reserves the right to amend or supplement these Invalidity Contentions in the event that the claims are construed differently at some point in the future.

Acronis does not necessarily adopt Plaintiff's positions on the scope or construction of the claims. In certain instances, Defendant has applied the claims to the prior art in view of Plaintiff's allegations, admissions, prior expert testimony, prior expert reports, or positions for purposes of these contentions only. As such, Defendant's Invalidity Contentions are not adoptions or

admissions by Defendant as to the accuracy of Plaintiff's allegations, admissions, or positions. Indeed, Acronis reserves the right to challenge Plaintiff's apparent constructions and to amend these Disclosures should Plaintiff pursue other constructions.  To the extent that these contentions rely on or otherwise suggest particular constructions of terms or phrases in the Asserted Claims, Defendant is not proposing any such constructions as proper constructions of those terms or phrases.  Accordingly, these Invalidity Contentions, and all charts are made in the alternative, are not necessarily intended to be consistent with each other, and should not be otherwise construed.

Acronis expressly reserves the right to take positions with respect to future claim construction or infringement issues that are inconsistent with, or even contradictory to, the claim construction or infringement positions expressed or implied in the Invalidity Contentions set forth herein.

### D.     Plaintiff's Infringement Contentions

Plaintiff's Preliminary Infringement Disclosure is deficient in numerous respects.[3] For example, Plaintiff fails to specifically identify where each element of each claim is found within each Accused Instrumentality. This lack of specificity and detail has prejudiced Defendant's ability to prepare these Invalidity Contentions by forcing Defendant to speculate as to Plaintiff's actual positions on Defendant's alleged infringement. Therefore, Defendant's Invalidity Contentions are based in whole or in part on its present understanding of Plaintiff's apparent positions as to the scope of the asserted claims. Because such deficiencies may lead to further grounds for invalidity, Defendant specifically reserves the right to modify, amend, or supplement their contentions if Plaintiff modifies, amends, or supplements its Preliminary Infringement Disclosure, produces

---

[3] Acronis outlined the deficiencies in Plaintiff's Preliminary Infringement Disclosure in correspondence of October 23, 2017 and November 6, 2017. Plaintiff, however, refused Defendant's request to provide amended infringement disclosure that show how each claim limitation is met by each accused product.

documents and information in discovery, request for interrogatories, and/or requests for admissions.

Additionally, Plaintiff has presented no substantive contentions for indirect infringement, i.e., active inducement or contributory infringement. Plaintiff has not, for example, provided contentions that identify in any way how Defendant allegedly induces direct infringement of the Asserted Patents by a third party, or how Defendant allegedly contributes to the infringement of the Asserted Patents by a third party. Nor has Plaintiff provided contentions regarding any alleged infringement by multiple parties pursuant to 35 U.S.C. § 271(a) (i.e., joint infringement). Nor has Plaintiff provided contentions of any detail regarding alleged infringement under the doctrine of equivalents. If Plaintiff is permitted to provide this and other information relating to alleged indirect or joint infringement or infringement pursuant to the doctrine of equivalents in the future, Acronis will amend and supplement these Invalidity Contentions as appropriate.

### E.    The Intrinsic Record

Acronis further reserves the right to rely upon applicable industry standards and prior art cited in the file histories of the Asserted Patents and any related U.S. and foreign patent applications as invalidating references or to show the state of the art. Defendant further reserves the right to rely on the patent applicants' admissions concerning the scope of the prior art relevant to the Asserted Patents found in, *inter alia*: the patent prosecution history for the asserted patent and any related patents and/or patent applications or reexaminations; any deposition testimony of the named patent applicants on the asserted patent; and the papers filed and any evidence submitted by Plaintiff in connection with this litigation.

### F.    Rebuttal Evidence

Prior art not included in these Invalidity Contentions, whether known or not known to Defendant, may become relevant. In particular, Acronis is currently unaware of the extent, if any,

to which Plaintiff will contend that limitations of the asserted claims of the Asserted Patents are not disclosed in the prior art identified herein. To the extent that such an issue arises, Defendant reserves the right to identify other references that would render obvious the allegedly missing limitation(s) or the disclosed device or method.

G.    **Contextual Evidence**

Defendant's claim charts cite particular teachings and disclosures of the prior art as applied to the limitations of each of the asserted claims. However, persons having ordinary skill in the art generally may view an item of prior art in the context of his or her experience and training, other publications, literature, products, and understanding. As such, the cited portions are only examples, and Acronis reserves the right to rely on uncited portions of the prior art references and on other publications and expert testimony as aids in understanding and interpreting the cited portions, as providing context thereto, and as additional evidence that the prior art discloses a claim limitation or the claimed subject matter as a whole. Defendant further reserves the right to rely on uncited portions of the prior art references, other publications, and testimony, including expert testimony, to establish bases for combinations of certain cited references that render the asserted claims obvious. The references discussed in the claim charts may disclose the elements of the asserted claims explicitly and/or inherently, and/or they may be relied upon to show the state of the art in the relevant time frame. The suggested obviousness combinations are provided in the alternative to anticipation contentions and are not to be construed to suggest that any reference included in the combinations is not by itself anticipatory.

H.    **Invalidity Under Section 102(f) Prior Art**

Acronis reserves the right to allege that the asserted claims are invalid under 35 U.S.C. § 102(f) in the event Defendant obtains evidence that James J. Fallon, Paul F. Pickel, Stephen J. McErlain and/or Carlton J. Melone, II, the inventors named on at least one of the Asserted Patents

or related patents, did not themselves "invent" the subject matter claimed. If Acronis obtains such evidence, Defendant will provide the name of the person(s) from whom and the circumstances under which the claimed subject matter or any part of it was derived.

## I. Priority And Effective Filing Date

Acronis contends that, for each Asserted Patent, Plaintiff will be unable to demonstrate that the asserted claims are entitled to claim a priority date or effective filing date earlier than the actual filing date of the application that issued as that patent. No ancestor application provides a disclosure sufficient under 35 U.S.C. § 112(1/a) to support such claim as required by section 119(e) or 120. *See* Section VIII below. If Plaintiff cannot backdate all of the claims of the '728 and '204 patents before each patent's respective filing date, then some of the asserted claims of the '728 and '204 patents may be governed by the first-to-file provisions of the AIA. All references herein to the Patent Act or requirements of the Patent Act are references to both the first-to-file and first-to-invent versions of the Patent Act. In any event, one or more of the Asserted Patents may also prove not patentably distinct from claims in earlier patents, and may be therefore invalid for obvious-type double patenting. Defendant's investigation of potential obviousness-type double patenting is ongoing.

## J. No Patentable Weight

Defendant reserves the right to argue that various portions of the asserted claims, such as an intended use or result, non-functional descriptive material, and certain preamble language, are entitled to no patentable weight. Mapping of a portion of an asserted claim to a prior art reference does not represent that such portion of the claim is entitled to patentable weight when comparing the claimed subject matter to the prior art.

## II.      **IDENTIFICATION OF PRIOR ART**

At least the prior art listed below, individually or in combination, invalidates the asserted claims. References indicated with a * are invalidating prior art under 35 U.S.C. § 102, as well as 35 U.S.C. § 103. The references without a * are invalidating prior art under 35 U.S.C. § 103.

Exhibits A1–A33, B1–B30, C1–C39, and D1–D38 provide detailed claim charts showing wherein each claim element may be found in the particular reference being charted.

Acronis identifies the following items of prior art that anticipate or render obvious the asserted claims. For ease of reference, an alias has been provided for each item of prior art. These aliases are used to refer to the identified prior art in Defendant's claim charts, which identifies where each element of the asserted claims is found in the given prior art. The identification of prior art below is not exclusive, and Defendant's production contains additional references that render the asserted claims invalid. Defendant reserves the right to rely upon both the listed and unlisted references produced, as well as other art that may become known and/or relevant during the course of this or any related litigations.

For those primary references for which detailed claim charts are provided in Exhibits A1–A33, B1–B30, C1–C39, and D1–D38, a reference to the particular Exhibit Number is provided with the alias. Additional references, which have not been charted, identified at  AI_00000001 – AI_00007682, are hereby each incorporated by reference in their entireties. At this time, Defendant is not providing claim charts for each of these additional references because these references have similar disclosure to the prior art references for which invalidity charts have been provided and/or may be used to show the state of the art, including with respect to a prior art system, including whether the prior art system was known or used by others and/or described in a printed publication or in public use or on sale and/or described in an application for patent.

Acronis also incorporates as if fully set forth herein the complete file histories for the Asserted Patents, including any prior art, invalidity grounds/rejections, or supporting documents cited therein.

Acronis not only relies upon the prior art disclosed herein, but also relies on any commercial embodiments, systems, and accompanying literature that correspond to the respective disclosures found within the prior art disclosed herein. The various and respective commercial embodiments and/or corresponding literature anticipate and/or render obvious the claims of the Asserted Patents for at least the reasons disclosed in these Invalidity Contentions and claim charts, as well as for other independent reasons found within the commercial embodiments and corresponding literature. Defendant also reserves the right to rely on related patents, published applications, foreign patents or publications, and other patent documents as necessary to establish prior art status or clarify the disclosures cited.

Acronis reserves the right to revise these claim charts to rely on any of these references to prove the invalidity of the claims of the Asserted Patents in a manner consistent with the Federal Rules of Civil Procedure, the Court's Local Rules, this Court's Orders, and case law.

A.     **Prior Art Patents And Published Applications**

| Patent |
| --- |
| U.S. Patent No. 4,956,808 to Aakre ("Aakre")* |
| U.S. Patent No. 6,198,850 to Banton ("Banton")* |
| U.S. Patent No. 6,092,071 to Bolan ("Bolan")* |
| U.S. Patent No. 5,408,542  to Callahan ("Callahan")* |
| U.S. Patent No. 5,630,092 to Carreiro ("Carreiro")* |
| U.S. Patent No. 5,467,087 to Chu ("Chu")* |
| U.S. Patent No. 5,253,325 to Clark ("Clark '325")* |
| U.S. Patent No. 5,319,682 to Clark ("Clark '682")* |
| U.S. Patent No. 5,627,534 to Craft ("Craft")* |
| U.S. Patent No. 6,023,233 to Craven ("Craven")* |
| U.S. Patent No. 5,553,160 to Dawson ("Dawson")* |

| |
|---|
| U.S. Patent No, 5,812,789 to Diaz ("Diaz")* |
| U.S. Patent No. 6,658,463 to Dillon ("Dillon")* |
| U.S. Patent No. 6,370,631 to Dye ("Dye")* |
| U.S. Patent No. 7,190,284 to Dye ("Dye")* |
| U.S. Patent No. 5,991,515 to Fall ("Fall")* |
| U.S. Patent No. 5,870,036 to Franaszek ("Franaszek")* |
| U.S. Patent No. 5,794,229 to French ("French")* |
| U.S. Patent No. 5,079,630 to Golin ("Golin")* |
| U.S. Patent No. 5,237,675 to Hannon ("Hannon")* |
| U.S. Patent No. 5,191,431 to Hasegawa ("Hasegawa")* |
| U.S. Patent No. 5,046,119 to Hoffert ("Hoffert")* |
| U.S. Patent No. 5,748,904 to Huang ("Huang")* |
| U.S. Patent No. 5,805,932 to Kawashima ("Kawashima")* |
| U.S. Patent No. 6,505,239 to Kobata ("Kobata")* |
| U.S. Patent No. 5,235,419 to Krause ("Krause")* |
| U.S. Patent No. 5,673,370 to Laney ("Laney")* |
| U.S. Patent No. 5,097,261 to Langdon ("Langdon")* |
| U.S. Patent No. 6,215,904 to Lavallee ("Lavallee")* |
| U.S. Patent No. 5,333,212 to Ligtenberg ("Ligtenberg")* |
| U.S. Patent No. 6,075,470 ("Little")* |
| U.S. Patent No. 5,619,995 to Lobodzinski ("Lobodzinski")* |
| PCT Patent Application No. WO 1998019450 A2 to Maccormack ("Maccormack")* |
| U.S. Patent No. 5,838,821 to Matsubara ("Matsubara")* |
| U.S. Patent No. 4,730,348 to MacCrisken ("MacCrisken")* |
| U.S. Patent No. 4,929,946 to O'Brien ("O'Brien")* |
| U.S. Patent No. 4,593,324 to Ohkubo ("Ohkubo")* |
| U.S. Patent No. 5,247,646 to Osterlund ("Osterlund")* |
| WO 97/27546 to Payne ("Payne")* |
| U.S. Patent No. 4,827,340 to Pirsch ("Pirsch")* |
| U.S. Patent No. 5,563,961 to Rynderman ("Rynderman")* |
| U.S. Patent No. 5,671,389 to Saliba ("Saliba")* |
| U.S. Patent No. 6,253,264 to Sebastian ("Sebastian")* |
| U.S. Patent No. 6,195,125 to Udagawa ("Udagawa")* |
| U.S. Patent No. 5,280,600 to Van Maren ("Van Maren")* |
| WO 2000/46688 to Wang ("Wang")* |
| U.S. Patent No. 4,558,302 to Welch ("Welch '302")* |
| U.S. Patent No. 5,990,810 to Williams ("Williams")* |
| U.S. Patent No. 6,285,458 to Yada ("Yada")* |
| U.S. Patent No. 6,195,465 to Zandi ("Zandi")* |

B.     **Prior Art Non-Patent References**

| Non-Patent References |
|---|
| "LZW Revisited: Speeding up an old data compression favorite," Dr. Dobb's Journal, #165, June 1990 ("Dr. Dobb's Journal 1990 Publication")* |
| Hifn 9711 Data Compression Coprocessor Preliminary Data Sheet ("Hifn 9711")* |
| Hoffman, Data Compression in Digital Systems, Chapman & Hall, 1997 ("Hoffman")* |
| William H. Hus & Amy E Zwarico, Automatic Synthesis of Compression Techniques for Heterogenous Files, 25 SOFTWARE—PRACTICE & EXPERIENCE (1995) ("Hsu")* |
| *The Bay Area Research Wireless Access Network (BARWAN)*, Randy H. Katz et al., (*Compcon '96. 'Technologies for the Information Superhighway' Digest of Papers* , pp.15-20, 25-28 Feb. 1996) ("Katz" or "BARWAN")* |
| MPEG 583 H261 Recommendation* |
| MPEG 584 H261 Recommendation* |
| Mark Nelson, THE DATA COMPRESSION BOOK (1992) ("Nelson")* |
| Clifford Reader et al, Block Character Coding, 87 SPIE ADVANCES IN IMAGE TRANSMISSION TECHS. 222 (1976) ("Reader")* |
| CCITT Study Group XV, "Description of Reference Model 8 (RM8)," Doc 525 (1989) ("RM8")* |
| International Telecommunication Union, "ITU-T Recommendation V.42 bis", 1990 ("V.42bis")* |
| "A Technique for High-Performance Data Compression," IEEE, 1984 ("Welch Article")* |

C.     **Prior Art Offered For Sale And/Or Publicly Used Or Known**

Acronis further provides the following information regarding prior art which was in public use and/or on sale in this country more than one year prior to the date of the application for the Asserted Patents, and/or known and/or used by others in this country, and/or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for the Asserted Patents. The following further includes information regarding derivation, and also regarding prior art which was made in this country by another and not abandoned, suppressed, or concealed and/or otherwise qualifies as prior art under 35 U.S.C. § 102, including § 102(g), and/or § 103, with an effective prior to earliest asserted conception date of the Asserted Patents.

- International Telecommunication Union, "ITU-T Recommendation V.42 bis", 1990 ("V.42bis") and/or LZW. On information and belief, this product package was invented and purchased, evaluated, compared, tested, implemented, made, used (publicly and/or commercially), disclosed, offered for sale, and/or sold by Sperry Corporation, Unisys Corporation, British Telecom, and/or IBM Europe in the United States at least as early as January 1990.

Acronis further understands that third party EchoStar Corporation / Hughes Network Systems, LLC ("EchoStar/Hughes"), which is a defendant to a case Realtime Data brought in the United States District Court, Eastern District of Texas, Case No. 6:17-cv-421 served invalidity contentions that included a prior art system incorporating certain EchoStar/Hughes technology. Acronis hereby incorporates by reference those invalidity contentions in their entirety, including charts and references evidencing a prior art system incorporating EchoStar/Hughes technology. Furthermore, Defendant understands that EchoStar/Hughes alleges that information regarding the prior art system which was made in this country was not abandoned, suppressed, or concealed and/or otherwise qualifies as prior art under 35 U.S.C. § 102, including § 102(g), or § 103 with an effective date prior to earliest conception date of the Asserted Patents.

### D.   Admitted Prior Art

The patent applicant for the Asserted Patents has expressly or implicitly admitted that certain elements recited in asserted claims of the Asserted Patents were known in the prior art and thus part of the state of the art. These admissions include, but are not limited to, the following exemplary prior art concepts. Acronis reserves the right to identify additional examples of admitted prior art and to further support the admissions identified below by relying on additional portions of the patent specification, statements made during the prosecution history of the Asserted Patents

and the prosecution history of any related applications, and any statements by the Plaintiff or the

patent applicants.

| Patent | Exemplary Admissions by Patent Applicant |
|---|---|
| '728 | The '728 Patent admits that the following was already known to persons of skill in the art before the alleged invention: "many conventional content dependent techniques" are discussed at '728, 2:65–3:9; coding techniques including "run length, Huffman, Lempel-Ziv Dictionary Compression, arithmetic coding, data compaction, and data null suppression" are all described as well-known in the art at '728 7:11-22. Lossy encoding techniques described as "well known within the art" include "MPEG4, various voice codecs, MPEG3, AC3, [and] AAC." '728 at 16:35–49.<br><br>Moreover, the '728 Patent admits that methods of selecting an appropriate compression technique were well known to persons of skill in the art before the alleged invention: "An alternative technique that approaches the problem of selecting an appropriate lossless data compression technique is disclosed, for example, in U.S. Pat. No. 5,467,087 to Chu entitled "High Speed Lossless Data Compression System" ("Chu")." '728 at 3:20-24.<br><br>The '728 Patent admits that processing, transmitting, and storing compressed data was already known to persons of skill in the art before the alleged invention: "Data compression is widely used to reduce the amount of data required to process, transmit, or store a given quantity of information." '728 at 2:1-3.<br><br>The '728 Patent further admits that content dependent compression techniques were already well known to persons of skill in the art before the alleged invention: "there are many conventional content dependent techniques that may be utilized." '728 at 2:67-3:2.<br><br>Further, the '728 Patent admits that U.S. Patent Nos. 5,955,976 and 5,973,630 to Heath are prior art as a result of its inclusion on the face of the patent. '728 References Cited (page 4). Similarly, the '728 Patent includes multiple references to the V42*bis* indicating that V42*bis* is admitted prior art to the '728 Patent. |
| '204 | The '204 Patent admits that the "Lempel-Ziv, modified/embellished Lempel-Ziv, Binary Arithmetic, and Huffman coding" algorithms were known in the art. '204 at 3:41-60. It also admits that known encoding techniques include "run length, Huffman, Lempel-Ziv Dictionary Compression, arithmetic coding, data compaction, and data null suppression." '204 at 17:15–26, *see also* '204 at 15:12-17.<br><br>The '204 Patent also admits that methods for recognizing any characteristic, attribute, or parameter of the data were known to persons of skill in the art before |

14

| Patent | Exemplary Admissions by Patent Applicant |
|---|---|
| | the alleged invention: "A descriptor extraction module 160 receives the buffered (or unbuffered) input data block and then parses, lexically, syntactically, or otherwise analyzes the input data block using methods known by those skilled in the art to extract the data compression type descriptor associated with the data block." '204, at 17:4-8.<br><br>The '204 Patent further admits that methods for decompressing data were also known to persons of ordinary skill in the art before the alleged invention of the '204 Patent: "[O]ther data decompression systems and methods known to those skilled in the art may be employed for providing accelerated data transmission in accordance with the teachings herein." '204 at 17:41-47.<br><br>Further, the '204 Patent admits that U.S. Patent Nos. 5,955,976 and 5,973,630 to Heath are prior art as a result of its inclusion on the face of the patent. '240 References Cited (pages 3-4). Similarly, the '204 Patent includes multiple references to the V42*bis* indicating that V42*bis* is admitted prior art to the '204 Patent. |
| '530 | The '530 Patent admits that the following was already known to persons of skill in the art before the alleged invention: "It is well known within the current art that data compression provides several unique benefits." '530 at 2:12-13.<br><br>The '530 Patent admits that a variety of storage devices or memory devices were well known to persons of skill in the art before the alleged invention: "Storage devices as known within the current art include all forms of random access memory, magnetic and optical tape, magnetic and optical disks, along with various other forms of solid-state mass storage devices." '530 at 5:17-20.<br><br>The '530 Patent admits that a variety of compression techniques were well known to persons of skill in the art before the alleged invention, including the ability to select a compression technique based on the type of data to be compressed: "It is well known within the current art that certain data compression techniques including, but not limited to, dictionary compression, run length encoding, null suppression and arithmetic compression are capable of encoding data when received." '530 at 7:28-32. "[L]ossless encoding techniques currently well known within the art such as run length, Huffman, Lempel-Ziv Dictionary Compression, arithmetic coding, data compaction, and data null suppression. It is to be understood that the encoding techniques are selected based upon their ability to effectively encode different types of input data." '530 at 11:43-48.<br><br>The '530 Patent admits that the use of a descriptor indicative of the data compression type was well known to persons of skill in the art before the alleged invention: "methods known by those skilled in the art to extract the data |

| Patent | Exemplary Admissions by Patent Applicant |
|---|---|
| | compression type descriptor associated with the data block." '530 at 14:8-12. |
| '908 | The '908 Patent admits that the following was already known to persons of skill in the art before the alleged invention: "It is well known within the current art that data compression provides several unique benefits." '908 at 2:13-14.<br><br>The '908 Patent admits that a variety of storage devices or memory devices were well known to persons of skill in the art before the alleged invention: "Storage devices as known within the current art include all forms of random access memory, magnetic and optical tape, magnetic and optical disks, along with various other forms of solid-state mass storage devices." '908 at 5:44-47.<br><br>The '908 Patent admits that a variety of compression techniques were well known to persons of skill in the art before the alleged invention, including the ability to select a compression technique based on the type of data to be compressed: "It is well known within the current art that certain data compression techniques including, but not limited to, dictionary compression, run length encoding, null suppression and arithmetic compression are capable of encoding data when received." '908 at 7:55-59. "[L]ossless encoding techniques currently well known within the art such as run length, Huffman, Lempel-Ziv Dictionary Compression, arithmetic coding, data compaction, and data null suppression. It is to be understood that the encoding techniques are selected based upon their ability to effectively encode different types of input data." '908 at 12:2-7.<br><br>The '908 Patent admits that that the use of a descriptor indicative of the data compression type was well known to persons of skill in the art before the alleged invention: "methods known by those skilled in the art to extract the data compression type descriptor associated with the data block." '908 at 14:34-36.<br><br>The '908 Patent admits that various decompression methods were well known to persons of skill in the art before the alleged invention: "other data decompression systems and methods known to those skilled in the art may be employed for providing accelerated data retrieval in accordance with the teachings herein." '908 at 15:4-7. |

E.      **The Applicants' Own Prior Patent And Published Applications**

As noted, no asserted claim of any Asserted Patent is entitled to an earlier priority date before the actual filing date of the application that issued as that patent. The following patents of the applicants and/or the Plaintiff, among others, thus qualify as § 102(b) prior art, and state of the art, to each of the asserted claims not in the '204, '728, '530, and/or '908 Patents:

1. U.S. Patent No 7,161,506, "Systems and methods for data compression such as content dependent data compression," issued January 9, 2007, and the PTO File History thereof;

2. U.S. Patent No 6,624,761, "Content independent data compression method and system," issued September 23, 2003, and the PTO File History thereof;

3. U.S. Patent No 6,309,424, "Content independent data compression method and system," issued October 30, 2001, and the PTO File History thereof;

4. U.S. Patent No 6,195,024, "Content independent data compression method and system," issued June 8, 2004, and the PTO File History thereof;

5. U.S. Patent No. 7,358,867, "Content independent data compression method and system," issued April 15, 2008, and the PTO File History thereof;

6. U.S. Patent No. 8,502,707, "Data compression system and methods," issued August 6, 2013, and the PTO File History thereof;

7. U.S. Patent No. 8,643,513, "Data compression systems and methods," issued February 4, 2014, and the PTO File History thereof;

8. U.S. Patent No. 8,682,695, "Methods for encoding and decoding data," issued April 8, 2014, and the PTO File History thereof;

9. U.S. Patent No. 7,777,651, "System and method for data feed acceleration and encryption, issued August 17, 2010, and the PTO File History thereof;

10. U.S. Patent No. 7,400,274, "System and method for data feed acceleration and encryption," issued July 15, 2008, and the PTO File History thereof;

11. U.S. Patent No. 7,417,568, "System and method for data feed acceleration and encryption," issued August 26, 2018, and the PTO File History thereof, and;

12. All other prior art references include all materials incorporated by reference into the above reference.

## III.   PRIOR ART CLAIM CHARTS

The claim charts attached hereto as Exhibits A1–A33, B1–B30, C1–C39, and D1–D38 identify specifically where each limitation of each claim is found in each prior art reference. Acronis expressly reserves the right to supplement or amend these contentions after the Court's *Markman* ruling or if Plaintiff is permitted to amend or alter its infringement contentions or its position on claim construction in any way. Further, to the extent that Acronis applies Plaintiff's constructions (and to the extent these constructions can be discerned), Defendant does not concede in any way that those constructions are correct, and instead expressly reserve the right to oppose those constructions at the appropriate time specified in the Court's Amended Scheduling Order. Nothing in these disclosures should be construed as an admission by Acronis.

In the Invalidity Charts, Acronis has referred to relevant, representative portions of the cited prior art. The absence of any specific or express reference to any claim term or claim element in these charts should not be construed as an admission that any corresponding limitation is lacking either expressly or inherently in the prior art reference. There may be additional support or other grounds for Defendant's contentions that such prior art satisfies a particular claim element, and Defendant reserves the right to supplement these invalidity contentions with such information. For example, persons of ordinary skill in the art at the time of the filing of the Asserted Patents knew to read prior art references as a whole, and in the context of other publications and literature and

18

the general knowledge in the field. Acronis may rely on all such information, including uncited portions of the prior art references listed herein, and on other publications and expert testimony, to provide context and as aids to understanding and interpreting the listed references, or to establish that a person of ordinary skill in the art would have been motivated to modify or combine any of the cited references so as to render the claims obvious. Additionally, citations to a particular figure in a prior art reference encompass all text relating to the figure, and citations to text encompass all figures relating to or referred to by that text.

Moreover, many of the prior art systems and apparatuses were sold prior to the earliest asserted priority dates and documentation regarding these prior art systems are not in the possession, custody, or control of Defendant. Instead, these documents are currently or will be the subject of third-party discovery. Defendant expressly reserves the right to supplement their contentions to include further information obtained in discovery

## IV.   PRIOR ART UNDER 35 U.S.C. § 102 WHICH ANTICIPATES THE ASSERTED CLAIMS OF THE ASSERTED PATENTS

The prior art listed below anticipates the asserted claims of the Asserted Patents either expressly or inherently as understood by a person having ordinary skill in the art. The specific anticipation assertions with respect to each claim are set forth in the accompanying claim charts, Exhibits A1–A33, B1–B30, C1–C39, and D1–D38.

| Ex. No. | Chart |
|---------|-------|
| A1 | '204 Patent v. U.S. Patent No. 4,956,808 to Aakre ("Aakre") |
| A2 | '204 Patent v. U.S. Patent No. 5,467,087 to Chu ("Chu") |
| A3 | '204 Patent v. U.S. Patent No. 5,253,325 to Clark ("Clark '325") |
| A4 | '204 Patent v. U.S. Patent No. 5,319,682 to Clark ("Clark '682") |
| A5 | '204 Patent v. U.S. Patent No. 5,627,534 to Craft ("Craft") |
| A6 | '204 Patent v. U.S. Patent No. 5,553,160 ("Dawson") |
| A7 | '204 Patent v. U.S. Patent No. 6,658,463 to Dillon ("Dillon") |
| A8 | '204 Patent v. "LZW Revisited: Speeding up an old data compression favorite," Dr. Dobb's Journal, #165, June 1990 ("Dr. Dobb's Journal 1990 Publication") |

| A9 | '204 Patent v. U.S. Patent No. 7,190,284 to Dye ("Dye") |
| A10 | '204 Patent v. U.S. Patent No. 5,991,515 ("Fall") |
| A11 | '204 Patent v. U.S. Patent No. 5,870,036 to Franaszek ("Franaszek") |
| A12 | '204 Patent v. William H. Hus & Amy E Zwarico, Automatic Synthesis of Compression Techniques for Heterogenous Files, 25 SOFTWARE—PRACTICE & EXPERIENCE (1995) ("Hsu") |
| A13 | '204 Patent v. U.S. Patent No. 5,805,932 to Kawashima ("Kawashima") |
| A14 | '204 Patent v. U.S. Patent No. 5,235,419 to Krause ("Krause") |
| A15 | '204 Patent v. U.S. Patent No. 5,097,261 to Langdon ("Langdon") |
| A16 | '204 Patent v. U.S. Patent No. 6,075,470 ("Little") |
| A17 | '204 Patent v. U.S. Patent No. 5,838,821 to Matsubara ("Matsubara") |
| A18 | '204 Patent v.MPEG 583 H261 Recommendation |
| A19 | '204 Patent v.MPEG 584 H261 Recommendation |
| A20 | '204 Patent v. U.S. Patent No. 5,247,646 to Osterlund ("Osterlund") |
| A21 | '204 Patent v. WO 97/27546 to Payne ("Payne") |
| A22 | '204 Patent v. U.S. Patent No. 4,827,340 to Pirsch ("Pirsch") |
| A23 | '204 Patent v. Clifford Reader et al, Block Character Coding, 87 SPIE ADVANCES IN IMAGE TRANSMISSION TECHS. 222 (1976) ("Reader") |
| A24 | '204 Patent v. CCITT Study Group XV, "Description of Reference Model 8 (RM8)," Doc 525 (1989) ("RM8") |
| A25 | '204 Patent v. U.S. Patent No. 5,563,961 to Rynderman ("Rynderman") |
| A26 | '204 Patent v. U.S. Patent No. 6,253,264 to Sebastian ("Sebastian") |
| A27 | '204 Patent v. Mark Nelson, THE DATA COMPRESSION BOOK (1992) ("Nelson") |
| A28 | '204 Patent v. International Telecommunication Union, "ITU-T Recommendation V.42 bis", 1990 ("V.42bis") |
| A29 | '204 Patent v. WO 2000/46688 to Wang ("Wang") |
| A30 | '204 Patent v. U.S. Patent No. 4,558,302 to Welch ("Welch '302") |
| A31 | '204 Patent v. "A Technique for High-Performance Data Compression," IEEE, 1984 ("Welch Article") |
| A32 | '204 Patent v. U.S. Patent No. 5,990,810 to Williams ("Williams") |
| A33 | '204 Patent v. U.S. Patent No. 6,195,465 to Zandi ("Zandi") |
|  |  |
| B1 | '728 Patent v. U.S. Patent No. 4,956,808 to Aakre ("Aakre") |
| B2 | '728 Patent v. U.S. Patent No. 5,467,087 to Chu ("Chu") |
| B3 | '728 Patent v. U.S. Patent No. 5,253,325 to Clark ("Clark '325") |
| B4 | '728 Patent v. U.S. Patent No. 5,319,682 to Clark ("Clark '682") |
| B5 | '728 Patent v. U.S. Patent No. 5,627,534 to Craft ("Craft") |
| B6 | '728 Patent v. U.S. Patent No. 6,658,463 to Dillon ("Dillon") |

| B7 | '728 Patent v. "LZW Revisited: Speeding up an old data compression favorite," Dr. Dobb's Journal, #165, June 1990 ("Dr. Dobb's Journal 1990 Publication") |
| --- | --- |
| B8 | '728 Patent v. U.S. Patent No. 7,190,284 to Dye ("Dye") |
| B9 | '728 Patent v. U.S. Patent No. 5,991,515 ("Fall") |
| B10 | '728 Patent v. U.S. Patent No. 5,870,036 to Franaszek ("Franaszek") |
| B11 | '728 Patent v. William H. Hus & Amy E Zwarico, Automatic Synthesis of Compression Techniques for Heterogenous Files, 25 SOFTWARE—PRACTICE & EXPERIENCE (1995) ("Hsu") |
| B12 | '728 Patent v. U.S. Patent No. 5,805,932 to Kawashima ("Kawashima") |
| B13 | '728 Patent v. U.S. Patent No. 5,235,419 to Krause ("Krause") |
| B14 | '728 Patent v. U.S. Patent No. 5,097,261 to Langdon ("Langdon") |
| B15 | '728 Patent v. U.S. Patent No. 6,075,470 ("Little") |
| B16 | '728 Patent v. U.S. Patent No. 5,838,821 to Matsubara ("Matsubara") |
| B17 | '728 Patent v. U.S. Patent No. 5,247,646 to Osterlund ("Osterlund") |
| B18 | '728 Patent v. WO 97/27546 to Payne ("Payne") |
| B19 | '728 Patent v. U.S. Patent No. 4,827,340 to Pirsch ("Pirsch") |
| B20 | '728 Patent v. Clifford Reader et al, Block Character Coding, 87 SPIE ADVANCES IN IMAGE TRANSMISSION TECHS. 222 (1976) ("Reader") |
| B21 | '728 Patent v. CCITT Study Group XV, "Description of Reference Model 8 (RM8)," Doc 525 (1989) ("RM8") |
| B22 | '728 Patent v. U.S. Patent No. 5,563,961 to Rynderman ("Rynderman") |
| B23 | '728 Patent v. U.S. Patent No. 6,253,264 to Sebastian ("Sebastian") |
| B24 | '728 Patent v. Mark Nelson, THE DATA COMPRESSION BOOK (1992) ("Nelson") |
| B25 | '728 Patent v. International Telecommunication Union, "ITU-T Recommendation V.42 bis", 1990 ("V.42bis") |
| B26 | '728 Patent v. WO 2000/46688 to Wang ("Wang") |
| B27 | '728 Patent v. U.S. Patent No. 4,558,302 to Welch ("Welch '302") |
| B28 | '728 Patent v. "A Technique for High-Performance Data Compression," IEEE, 1984 ("Welch Article") |
| B29 | '728 Patent v. U.S. Patent No. 5,990,810 to Williams ("Williams") |
| B30 | '728 Patent v. U.S. Patent No. 6,195,465 to Zandi ("Zandi") |
|  |  |
| C1 | '530 v. U.S. Patent No. 4,593,324 to Ohkubo ("Ohkubo") |
| C2 | '530 v. U.S. Patent No. 4,730,348 to MacCrisken ("MacCrisken") |
| C3 | '530 v. U.S. Patent No. 4,929,946 to O'Brien ("O'Brien") |
| C4 | '530 v. U.S. Patent No. 4,956,808 to Aakre ("Aakre") |
| C5 | '530 v. U.S. Patent No. 5,046,119 to Hoffert ("Hoffert") |
| C6 | '530 v. U.S. Patent No. 5,079,630 to Golin ("Golin") |
| C7 | '530 v. U.S. Patent No. 5,191,431 to Hasegawa ("Hasegawa") |
| C8 | '530 v. U.S. Patent No. 5,237,675 to Hannon ("Hannon") |

| C9 | '530 v. U.S. Patent No. 5,280,600 to Van Maren ("Van Maren") |
| C10 | '530 v. U.S. Patent No. 5,333,212 to Ligtenberg ("Ligtenberg") |
| C11 | '530 v. U.S. Patent No. 5,408,542 to Callahan ("Callahan") |
| C12 | '530 v. U.S. Patent No. 5,563,961 to Rynderman ("Rynderman") |
| C13 | '530 v. U.S. Patent No. 5,619,995 to Lobodzinski ("Lobodzinski") |
| C14 | '530 v. U.S. Patent No. 5,671,389 to Saliba ("Saliba") |
| C15 | '530 v. U.S. Patent No. 5,673,370 to Laney ("Laney") |
| C16 | '530 v. U.S. Patent No. 5,748,904 to Huang ("Huang") |
| C17 | '530 v. U.S. Patent No. 5,794,229 to French ("French") |
| C18 | '530 v. U.S. Patent No, 5,812,789 to Diaz ("Diaz") |
| C19 | '530 v. U.S. Patent No. 5,870,036 to Franaszek ("Franaszek") |
| C20 | '530 v. U.S. Patent No. 5,991,515 to Fall ("Fall") |
| C21 | '530 v. U.S. Patent No. 6,023,233 to Craven ("Craven") |
| C22 | '530 v. U.S. Patent No. 6,092,071 to Bolan ("Bolan") |
| C23 | '530 v. U.S. Patent No. 6,198,850 to Banton ("Banton") |
| C24 | '530 v. U.S. Patent No. 6,215,904 to Lavallee ("Lavallee") |
| C25 | '530 v. U.S. Patent No. 6,195,125 to Udagawa ("Udagawa") |
| C26 | '530 v. U.S. Patent No. 6,253,264 to Sebastian ("Sebastian") |
| C27 | '530 v. U.S. Patent No. 6,285,458 to Yada ("Yada") |
| C28 | '530 v. U.S. Patent No. 5,630,092 to Carreiro ("Carreiro") |
| C29 | '530 v. U.S. Patent No. 6,370,631 to Dye ("Dye") |
| C30 | '530 v. U.S. Patent No. 6,505,239 to Kobata ("Kobata") |
| C31 | '530 v. U.S. Patent No. 7,190,284 to Dye ("Dye") |
| C32 | '530 v. PCT Patent Application No. WO 1998019450 A2 to Maccormack ("Maccormack") |
| C33 | '530 v. Hsu Publication ("Hsu") |
| C34 | '530 v. Hoffman Publication ("Hoffman") |
| C35 | '530 v. Hifn 9711 Publication ("Hifn 9711") |
| C36 | '530 v. BARWAN ("Katz") |
| C37 | '530 v. U.S. Patent No. 5,247,646 to Osterlund ("Osterlund") |
| C38 | '530 v. U.S. Patent No. 5,319,682 to Clark ("Clark") |
| C39 | '530 v. U.S. Patent No. 5,990,810 to Williams ("Williams") |
| | |
| D1 | '908 v. U.S. Patent No. 4,593,324 to Ohkubo ("Ohkubo") |
| D2 | '908 v. U.S. Patent No. 4,730,348 to MacCrisken ("MacCrisken") |
| D3 | '908 v. U.S. Patent No. 4,929,946 to O'Brien ("O'Brien") |
| D4 | '908 v. U.S. Patent No. 4,956,808 to Aakre ("Aakre") |
| D5 | '908 v. U.S. Patent No. 5,046,119 to Hoffert ("Hoffert") |
| D6 | '908 v. U.S. Patent No. 5,079,630 to Golin ("Golin") |
| D7 | '908 v. U.S. Patent No. 5,191,431 to Hasegawa ("Hasegawa") |

| D8 | '908 v. U.S. Patent No. 5,237,675 to Hannon ("Hannon") |
| D9 | '908 v. U.S. Patent No. 5,280,600 to Van Maren ("Van Maren") |
| D10 | '908 v. U.S. Patent No. 5,333,212 to Ligtenberg ("Ligtenberg") |
| D11 | '908 v. U.S. Patent No. 5,408,542  to Callahan ("Callahan") |
| D12 | '908 v. U.S. Patent No. 5,563,961 to Rynderman ("Rynderman") |
| D13 | '908 v. U.S. Patent No. 5,619,995 to Lobodzinski ("Lobodzinski") |
| D14 | '908 v. U.S. Patent No. 5,630,092 to Carreiro ("Carreiro") |
| D15 | '908 v. U.S. Patent No. 5,671,389 to Saliba ("Saliba") |
| D16 | '908 v. U.S. Patent No. 5,673,370 to Laney ("Laney") |
| D17 | '908 v. U.S. Patent No. 5,748,904 to Huang ("Huang") |
| D18 | '908 v. U.S. Patent No. 5,794,229 to French ("French") |
| D19 | '908 v. U.S. Patent No, 5,812,789  to Diaz ("Diaz") |
| D20 | '908 v. U.S. Patent No. 5,870,036 to Franaszek ("Franaszek") |
| D21 | '908 v. U.S. Patent No. 5,991,515 to Fall ("Fall") |
| D22 | '908 v. U.S. Patent No. 6,092,071 to Bolan ("Bolan") |
| D23 | '908 v. U.S. Patent No. 6,195,125 to Craven ("Craven") |
| D24 | '908 v. U.S. Patent No. 6,198,850 to Banton ("Banton") |
| D25 | '908 v. U.S. Patent No. 6,215,904 to Lavallee ("Lavallee") |
| D26 | '908 v. U.S. Patent No. 6,195,125 to Udagawa ("Udagawa") |
| D27 | '908 v. U.S. Patent No. 6,253,264 to Sebastian ("Sebastian") |
| D28 | '908 v. U.S. Patent No. 6,285,458 to Yada ("Yada") |
| D29 | '908 v. U.S. Patent No. 6,370,631 to Dye ("Dye") |
| D30 | '908 v. U.S. Patent No. 6,505,239 to Kobata ("Kobata") |
| D31 | '908 v. U.S. Patent No. 7,190,284 to Dye ("Dye") |
| D32 | '908 v. PCT Patent Application No. WO 1998019450 A2 to Maccormack ("Maccormack") |
| D33 | '908 v. Hsu Publication ("Hsu") |
| D34 | '908 v. Hoffman Publication ("Hoffman") |
| D35 | '908 v. Hifn 9711 Publication ("Hifn 9711") |
| D36 | '908 v. BARWAN ("Katz") |
| D37 | '908 v. U.S. Patent No. 5,247,646 to Osterlund ("Osterlund") |
| D38 | '908 v. U.S. Patent No. 5,990,810 to Williams ("Williams") |

Acronis has endeavored to identify the most relevant portions of identified references. The references may contain additional support, however, for a particular claim element. Defendant may rely on uncited portions of the prior art references and/or other publications and fact or expert

testimony to provide context and as aids to understanding and interpreting the portions that are cited.

The references discussed in the claim charts may disclose the elements of the claims explicitly and/or inherently, and/or they may be relied upon to show the state of the art in the relevant time frame. The suggested obviousness combinations are provided in the alternative to Defendant's anticipation contentions and are not to be construed to suggest that any reference included in any combination is not by itself anticipatory. Also, the suggested obviousness combinations are provided as examples, and it should be understood that other combinations of the prior art disclosed and cited herein could be used in such combinations.

## V.   PRIOR ART UNDER 35 U.S.C. § 103 WHICH RENDERS OBVIOUS THE ASSERTED CLAIMS OF THE ASSERTED PATENTS

To the extent that the asserted claims are not rendered invalid purely on anticipatory grounds or are not obvious in light of the general knowledge in the field and of one skilled in the art, the prior art references render obvious the asserted claims as discussed in detail below. These combinations are not exclusive, and Defendant reserves the right to supplement the obviousness arguments listed below, using any references listed above in Section II and any references that may become known to the Defendant during the course of discovery.

## VI.   MOTIVATION FOR COMBINING IDENTIFIED PRIOR ART

Defendant has included this section discussing motivation to combine. The Supreme Court, however, has rejected the idea that a "teaching, suggestion, or motivation to combine" is a prerequisite for proving obviousness. *See KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 415 (2007) (rejecting the Federal Circuit's "rigid" application of the teaching, suggestion, or motivation to combine test, and instead espousing an "expansive and flexible" approach). Indeed, the Supreme Court held that a person of ordinary skill in the art is "a person of ordinary creativity, not an

automaton" and "in many cases a person of ordinary skill [in the art] will be able to fit the teachings of multiple patents together like pieces of a puzzle." *Id.* at 420-21.  A person of ordinary skill in the field of data compression in 1998 would have had at least a Bachelor's Degree, or equivalent, in Computer Science, Software Engineering, or a closely related program of study, and one to two years of relevant experience.

Subject to the reservation of rights based on Defendant's present understanding of the claims of the Asserted Patents, and the apparent constructions the Plaintiff is asserting based on Plaintiff's Infringement Contentions, the prior art references identified above in Section II, which are charted in Exhibits A1–A33, B1–B30, C1–C39, and D1–D38, each anticipate and/or render obvious the asserted claims of the Asserted Patents.

Should any individual prior art reference be deemed not to disclose, explicitly or inherently, any limitation of a claim, Defendant contends in the alternative that such individual prior art references identified above in Section II (and charted in Exhibits A1–A33, B1–B30, C1–C39, and D1–D38) can be combined with the specific references identified below for individual claim elements, as indicated in many of the charts in Exhibits A1–A33, B1–B30, C1–C39, and D1–D38. Specific motivations for such combinations are indicated in the claim charts and below.

Further, to the extent that the claims are not rendered invalid purely on anticipatory grounds or are not obvious in light of the general knowledge in the field and of one skilled in the art, the following prior art combinations of references render obvious the asserted claims of the Asserted Patents. To the extent a cited prior art reference is deemed not to anticipate or render obvious a claim as noted in the attached charts for failing to teach or suggest one or more limitations of that claim, that claim would nonetheless have been obvious to one of ordinary skill in the art at the time of the invention by the combination of the cited prior art reference with one or more other

prior art references disclosing the missing claim limitations. Examples of references disclosing any such alleged missing limitations may be found in the charts in Exhibits A1–A33, B1–B30, C1–C39, and D1–D38.

These combinations are not exclusive, and Acronis reserves the right to supplement the obviousness arguments listed below, using any references listed above in Section II and any references that may become known to the Defendant during the course of discovery.

The United States Supreme Court has clarified the standard for what types of inventions are patentable. *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 415 (2007). In particular, the Supreme Court emphasized that inventions arising from ordinary innovation, ordinary skill, or common sense should not be patentable. *See, e.g.*, *id.* at 402, 413, 421-22, 427. In that regard, a patent claim may be obvious if the combination of elements was obvious to try or there existed at the time of the invention a known problem for which there was an obvious solution encompassed by the patent's claims. In addition, when a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one. If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability.

"[T]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *Id.* at 416. Because the Asserted Patents simply arrange old elements with each performing the same function it had been known to perform and yields no more than what one would expect from such an arrangement, the combination is obvious. *Id.* at 420. The asserted claims are therefore invalid under 35 U.S.C. § 103 because they do nothing more than combine known techniques and apparatuses according to their known and ordinary uses to yield predictable results.

The Supreme Court further held that, "[w]hen a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one. If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability. For the same reason, if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill." *Id.* at 417. Accordingly, a person of ordinary skill in the art at the time of the alleged invention would have been motivated to combine or adapt known or familiar methods in the art, especially where market forces prompt such variations. Here, market forces demanded implementation of compression systems, and thus one of skill in the art would have thought to combine or modify references that described known methods that one of skill in the art would have recognized as offering improvements to solutions of that time. Each of the references describes methods that were known to offer such improvements, and, accordingly, one of skill in the art would have been motivated to combine or modify the references as identified in each of the combinations above.

Moreover, since there was a finite number of predictable solutions, a person of ordinary skill in the art had good reason to pursue the known options. *Id.* The above-identified prior art references merely use those familiar elements for their primary or well-known purposes in a manner well within the ordinary level of skill in the art. Accordingly, common sense and the knowledge of the prior art render the claims invalid under either § 102 or § 103.

A person of ordinary skill would have been motivated to combine the above prior art based on his knowledge, the nature of the problem to be solved, and the teachings of the prior art. The identified prior art addresses the same or similar technical issues and suggests the same or similar

solutions to those issues. Moreover, some of the prior art refer to or discuss other prior art, illustrating the close technical relationship among the prior art.

By way of further example, the references listed in Section II above are directed to the same or similar technology. Thus, for example, one of ordinary skill in the art would have been motivated to combine known prior art solutions described in these references relating to data compression.

Moreover, as detailed below, many of the claim elements were already known as admitted by the applicants in the specifications of the Asserted Patents. These elements represented design choices available to a person of ordinary skill. When there is a design need or market pressure to solve a problem such as identified previously and/or described in the Asserted Patents, and there are a finite number of identified, predictable solutions, a person of ordinary skill would be motivated to combine the known options that are within his or her technical grasp. Here, one of ordinary skill in the art would have been motivated to combine known prior art solutions represented in the primary references. These motivations apply throughout each of the combinations below and in the claim charts.

In some of the paragraphs below, exemplary combinations are listed for purposes of explaining and exemplifying which references would be combined under the motivation cited in that particular paragraph. These combinations are not intended to be limiting but rather intended to provide notice of the reasoning behind particular motivations to combine and the references that would be combined thereunder. In many instances, multiple different motivations would apply to a particular combination (for example, if multiple references were both authored by the same person and referred to the same product/system, then both of those motivations would apply) and the specific combinations were not duplicated.

Should any prior art cited in Section II (and charted in Exhibits A1–A33, B1–B30, C1–C39, and D1–D38) be deemed not to disclose, explicitly or inherently, any limitation of a claim, Defendant reserves the right to argue that any such difference between that prior art and the corresponding claim would have been obvious to one of ordinary skill in the art. To the extent that such an argument is deemed a "combination" analysis for purposes of obviousness, Defendant discloses their present intention to rely on the separate combination of the knowledge of a person of ordinary skill in the art with each item of prior art identified in Section II. The knowledge of a person of ordinary skill in the art is demonstrated by the full list of references in Section II and the prior art produced herein pursuant to the Amended Scheduling Order.

For each of the various "systems" or "products" that were charted (*e.g.*, the Systems and Products), to the extent that the collective references cited in each exhibit are not considered to be the same reference for purposes of invalidity under 35 U.S.C. § 102, it would have been obvious to combine the references cited in each such Exhibit (*e.g.*, combining all of the references cited in Exhibits A1–A33, B1–B30, C1–C39, and D1–D38). For each such product/system, all of the listed references relate to the same computer architecture and variations thereof. One of skill in the art would have been motivated to look at all of the available documentation for a particular product/system to understand the operation. One of skill in the art would have combined that knowledge from the various related references because it would be clear that the references were related. For at least this reason, one of skill in the art could consider it obvious to combine the references that collectively teach a particular operating system. The references were identified in the charts for each such system/product, and Defendant intends to rely upon the combination of references in each of the system/product charts.

One of skill in the art would have been motivated to combine the different publications and patents that were authored by employees of the company or assigned to the same assignee and related to the same subject matter, particularly when that assignee was well-known to have experience and knowledge in the design and development of computer architectures and the patents are directed to improvements in the company's products. So, for example, for such companies (*e.g.*, Sperry Corporation, Unisys Corporation, Storage Technology Corporation, Hewlett-Packard Company, International Business Machines, Inc., Hughes Electronics Corporation, etc.) one of skill in the art would have been motivated to look at the various patents assigned to the companies, as well as articles written about their products, and to combine the approaches taken in those patents and articles for such products.

One of skill in the art would have been motivated to combine different references that were authored, developed, or invented by the same individual(s) related to the same subject matter. So, for example, individuals such as Lempel, Ziv, Welch, O'Brien and others, were either the named author (e.g., for a paper) or a named inventor (on a patent) or known as a product architect on multiple related references charted in Exhibits A1–A33, B1–B30, C1–C39, and D1–D38. The common inventor/author/architect references themselves demonstrate that they relate to continued work in a common field of effort and continued related developments in that field. One of skill in the art would, therefore, combine the references related to each individual.

Based on the teachings of the references and/or the knowledge of one of ordinary skill, one of skill in the art would have been motivated to combine different references from the same company that relate to various generations of data compression systems that were developed, made and sold by that same company. For example, the references and/or companies themselves described how the products evolved and were related to one another.

One of skill in the art would have been motivated to combine different references from common data compression systems that were known to be related or subject to collaboration by different companies or individuals. So, for example, a person of ordinary skill knew that many companies used the work of Lempel and Ziv to create LZ-based compressors. It would have been obvious to combine references and aspects of these different but closely-related disclosures.

Each of the references can be combined with the known prior art based upon the statements made in the specification and during prosecution of the Asserted Patents. For example, the applicants acknowledged that many of the claimed features were well known in the art. *See* Section II.D, above. By way of further non-limiting example, based on the applicants' admission that encoding techniques such as MPEG4, various voice codecs, MPEG3, AC3, AAC, as well as lossless algorithms such as run length, Huffman, Lempel-Ziv Dictionary Compression, arithmetic coding, data compaction, and data null suppression were "well-known in the art", it would be obvious to one skilled in the art that the encoders described in any of the charted prior art references could be altered using and/or implemented along with other well-known encoders. Thus, it would have been obvious for one of skill in the art to combine this knowledge in the art (as the applicants did) with any of the charted references because the applicants acknowledged that the basic arrangement of elements was known in the art.

Additionally, beyond the elements acknowledged in the patent and prosecution history to be known in the art, to the extent that the Plaintiff alleges that certain elements are missing from any of the charted references, those elements are known in the art or would be inherent in the relevant context. One of skill in the art would have understood that different approaches could be taken depending on the design needs and would have combined those approaches to meet the various design needs.

It would have been obvious to combine any references that expressly refer to each other or incorporate each other by reference. For example, one of skill in the art would have been motivated to combine different references from articles or papers that were known to be related and/or referenced within another related article or paper. So, for example, it would have been obvious to combine a paper referenced in an article with the paper that references the article.

In addition to the specific combinations of prior art and the specific combinations of groups of prior art disclosed, Acronis reserves the right to rely on any other combination of any prior art references disclosed in Section II above and charted in Exhibits A1–A33, B1–B30, C1–C39, and D1–D38. Defendant further reserves the right to rely upon combinations disclosed within the prosecution history of the references cited herein. These obviousness combinations reflect Defendant's present understanding of the potential scope of the claims that Plaintiff appears to be advocating and should not be seen as Defendant's acquiescence to Plaintiff's interpretation of the patent claims.

In addition to the motivations set forth above, one or more combinations of the prior art references identified above and below would have been obvious because these references would have been combined using: known methods to yield predictable results; known techniques in the same way; a simple substitution of one known, equivalent element for another to obtain predictable results; and/or a teaching, suggestion, or motivation in the prior art generally. In addition, it would have been obvious to try combining the prior art references identified above because there were only a finite number of predictable solutions and/or because known work in one field of endeavor prompted variations based upon predictable design incentives and/or market forces either in the same field or a different one. In addition, the combinations of the prior art references identified

above would have been obvious because the combinations represent the known potential options with a reasonable expectation of success.

Additional evidence that there would have been a motivation to combine the prior art references identified above includes the interrelated teachings of multiple prior art references; the effects of demands known to the design community or present in the marketplace; the existence of a known problem for which there was an obvious solution encompassed by the claims of the Asserted Patents; the existence of a known need or problem in the field of the endeavor at the time of the alleged invention(s); and the background knowledge that would have been possessed by a person having ordinary skill in the art. For example, the prior art references are directed to solving the same problem: data compression. Thus, a skilled artisan seeking to solve this problem of data compression would have looked to these cited references alone or in combination. Accordingly, the motivation to combine the teachings of the prior art references disclosed herein is found in the references themselves and: (1) the nature of the problem being solved, (2) the express, implied and inherent teachings of the prior art, (3) the knowledge of persons of ordinary skill in the art, (4) the fact that the prior art is generally directed toward methods and systems for data compression, or (5) the predictable results obtained in combining the different elements of the prior art.

Any reference or combination of references that anticipates or makes obvious an independent claim also makes obvious any claim dependent on that independent claim because every element of each dependent claim was known by a person of ordinary skill at the time of the alleged invention, and it would have been obvious to combine those known elements with the independent claim at least as a matter of common sense and routine innovation. Accordingly, Defendant contends that each claim would have been obvious not only by the combinations

explicitly defined in these contentions, but also by any combination of references that renders obvious that claim.

To the extent Plaintiff contends that any reference contains multiple distinct embodiments, it would be obvious to combine elements of the distinct embodiments. A person would be motivated to make such a combination because the elements are found in the same reference and the reference as a whole is directed to the same topic or topics.

## VII.  ADDITIONAL BASES FOR OBVIOUSNESS UNDER 35 U.S.C. § 103

### A.  The State Of The Art

Numerous prior art references, including those identified above, reflect common knowledge and the state, scope, and content of the prior art before the priority dates of the Asserted Patents. *See Graham v. John Deere Co.,* 383 U.S. 1, 35-36 (1966). As it would be unduly burdensome to create detailed claim charts for the thousands of invalidating combinations, the combinations cited herein are illustrative and not exhaustive. Though the claim charts provide illustrative citations to where each element may be found in the prior art references or in their combination, the cited references may contain other disclosures of each claim element as well, and Acronis reserves the right to argue any claim elements of the asserted claims of the Asserted Patents are disclosed in non-cited portions of these references.

The state of the art included knowledge of the following (support for the following points below can be found above in Section VI):

- What run length encoding was and how to implement a run length encoding system;
    - The advantages and disadvantages of run length encoding;
    - That the output of a run length encoding system could have various formats;
    - The types of data that are particularly suited for run length encoding.
- What dictionary encoding is and how to implement various dictionary encoders;

34

o   That LZ77 is an adaptive dictionary encoder;

o   That LZ78 is an adaptive dictionary encoder;

o   That most adaptive dictionary encoders are based on the fundamental work
    of Abraham Lempel and Jacob Ziv as described in Ziv, Jacob; Lempel,
    Abraham (May 1977). "A Universal Algorithm for Sequential Data
    Compression". IEEE Transactions on Information Theory 23 (3): 337–343;
    and Ziv, Jacob; Lempel, Abraham (September 1978). "Compression of
    Individual Sequences via Variable-Rate Coding". IEEE Transactions on
    Information Theory 24 (5): 530–536;

o   The differences between various types of dictionary encoders, such as
    LZ77, LZ78, LZW, LZJH, LZSS, and others;

o   The advantages and disadvantages associated with various dictionary
    encoders;

o   That many dictionary encoders are adaptive and dynamically add newly
    encountered strings to the dictionary;

o   That many dictionary encoders create a code word for each string added to
    a dictionary;

o   That many dictionary encoders use indexes as code words;

o   The types of data that are particularly suited for the various types of
    dictionary encoders;

o   That LZ-based encoders are all based on the fundamental work of Abraham
    Lempel and Jacob Ziv as described in Ziv, Jacob; Lempel, Abraham (May
    1977). "A Universal Algorithm for Sequential Data Compression". IEEE

Transactions on Information Theory 23 (3): 337–343; and Ziv, Jacob; Lempel, Abraham (September 1978). "Compression of Individual Sequences via Variable-Rate Coding". IEEE Transactions on Information Theory 24 (5): 530–536;

- o That the various LZ-based encoders and features of LZ-based encoders can be readily combined, substituted and/or modified, including LZJH.

- What arithmetic and Huffman encoding was and how to implement arithmetic and Huffman encoding system;

  - o The advantages and disadvantages of arithmetic and Huffman encoding; and

  - o The types of data that are particularly suited for arithmetic and Huffman encoding.

- What JPEG encoding was and how to implement a JPEG encoding;

  - o The advantages and disadvantages of JPEG encoding; and

  - o The types of data that are particularly suited for JPEG encoding.

- What MPEG encoding was and how to implement a MPEG encoding;

  - o The advantages and disadvantages of MPEG encoding; and

  - o The types of data that are particularly suited for MPEG encoding.

- That there were a variety of additional encoding schemes and how to implement a variety of additional encoding schemes;

  - o The advantages and disadvantages of each of a variety of encoding; and

  - o The types of data that are particularly suited each of a variety of encoding.

- That the use of different encoding schemes for different types of data could be beneficial.

- That analyzing data can allow the selection of an encoder that is well suited for compressing the data.

    o That compression of data can be optimized by selecting an encoder that is well-suited to the data.

- That a single compression system could use two or more encoding schemes to improve performance.

    o That run length compression and dictionary compression have been combined in several systems.

    o That compression schemes can be used in parallel.

    o That compression schemes can be used in series.

- That many encoders receive uncompressed data and output compressed data.

    o That many encoders receive blocks of data.

    o That many encoders operate on blocks of data.

- That many encoders reduce repetition of data.

- That descriptors can be used in compressed data to identify the compression scheme used to compress the data.

    o That a decompression system can use a descriptor in compressed data to determine which decoder to use to decompress the data.

    o That descriptors in compressed data can be stored with the compressed data.

- That compressed data can be transmitted using less bandwidth than uncompressed data.

- That compressed data can be stored more quickly than uncompressed data.

  o That compressed data can be stored on a variety of storage media.

  o That stored compressed data can be retrieved.

- That modifying parameters of various encoders can alter the rate at which data is compressed and output by the various encoders.

- How to determine the bandwidth of a data stream.

### B.     The Admitted Prior Art

As discussed in Section II.D above, the patent applicants admitted in the specification of the Asserted Patents that many of the claimed features and techniques were well known in the prior art. Thus, Plaintiff is barred from denying the obviousness of those admittedly-old aspects of the claims.

### C.     Secondary Considerations

Notwithstanding the factors and motivations identified above, including the exemplary combinations identified above and in the claim charts of the Exhibits, and notwithstanding the nascent stage of discovery, and subject to the reservation of rights stated above, Acronis contends that an analysis of secondary considerations further supports the view that each of the asserted claims is obvious. Secondary considerations that courts evaluate as objective indicia of obviousness or nonobviousness of an alleged invention include (1) commercial success of the claimed subject matter; (2) long felt but unresolved needs; (3) failure of others; (4) teaching away from the claimed subject matter by the prior art; (5) copying or acclamation by others; and (6) skepticism of experts. *See, e.g.*, *Ruiz v. A.B. Chance Co.,* 357 F.3d 1270, 1274 (Fed. Cir. 2004); *Ecolochem, Inc. v. Southern Cal. Edison Co.*, 227 F.3d 1361, 1379 (Fed. Cir. 2000).

Based on information and belief, neither Plaintiff, nor any predecessor in interest of the Asserted Patents has developed a commercially successful product embodying the claimed subject

matter of these patents. The Asserted Patents also were not directed to long felt, unresolved needs. On the contrary, the Asserted Patents addressed problems that had been handled successfully in the prior art.

Additionally, and as outlined herein and in the Exhibits, numerous prior art references anticipate the claims of the Asserted Patents, so failure by others cannot be cited as a secondary consideration in favor of nonobviousness. Numerous prior art references, including those identified above, are directed to the same approach as the Asserted Patents regarding compression. Importantly, none of the prior art teaches away from the claimed subject matter. In fact, just the opposite is true, and as shown in these Invalidity Contentions and the accompanying claim charts, the prior art teaches the claimed subject matter. Thus, Plaintiff cannot rely upon any teaching away in the prior art.

Plaintiff has not presented any evidence to suggest that others in the industry copied or praised the alleged invention of the Asserted Patents. To the extent that others may have subsequently adopted a similar technique, Acronis asserts that they were in fact copying well-known systems that predate the Asserted Patents. At the time of the alleged invention of the Asserted Patents, experts would not have been skeptical of the general approach or idea disclosed therein. The general idea—using multiple compression techniques—had already been in widespread use for a long time and was not patentable by the time the applicants filed their patent applications. Experts would have regarded the disclosures and matter claimed in the Asserted Patents as obvious.

## VIII. INELIGIBILITY UNDER 35 U.S.C. § 101

Acronis contends that all of the asserted claims are directed to ineligible subject matter under 35 U.S.C. § 101. For example the asserted claims of the Asserted Patents are directed to at

least the abstract idea of applying a compression algorithm on the basis of some feature of the data sought to be compressed—an abstract and conventional idea performed with conventional components. Claims reciting "generalized steps to be performed on a computer using conventional computer activity" are directed to ineligible subject matter and therefore not patentable. *See Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1338 (Fed. Cir. 2016). The recitations of the claims are functional in nature and do little more than set forth the general concept of compression under certain conditions. Further, the recitation of interfaces, processors, memories, and other generic hardware do not transform this abstract idea into patentable subject matter, indeed "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice Corp. Pty. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2358 (2014). As such, the asserted claims of the Asserted Patents are invalid or not patentable for failure to claim eligible subject matter as required by 35 U.S.C. § 101.

## IX.    INVALIDITY UNDER 35 U.S.C. § 112(1/a)

Acronis hereby identifies grounds of invalidity based on lack of written description and enablement under 35 U.S.C. § 112(1/a) (requiring "a written description of the [claimed] invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same."). Defendant reserves the right to supplement or amend these contentions based on Plaintiff's representations during the course of the litigation and any claim construction rulings of the Court.

Acronis notes that Plaintiff's Preliminary Infringement Disclosures fail to identify the priority date that the Plaintiff asserts is entitled to each claim of each of the Asserted Patents. To the extent that Plaintiff later alleges that each asserted claim of the respective patent is entitled to

the filing date of that patent's earliest ancestor application as its priority date (hereinafter, "the asserted priority application"), Acronis denies that asserted entitlement. However, in view of any such position of Plaintiff, that asserted priority application is the application governing invalidity of the claims under § 112(1/a), these Invalidity Contention focuses on the lack of support in the asserted priority application for each claim.

Throughout these contentions, an assertion that an application did not "support" a claim or claim element means—unless otherwise noted—that the application did not provide as of the filing date sought:

(a) the required written description for the claim element and the claimed subject matter;

(b) the required written description for the full-scope of the claim element and the claim;

(c) the required enabling disclosure for the claim element and the claimed subject matter;

(d) the required enabling disclosure for the full-scope of the claim element and the claim;

(e) a description of the claimed "invention" understandable to a skilled artisan and showing that the applicant actually possessed such "invention";

(f) a description of the claimed "invention" that was express or necessarily present (inherent), complete, unambiguous, specific, and as broad as the claim; and/or

(g) a disclosure teaching a skilled artisan how, by following the steps set forth in the application, to make or carry out (use) the claimed "invention" without undue experimentation.

Throughout these contentions, an assertion that an application did not "support" an independent claim or language in an independent claim means—unless otherwise noted—that the application did not support that claim's asserted dependent claims either.

## A.     All '204 Patent Asserted Claims Are Invalid Under §112(1/a)

Each asserted claim of the '204 Patent is invalid for failure of the asserted priority application (filed in 2000) to support the claim. For each asserted claim of the '204 Patent, the asserted priority application failed to support the claim and individual elements of the claim, as listed below.

'204: 12:

- recognizing any characteristic, attribute, or parameter of the data;
- selecting an encoder associated with the recognized characteristic, attribute, or parameter of the data;
- compressing the data with the selected encoder utilizing at least one state machine to provide compressed data having a compression ratio of over 4:1; and
- point-to-point transmitting the compressed data to a client;
- wherein the compressing and the transmitting occur over a period of time which is less than a time to transmit the data in an uncompressed form.

'204: 13:

- comprising: decompressing the compressed data at the client; and
- wherein the compressing, the transmitting, and the decompressing occur over a period of time that is less than the time to transmit the data in uncompressed form

'204: 14:

- wherein a data packet that includes the data fields also includes multiple messages

'204: 20:

- wherein the compressing is performed on a server, and wherein the compressed data is transmitted from the server

'204: 21:

- wherein the recognizing includes analyzing the data within the data fields and excludes analyzing based on a descriptor that is indicative of the recognized characteristic, attribute, or parameter of the data within the data fields

The asserted claims of the '204 patent recite and encompass in part a desired result of being able to read "data," "data residing in data fields," "data packet" and/or "multiple messages" by "recognizing any characteristic, attribute, or parameter of the data" and "selecting an encoder

associated with the recognized characteristic, attribute, or parameter of the data." And, their full-scope lacks any bounds on that desired result and ability vis-à-vis the type or size of the "data," "data residing in data fields," "data packet" and/or "multiple messages," or how an encoder can be "associated" with "data," "data residing in data fields," "data packet" and/or "multiple messages," or the amount of compression achieved. But, the asserted priority application did not support an invention for achieving such results. The asserted priority application did not disclose any structure, material or acts that achieve such claimed results and did not even purport to disclose how to achieve such claimed results. It did not disclose how to perceive from input "data," "data residing in data fields," "data packet" and/or "multiple messages" what these claims recite is perceived.

The asserted priority application did not support any asserted claim of the '204 patent on account of the claim language "wherein the compressing and the transmitting occur over a period of time which is less than a time to transmit the data in an uncompressed form" and "the decompressing occur over a period of time that is less than the time to transmit the data in uncompressed form." For example, the asserted priority application did not describe or enable materials, acts and/or structures that support these claim-recited results or the full-scope of these claim-recited results (such as the full range of "compressing and the transmitting occur over a period of time which is less than a time to transmit the data in an uncompressed form" performance, or the full range of "data," "data residing in data fields," "data packet" and/or "multiple messages" sizes and types, or the full range of input "data," "data residing in data fields," "data packet" and/or "multiple messages" transmission rates, or the full range of compression techniques) or support ensuring these recited results for each successive "data," "data residing in data fields," "data packet" and/or "multiple messages." The asserted priority application did not disclose the amount

of time taken for transmitting and/or from start of compression to the end of compression, or disclose that such amount of time was less than the time taken to "transmit the data in uncompressed form." Nor did it disclose how long an encoding step took to complete or how much time elapsed from the completion of compression of "data," "data residing in data fields," "data packet" and/or "multiple messages" to the start of transmission and/or decompression. Nor did the asserted priority application provide any assertion that the time saved due to the compression exceeded the time lost due to the compression. Nor did it disclose the rate of compression and transmitting together. Nor did it disclose how much time it takes to transmit "data," "data residing in data fields," "data packet" and/or "multiple messages." Additionally, with respect to the "compression ratio of over 4:1," it is problematic that the length of time to compress a given set of input data may be difficult or impractical to predict. Consequently, there is no guarantee that a given encoding algorithm or set of encoding algorithms will perform for all possible combinations of input data for a specific timing constraint and/or compression ratio. Another problem is that, by altering the parameters of the encoding process, it may be difficult and/or impractical to predict the resultant compression ratio.

The asserted priority application did not support any asserted claim of the '204 patent on account of the claim language "state machine." For example, the asserted priority application did not describe or enable materials, acts and/or structures that support the recited results for "data," "data residing in data fields," "data packet" and/or "multiple messages." The asserted priority application did not disclose any structure, material or acts that achieve the claimed result of a "sate machine" utilized to "provide compressed data having a  compression ratio of over 4:1," and did not even purport to disclose how to achieve such claimed results. Nor did it disclose how to

perceive from "data," "data residing in data fields," "data packet" and/or "multiple messages" what these claims recite is "provide[d]."

The asserted priority application did not support the '204 claim language "data," "data residing in data fields," "data packet" and/or "multiple messages" as part of the claimed method. The asserted priority application does not explain the distinctions and/or similarities among these terms.

The asserted priority application did not support the '204 claim language "client" and/or "sever"" as part of the claimed method. The asserted priority application does not explain the distinctions and/or similarities among these terms.

The asserted priority application did not support the '204 claim language "descriptor" and/or "characteristic, attribute or parameter" as part of the claimed method. The asserted priority application does not explain the distinctions and/or similarities among these terms.

**B.**    **All '728 Patent Asserted Claims Are Invalid Under §112(1/a)**

Each asserted claim of the '728 Patent is invalid for failure of the asserted priority application (filed in 1998) to support the claim. For each asserted claim of the '728 Patent, the asserted priority application failed to support the claim and individual elements of the claim, as listed below.

'728: 1:

- one or more content dependent data compression encoders; and

- a single data compression encoder;

- wherein the processor is configured: to analyze data within a data block to identify one or more parameters or attributes of the data wherein the analyzing of the data within the data block to identify the one or more parameters or attributes of the data excludes analyzing based solely on a descriptor that is indicative of the one or more parameters or attributes of the data within the data block;

- to perform content dependent data compression with the one or more content dependent data compression encoders if the one or more parameters or attributes of the data are identified; and

- to perform data compression with the single data compression encoder, if the one or more parameters or attributes of the data are not identified.

'728: 2:

- wherein the data block is received in an uncompressed form, the data block being included in one or more data blocks transmitted in sequence originating from an external source

'728: 4:

- wherein the compressing, is performed in real-time

'728: 5:

- wherein the content dependent data compression with the one or more content dependent data compression encoders is performed in real-time

'728: 6:

- wherein the data compression with the single data compression encoder is performed in real-time

'728: 9:

- wherein the processor is further configured to associate a data token indicative of the content dependent data compression applied to the data block to create a compressed data block

'728: 10

- wherein the processor is further configured to associate a data token indicative of the single data compression encoder applied to the data block to create a compressed data block.")

'728: 15:

- wherein a compressed data block is stored

'728: 20:

- wherein the processor is further configured to output a compressed data block with a token representative of a compression technique used to compress the data block

'728: 24:

- one or more data compression encoders; and

- a default compression encoder;

- wherein the processor is configured: to analyze data within a data block to identify one or more parameters or attributes of the data wherein the analyzing of the data within the data block to identify the one or more parameters or attributes of the data excludes analyzing based solely on a descriptor that is indicative of the one or more parameters or attributes of the data within the data block; and

- to compress the data block to provide a compressed data block, wherein if one or more encoders are associated with the one or more parameters or attributes of the data, compressing the data block with at least one of the one or more data compression encoders, otherwise compressing the data block with the default data compression encoder.

'728: 25:

- analyzing, using a processor, data within a data block to identify one or more parameters or attributes of the data within the data block;

- determining, using the processor, whether to output the data block in a received form or in a compressed form; and

- outputting, using the processor, the data block in the received form or the compressed form based on the determination,

- wherein the outputting the data block in the compressed form comprises determining whether to compress the data block with content dependent data compression based on the one or more parameters or attributes of the data within the data block or to compress the data block with a single data compression encoder; and

- wherein the analyzing of the data within the data block to identify the one or more parameters or attributes of the data excludes analyzing based only on a descriptor that is indicative of the one or more parameters or attributes of the data within the data block

The asserted claims of the '728 patent recite and encompass in part a desired result of being

able to read a data block or a plurality of data blocks "analyz[ing] of the data within the data block

to identify the one or more parameters or attributes of the data excludes analyzing based solely on

a descriptor that is indicative of the one or more parameters or attributes of the data within the data

block" / "determining whether to compress the data block with content dependent data compression based on the one or more parameters or attributes of the data within the data block," "to perform content dependent data compression with the one or more content dependent data compression encoders if the one or more parameters or attributes of the data are identified," and "to perform data compression with the single data compression encoder, if the one or more parameters or attributes of the data are not identified" / "outputting, using the processor, the data block in the received form or the compressed form based on the determination" / "compressing the data block with at least one of the one or more data compression encoders." And, their full-scope lacks any bounds on that desired result and ability vis-à-vis the type or size of the data block, or how an encoder can be "analyze data within a data block to identify" / "analyzing, using a processor, data within a data block to identify," or the amount of compression achieved. But, the asserted priority application did not support an invention for achieving such results. The asserted priority application did not disclose any structure, material or acts that achieve such claimed results and did not even purport to disclose how to achieve such claimed results. It did not disclose how to perceive from input data what these claims recite is perceived. On the contrary, the asserted priority application criticized and disclaimed such a concept. It contended that analyzing data to perceive its characteristics and determine an associated a compression algorithm is often difficult or impractical.

The asserted priority application was limited to so-called "content-independent" embodiments that did not depend on any alleged ability to perceive the data type of, or "appropriate" algorithm for, any data block, but instead criticized such "content-dependent" techniques. It disclaimed such "content-dependent" techniques as the "prior art" it supposedly overcame.

Claims 1, 24, and 25 of the '728 patent are directed to a so-called content-dependent compression concept that is contrary to the content-independent concept proposed in the asserted priority application. Instead of perceiving each data block's data type or "identified" / "associated" / "determ[ined]" compression algorithm, as claimed, the embodiments of the asserted priority application supposedly sent each new data block to each of the enabled encoders without first analyzing the type or content of the data block.

The asserted priority application did not support claims 1, 5, 9, 24, and 25 of the '728 patent language "one or more content dependent data compression encoders" / "one or more data compression encoders" / "content dependent data compression" as part of the claimed system. On the contrary, the asserted priority application criticized this type of approach.

The asserted priority application did not support the claims 1, 24, and 25 of the '728 patent language "to perform content dependent data compression with the one or more content dependent data compression encoders if the one or more parameters or attributes of the data are identified" /"compressing the data block with at least one or more of the data compression encoders" / "outputting the data block in the compressed form comprises determining whether to compress the data block with content dependent data compression" as part of the claimed system. On the contrary, the asserted priority application criticized this type of approach.

The asserted priority application does not support claims 1, 24, and 25 of the '728 patent language "wherein the processor is configured: to analyze data within a data block to identify one or more parameters or attributes of the data wherein the analyzing of the data within the data block to identify the one or more parameters or attributes of the data excludes analyzing based solely on a descriptor that is indicative of the one or more parameters or attributes of the data within the data block" / "wherein the processor is configured: to analyze data within a data block to identify one

or more parameters or attributes of the data wherein the analyzing of the data within the data block to identify the one or more parameters or attributes of the data excludes analyzing based solely on a descriptor that is indicative of the one or more parameters or attributes of the data within the data block" / "analyzing, using a processor . . . wherein the analyzing of the data within the data block to identify the one or more parameters or attributes of the data excludes analyzing based only on a descriptor that is indicative of the one or more parameters or attributes of the data within the data block" as part of the claimed system. On the contrary, the asserted priority application criticized this type of approach.

The asserted priority application did not support any asserted claim of the '728 patent on account of the claim language "in real-time." For example, the asserted priority application did not describe or enable materials, acts and/or structures that support these claim-recited results or the full-scope of these claim-recited results (such as the full range of "the content dependent data compression" or "the single data compression encoder" performance, or the full range of "data" / "data block" sizes and types, or the full range of input "data" / "data block[s]," or the "data" / "data block" transmission rates, or the full range of compression techniques) or support ensuring these recited results for each successive "data" / "data blocks." The asserted priority application did not disclose the amount of time taken for transmitting and/or from start of compression to the end of compression, or disclose what amount of time would be real-time. Nor did it otherwise disclose how long a compression step took to complete or how much time elapsed during real-time compression of "data" / a "data block." Nor did the asserted priority application provide any assertion that the time saved due to the compression exceeded the time lost due to the compression. Nor did it disclose the rate of compression and transmitting together. Nor did it disclose how much time it takes to transmit "data" / a "data block."

The asserted priority application did not support the '728 claim language "descriptor" and/or "parameters or attributes" as part of the claimed method. The asserted priority application does not explain the distinctions and/or similarities among these terms.

The asserted priority application did not support the '728 claim language "data" / "a data block" as part of the claimed method. The asserted priority application does not explain the distinctions and/or similarities among these terms. All of the asserted claims of the '728 patent are not adequately described because of their use of the term "data block." The specification describes data block as "any quantity of data from a single bit through a multiplicity of files or packets and may vary from block to block," yet describe compressing data blocks. A person of ordinary skill would understand that a single bit cannot be subject to compression, so the claims are invalid for claiming the compression of a single bit without enabling such a feat.

C.    **All of the '530 and '908 Patents Asserted Claims Are Invalid Under §112(1/a)**

Each asserted claim of the '530 Patent and '908 Patent is invalid for failure of the asserted priority application (filed in 1999) to support the claim. For each asserted claim of the '530 Patent and '908 Patent, the asserted priority application failed to support the claim and individual elements of the claim, as listed below.

'530: 1:

- said data block in received form

- said data accelerator is coupled to said memory device

- said data stream includes a first data block and a second data block, said data stream is compressed by said data accelerator to provide a compressed data stream by compressing said first data block with a first compression technique and said second data block with a second compression technique

- said compression and storage occurs faster than said data stream is able to be stored on said memory device in said received form,

51

- a first data descriptor is stored on said memory device indicative of said first compression technique,

- said first descriptor is utilized to decompress the portion of said compressed data stream associated with said first data block.

'530: 2:

- said data accelerator stores said first descriptor to said memory device.

'530: 3:

- said data accelerator retrieves said first descriptor and said compressed data stream from said memory device.

'530: 4:

- said data accelerator retrieves said compressed data stream from said memory device.

'530: 18:

- said first compression technique comprises compressing with a first encoder.

'530: 19:

- said data stream comprises a collection of multiple files.

'908: 1:

- a data accelerator configured to compress,

- a first data block with a first compression technique to provide a first compressed data block,

- a second data block with a second compression technique, different from the first compression technique, to provide a second compressed data block,

- wherein the compressed first and second data blocks are stored on the memory device,

- the compression and storage occurs faster than the first and second data blocks are able to be stored on the memory device in uncompressed form.

'908: 2:

- wherein the data accelerator stores a first data descriptor on the memory device indicative of the first compression technique such that the first descriptor is capable of being utilized to decompress at least a portion of the first data block.

'908: 4:

- wherein the data accelerator retrieves the first descriptor and the first compressed data block from the memory device.

'908: 6:

- wherein the data accelerator retrieves the first compressed data block from the memory device and decompresses the first compressed data block.

'908: 21:

- compressing a first data block with a first data compression technique to provide a first compressed data block,

- compressing a second data block with a second data compression technique to provide a second compressed data block,

- wherein the first data compression technique and the second data compression technique are different;

- storing the first and second data compressed blocks on a memory device wherein the compression and storage occurs faster than the first and second data blocks are able to be stored on the memory device in uncompressed form

'908: 22:

- storing, on the memory device, a first data descriptor indicative of the first compression technique such that the first descriptor is capable of being utilized to decompress the first compressed data block

'908: 25

- receiving a first and a second data block over a communications channel,

- compressing the first data block with a first data compression technique to provide a first compressed data block,

- compressing the second data block with a second data compression technique to provide a second compressed data block, wherein the first data compression technique and the second data compression technique are different,

- storing the first and second data compressed blocks on a memory device wherein the compression and storage occurs faster than the first and second data blocks are able to be stored on the memory device in uncompressed form.

The asserted priority application did not support any asserted claim of the '530 and '908 Patents on account of the claim language "data accelerator," "occurs faster," "said compression and storage occurs faster than said data stream is able to be stored on said memory device in said received form," and "compression and storage occurs faster than the first and second data blocks are able to be stored on the memory device in uncompressed form." For example, the asserted priority application did not describe or enable materials, acts and/or structures that support these claim-recited results or the full-scope of these claim-recited results (such as the full range of "faster" performance, or the full range of data block sizes and types, or the full range of input data transmission rates, or the full range of compression techniques, or the full range of data storage devices and access rates) or support ensuring these recited results for each successive pair of data blocks in the data stream and/or for the entire data stream. The asserted priority application did not disclose the amount of time taken from start of compression to the end of storage or disclose that such amount of time was less than the time taken to stored uncompressed data. Nor did it disclose how long an encoding step took to complete or how much time elapsed from the completion of compression of a data block to the start of storage of that compressed data block. Nor did the asserted priority application provide any assertion that the time saved due to the compression exceeded the time lost due to the compression. Nor did it disclose the rate of compression and storage together. Nor did it disclose how much time it takes to transmit data from the accelerator to the data storage device.

The asserted priority application did not support the claimed subject matter or claimed results for the full scope of data block sizes encompassed by each asserted claim. For example, the full scope of each claim encompasses a data block which is only a single bit or only two bits. The

claims encompass positive compression (reducing the size) of such a data block but the asserted priority application did not support such a result.

All of the asserted claims of the '530 Patent and '908 Patent are not adequately described because of their use of the term "data" / "data block." The specification describes that data blocks "may range in size from individual bits through complete files or collections of multiple files, and the data block size may be fixed or variable," yet describe compressing data blocks. A person of ordinary skill would understand that an individual bit cannot be subject to compression, so the claims are invalid for claiming the compression of an individual bit without enabling such a feat.

All of the asserted claims of the '530 and '908 Patents are further not adequately described because of their use of the terms "first compression technique," "second compression technique," and "said first and second compression techniques are different" that is not recited in the specification of the asserted priority application(s).

## X.     INVALIDITY UNDER 35 U.S.C. § 112(2/b)

Acronis hereby further identifies grounds of invalidity "based on indefiniteness" under 35 U.S.C. § 112(2/b) (requiring "claims particularly pointing out and distinctly claiming the …invention"). Defendant reserves the right to supplement or amend these contentions based on Plaintiff's representations during the course of the litigation and any claim construction rulings of the Court. The Patent Rules do not require these contentions to include, and Defendant does not include, contentions regarding invalidity under the additional "regards as the invention" requirement of § 112(2/b).

Throughout these contentions, an assertion that a claim or claim language is unclear and imprecise means—unless otherwise noted—that the claim, each claim containing that claim language, and each dependent claim therefrom, read by a skilled artisan at the time of the patent

application, in light of the application and its Patent Office prosecution history leading to issuance of the patent:

(a) failed the statute's particular and distinct claiming mandate;

(b) failed to inform, with reasonable certainty, those skilled in the art at the time of the patent application of the scope of the claimed invention; and

(c) failed to clearly distinguish what is claimed from what went before in the art and clearly circumscribe what is foreclosed from future enterprise.

An assertion that a claim or claim language was unclear and imprecise does not necessarily mean that the claim or claim language is not now amenable to construction by the Court.

### A.   All '204 Patent Asserted Claims Are Invalid Under § 112(2/b)

Each asserted claim of the '204 patent was unclear and imprecise on account of its language reciting desired results not structures, materials or acts for achieving those results, including each "recognizing," "selecting," and "transmitting" step or "associated" and "transmit" function recited in these claims. These claims do not recite how to perform these "recognizing," "selecting," and "transmitting" steps or "associated" and "transmit" functions, or how they achieve the claim-recited result of "recognizing" characteristic, attribute, or parameter, or recognizing when an "associated" "encoder" is "selected." Further, these claims were unclear and imprecise on whether this claim language did or did not trigger the provisional safe-harbor and claim-construction provision of § 112(6/f). Plaintiff has not contended that any language in these claims triggers the provisional safe harbor of 35 U.S.C. § 112(6/f). To the extent that any language in these claims does trigger § 112(6/f), the patent's specification fails to satisfy the requirements of that provision and thus the claims remain invalid under § 112(2/b).

Each asserted claim of the '204 patent was unclear and imprecise on account of its language "compressing," "compressed," "compression," "selected encoder," and "uncompressed." For

example, this language and the claim were unclear and imprecise on whether it requires that the size of the data block be smaller in its "compressed" form and larger in its "uncompressed" form. They were unclear and imprecise on whether "compress" and its variants in these claims encompass what the patents refer to as "negative compression" or "data expansion."

Each asserted claim of the '204 patent was unclear and imprecise on account of the claim language "wherein the compressing and the transmitting occur over a period of time which is less than a time to transmit the data in an uncompressed form," and claim 13 of the '204 patent is unclear and imprecise on account of the claim language "the decompressing occur over a period of time that is less than the time to transmit the data in uncompressed form." For example, this claim language was unclear and imprecise on what supposedly occurs in less time than what, and how (e.g., what materials, acts and structures) these claimed results are achieved. For example, the asserted claims were unclear and imprecise on whether this claim language accounts for the total time period taken by compression, decompression, transmission, transfer to and/or from any buffering necessary as part of transmitting, whether buffers are allowed for in the transmitting, the medium of transmitting, or instead ignores the time taken to transfer data from any compression mechanism to any mechanism involved in transmitting.

Claim 12 of the '204 patent was unclear and imprecise on account of its language "selecting an encoder associated with the recognized characteristic, attribute, or parameter of the data." The '204 fails to explain to a person skilled in the art at the time the patent was filed, cognizant of the competing concerns regarding content independent and content dependent encoders, how an encoder is selected and/or how an encoder is associated "with the recognized characteristic, attribute, or parameter of the data." Additionally, the '204 patent was unclear and imprecise on

account of this language because the '204 patent claims and specification fail to inform a person of ordinary skill how to distinguish between a singular and multiple encoders.

Claim 12 of the '204 patent was further unclear and imprecise on account of its language "state machine." The '204 fails to explain how a person of ordinary skill could distinguish between "a method for processing data . . . utilizing at least one state machine" versus any other device capable of compression nor how data may be transmitted to and from this "state machine."

Claims 12 and 16 of the '204 patent are unclear and imprecise on account of its language referencing a "client," wherein "point-to-point transmitting [of] the compressed data [is] to a client" and "decompressing the compressed data [is] at the client." The '204 fails to explain how a person of ordinary skill could distinguish between a "client" and any other device capable of decompressing and/or receiving a point-to-point transmission, nor how data may be transmitted to and from this client.

Claim 14 of the '204 patent was unclear and imprecise on account of its language "wherein a data packet that includes the data fields also includes multiple messages." The specification fails to sufficiently describe the relationship between data packets and messages and how to distinguish between the two.

Claim 20 of the '204 patent was unclear and imprecise on account of its language "wherein the compressing is performed on a server, and wherein the compressed data is transmitted from the server." The '204 fails to explain how a person of ordinary skill could distinguish between a "server" and any other device capable of compression nor how data may be transmitted to and from this server.

Claim 21 of the '204 patent was unclear and imprecise on account of its language "wherein the recognizing includes analyzing the data within the data fields and excludes analyzing based on

a descriptor that is indicative of the recognized characteristic, attribute, or parameter of the data within the data fields." The '204 patent claims and specification fail to inform a person of ordinary skill how to distinguish between a claimed "analyzing the data within the data field" and the unclaimed "analyzing based on a descriptor." The specification also fails to explain how a descriptor is "indicative" of compression or no compression. The '204 patent also fails to inform a person of ordinary skill how to distinguish between "recognizing," "analyzing the data within the data fields" and analyzing that "excludes analyzing based on a descriptor that is indicative of the recognized characteristic, attribute, or parameter of the data within the data fields."

### B.   All '728 Patent Asserted Claims Are Invalid Under § 112(2/b)

Each asserted claim of the '728 patent was unclear and imprecise on account of its language reciting desired results not structures, materials or acts for achieving those results, including each "analyzing" step and "analyze" function recited in these claims. These claims do not recite how to perform this "analyzing" step or "analyze" function, or how they achieve the claim-recited result of identifying parameters or attributes, or identifies when an encoder is to be applied. Further, these claims were unclear and imprecise on whether this claim language did or did not trigger the provisional safe-harbor and claim-construction provision of § 112(6/f). Plaintiff has not contended that any language in these claims triggers the provisional safe harbor of 35 U.S.C. § 112(6/f). To the extent that any language in these claims does trigger § 112(6/f), the patent's specification fails to satisfy the requirements of that provision and thus the claims remain invalid under § 112(2/b).

Each asserted claim of the '728 patent was unclear and imprecise on account of its language "compressing," "compressed," "compression"; and "compression encoder(s)." For example, this language and the claim were unclear and imprecise on whether it requires that the size of the data block be smaller in its "compressed" form and larger in its "uncompressed" form. They were

unclear and imprecise on whether "compress" and its variants in these claims encompass what the patents refer to as "negative compression" or "data expansion."

Claims 1, 24, and 25 of the '728 were unclear and imprecise on account of its language "wherein if one or more encoders are associated with the one or more parameters or attributes of the data" / "wherein the outputting the data block in the compressed form comprises determining whether to compress the data block with content dependent data compression based on the one or more parameters or attributes of the data within the data block," / "recognizing any characteristic, attribute, or parameter of the data; selecting an encoder associated with the recognized characteristic, attribute, or parameter of the data." The '728 fails to explain to a person skilled in the art at the time the patent was filed, cognizant of the competing concerns regarding content independent and content dependent encoders and/or compression , how "encoders are associated" / the processor determines / how an encoder is associated in regards to "one or more parameters or attributes of the data." Additionally, the '728 patent was unclear and imprecise on account of this language because the '728 patent claims and specification fail to inform a person of ordinary skill how to distinguish between a singular and multiple encoders and/or compressions.

Claims 1, 24 and 25 of the '728 patent were unclear and imprecise on account of its language "excludes analyzing based solely on a descriptor that is indicative of the one or more parameters or attributes of the data within the data block" / "analyzing of the data within the data block to identify the one or more parameters or attributes of the data excludes analyzing based only on a descriptor that is indicative of the one or more parameters or attributes of the data within the data block." For example, this language and the claim were unclear and imprecise on how, if at all, it relates to analyzing based only on "file descriptors" and/or "file format data descriptions" referenced in the patent, or to the following type of analysis referenced in the patent: "A content

dependent data recognition module 1300 analyzes the incoming data stream to recognize data types, data structures, data block formats, file substructures, file types, and/or any other parameters that may be indicative of either the data type/content of a given data block or the appropriate data compression algorithm or algorithms (in serial or in parallel) to be applied."

Claims 1, 24, and 25 of the '728 patent were unclear and imprecise on account of its language "wherein the processor is configured: to analyze data within a data block to identify one or more parameters or attributes of the data wherein the analyzing of the data within the data block to identify the one or more parameters or attributes of the data excludes analyzing based solely on a descriptor that is indicative of the one or more parameters or attributes of the data within the data block" / "wherein the analyzing of the data within the data block to identify the one or more parameters or attributes of the data excludes analyzing based solely on a descriptor that is indicative of the one or more parameters or attributes of the data within the data block." The '728 patent claims and specification fail to inform a person of ordinary skill how to distinguish between a claimed "analyze data within a data block to identify one or more parameters or attributes of the data" and respectively unclaimed "analyzing based solely on a descriptor that is indicative of the one or more parameters or attributes of the data within the data block."

Claims 1 24, and 25 of the '728 patent were unclear and imprecise on account of its language "wherein the processor is configured: to analyze data within a data block to identify one or more parameters or attributes of the data wherein the analyzing of the data within the data block to identify the one or more parameters or attributes of the data excludes analyzing based solely on a descriptor that is indicative of the one or more parameters or attributes of the data within the data block" / "wherein the analyzing of the data within the data block to identify the one or more parameters or attributes of the data excludes analyzing based solely on a descriptor that is

61

indicative of the one or more parameters or attributes of the data within the data block." The term "descriptor" as used in claims 1, 24, and 25 of the '728 patent is inconsistent with its use in claims 1 and 30 of the '707 patent, where it is used as "indicative of how said compressed data block was compressed." Because descriptor has inconsistent meanings within the patent family, it failed to inform, with reasonable certainty, those skilled in the art at the time of the patent application of the scope of the claimed invention.

All of the asserted claims of the '728 patent were unclear and imprecise on account of their use of the term "data block." The specification describes data block as "any quantity of data from a single bit through a multiplicity of files or packets and may vary from block to block," yet describe compressing data blocks. A person of ordinary skill would understand that a single bit cannot be subject to compression, so the claims are vague because they suggest an impossible claim scope.

Claim 20 of the '728 patent was unclear and imprecise as to the meaning of "compression techniques." The specification is unclear if compression techniques is limited to compression algorithms, or encompasses other techniques, such as using multiple algorithms. If "compression techniques" does mean compression algorithms, then it is limited to those disclosed by the specification, run length, Huffman, Lempel-Ziv Dictionary Compression, arithmetic coding, data compaction, data null suppression, MPEG4, various voice codecs, MPEG3, AC3, and AAC.

Claims 1, 9, 10, 24, and 25 of the '728 patent were unclear and imprecise as to the meaning of "descriptor that is indicative of the one or more parameters or attributes of the data within the data block" / "wherein the processor is further configured to associate a data token indicative of the content dependent data compression applied to the data block to create a compressed data block" / "wherein the processor is further configured to associate a data token indicative of the

single data compression encoder applied to the data block to create a compressed data block." The specification fails to explain how a descriptor is "indicative" of compression or no compression.

Claim 24 of the '728 patent was unclear and imprecise on account of its language "default compression encoder." The claim fails to define what characteristics lead to an encoder being classified as "default." The specification appears to offer the suggestion that a default encoder is a "content independent lossless compression" algorithm, but otherwise fails to describe what the characteristics of a default encoder are.

Claims 1, 6, 10, and 25 of the '728 patent were unclear and imprecise on account of its language "a single data compression encoder." The claim fails to define what characteristics lead to an encoder being classified as "single." The specification appears to offer the suggestion that "a single data compression encoder" is a "content independent lossless compression" algorithm, but otherwise fails to describe what the characteristics of "a single data compression encoder" are.

Claims 4, 5, and 6 of the '728 patent were unclear and imprecise on account of their language "performed in real-time." The specification fails to describe a sufficient threshold for "real-time," describing a timing feature "so as to ensure that the real-time, pseudo real-time, or other time critical nature of the data compression." But the patent fails to provide any distinguishing feature between a "real-time," "pseudo real-time," or other timing constraint.

Claim 25 of the '728 patent was unclear and imprecise on account of its language "determining, using the processor, whether to output the data block in a received form or in a compressed form." The claim fails to describe how to make this determination or what sorts of criteria to use. This claim does not recite how to achieve this recited encoding or recited combining. And, Plaintiff has not contended that any language in these claims trigger the provisional safe harbor of 35 U.S.C. § 112(6/f). To the extent that any language in these claims does trigger §

112(6/f), the patent's specification fails to satisfy the requirements of that provision and thus the claims remain invalid under § 112(2/b).

### C.   All '530 Asserted Claims are Invalid Under §112(2/b)

Each asserted claim of the '530 patent was unclear and imprecise on account of its language "compressing," "compressed," "compression," "compression techniques," and "compression encoder(s)." For example, this language and the claim were unclear and imprecise on whether it requires that the size of the data block be smaller in its "compressed" form and larger in its "uncompressed" form. They were unclear and imprecise on whether "compress" and its variants in these claims encompass what the patents refer to as "negative compression" or "data expansion."

All of the asserted claims of the '530 patent were unclear and imprecise on account of their use of the term "data block." The specification describes data block "to include any "range in size from individual bits through complete files or collections of multiple files, and the data block size may be fixed or variable." A person of ordinary skill would understand that a single bit cannot be subject to compression, so the claims are vague because they suggest an impossible claim scope.

All of the asserted claims of the '530 patent were unclear and imprecise as to the meaning of "compression techniques." The specification is unclear if compression techniques is limited to compression algorithms, or encompasses other techniques, such as using multiple algorithms. If "compression techniques" does mean compression algorithms, then it is limited to those disclosed by the specification, run length, Huffman, Lempel-Ziv Dictionary Compression, arithmetic coding, data compaction, data null suppression, MPEG4, various voice codecs, MPEG3, AC3, and AAC.

### D.   All '908 Asserted Claims are Invalid Under §112(2/b)

Each asserted claim of the '908 patent was unclear and imprecise on account of its language "compressing," "compressed," "compression," "compression techniques," and "compression

encoder(s)." For example, this language and the claim were unclear and imprecise on whether it requires that the size of the data block be smaller in its "compressed" form and larger in its "uncompressed" form. They were unclear and imprecise on whether "compress" and its variants in these claims encompass what the patents refer to as "negative compression" or "data expansion."

All of the asserted claims of the '908 patent were unclear and imprecise on account of their use of the term "data block." The specification describes data block "to include any "range in size from individual bits through complete files or collections of multiple files, and the data block size may be fixed or variable." A person of ordinary skill would understand that a single bit cannot be subject to compression, so the claims are vague because they suggest an impossible claim scope.

All of the asserted claims of the '908 patent were unclear and imprecise as to the meaning of "compression techniques." The specification is unclear if compression techniques is limited to compression algorithms, or encompasses other techniques, such as using multiple algorithms. If "compression techniques" does mean compression algorithms, then it is limited to those disclosed by the specification, run length, Huffman, Lempel-Ziv Dictionary Compression, arithmetic coding, data compaction, data null suppression, MPEG4, various voice codecs, MPEG3, AC3, and AAC.

## XI.   ACCOMPANYING DOCUMENT PRODUCTION

Pursuant to the Amended Scheduling order, Acronis is concurrently producing copies of the identified prior art at AI_00000001 – AI_00007682. Defendant's investigation is ongoing. If and when any additional documents required to be disclosed are discovered, Defendant will timely produce them.

Dated: December 4, 2017                    Respectfully submitted,


                                           */s/ Jasjit S. Vidwan*

                                           Janine A. Carlan (*Pro Hac Vice*)
                                           Jasjit S. Vidwan (*Pro Hac Vice*)
                                           **ARENT FOX LLP**
                                           1717 K Street, NW
                                           Washington, DC 20006-5344
                                           (202) 857-6000
                                           janine.carlan@arentfox.com
                                           jasjit.vidwan@arentfox.com

                                           Allen N. David, BBO #115000
                                           Elizabeth A. Houlding, BBO #645981
                                           Peabody & Arnold LLP
                                           Federal Reserve Plaza
                                           600 Atlantic Avenue
                                           Boston, MA 02210
                                           (617) 951-2100
                                           adavid@peabodyarnold.com
                                           ehoulding@peabodyarnold.com


                                           *Attorneys for the Defendant Acronis*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on December 4, 2017, by causing a copy thereof, to be sent electronically, through the ECF system to the registered participants in this case, as identified on the Notice of Electronic Filing (NEF).


*/s/ Jasjit S. Vidwan*