**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| REALTIME LLC d/b/a IXO., <br><br> Plaintiff, <br><br> v. <br><br> ACRONIS, INC., <br><br> Defendant. | C.A. No. 1:17-CV-11279-IT <br><br> (LEAD CASE) |
| v. <br><br> CARBONITE, INC., <br><br> Defendant. | C.A. NO. 1:17-CV-12499-IT <br><br> (CONSOLIDATED) |

**DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF**

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................1

II.    BACKGROUND ...................................................................................................2

    A.    Data Compression vs. Deduplication......................................................2

    B.    Prior Constructions from Other Litigations ............................................4

III.    LEGAL FRAMEWORK .......................................................................................5

IV.    ANALYSIS OF DISPUTED CLAIM TERMS .....................................................6

    A.    "Compressed [data] / [data block] / [data stream] / [form]"....................6

        1.    Realtime's proposed construction improperly expands the scope of "compressed data" in an attempt to capture deduplication. ........................7

        2.    Plaintiff's construction is not supported by the intrinsic record. ................8

        3.    Both the intrinsic and extrinsic evidence support Defendants' construction....................................................................................9

            a.    *"data encoded to reduce its size"* .................................................10

            b.    *"where the encoded data can be decoded to expanded form"*....................................................................................12

        4.    Realtime's prior constructions—either stipulated to or adopted by courts from other districts against other defendants—are not controlling here. ..........................................................................13

    B.    "Compressing / Compression"..............................................................14

    C.    "Descriptor / token" ..............................................................................14

        1.    The *Morgan Stanley* appeal to the Federal Circuit is on a related patent to the Asserted Patent in this case. ...................................................16

        2.    The Asserted Patents use the term "descriptor" and "token" interchangeably and thus should be given the same meaning. .................17

        3.    The same evidence that the Federal Circuit cited in *Morgan Stanley* is equally applicable here. ......................................................18

    D.    "Data stream"........................................................................................19

    E.    "Excludes analyzing based solely on a descriptor" ...............................20

1.      Analyses of the "data within the data block" and "file type descriptor" is mutually inclusive. .............................................................21

2.      Realtime's inclusion of "based solely on" was purposeful.......................22

V.    DISPUTED CLAIM TERMS INVOKING MEANS-PLUS-FUNCTION CONSTRUCTION PURSUANT TO 35 U.S.C. § 112, ¶ 6................................................23

    A.    "Data Accelerator" and "Processor"........................................................24

        1.      The terms invoke means-plus-function construction................................24

        2.      The corresponding structure for computer-implemented functions is the algorithm disclosed in the specification ...........................................28

VI.    CONCLUSION.............................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aircraft Tech. Publishers v. Avantext, Inc.*,
  No. C 07-4154, 2009 WL 3817944 (N.D. Cal. Nov. 10, 2009)...........................................2, 13

*Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech.*,
  521 F.3d 1328 (Fed. Cir. 2008).....................................................................................28

*Camreta v. Greene*,
  563 U.S. 692 (2011)..................................................................................................2, 13

*Finisar Corp. v. DirecTV Group, Inc.*,
  523 F.3d 1323 (Fed. Cir. 2008).....................................................................................28

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
  381 F.3d 1111 (Fed. Cir. 2004).......................................................................................5

*In re Katz Interactive Call Processing Patent Litig.*,
  639 F.3d 1303 (Fed. Cir. 2011).....................................................................................27

*Markman v. Westview Instruments, Inc.*,
  517 U.S. 370 (1996).......................................................................................................5

*Merck & Co. v. Teva Pharm. USA, Inc.*,
  395 F.3d 1364 (Fed. Cir. 2005).....................................................................................21

*Microsoft Corp. v. Multi-Tech Sys., Inc.*,
  357 F.3d 1340 (Fed. Cir. 2004).....................................................................................20

*Nestle USA, Inc. v. Steuben Foods, Inc.*,
  884 F.3d 1350 (Fed. Cir. 2018)................................................................................15, 25

*Pfaff v. Wells Elec., Inc.*,
  5 F.3d 514 (Fed. Cir. 1993) ..........................................................................................15

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc)........................................................................5

*Phonometrics, Inc. v. Choice Hotels Int'l, Inc.*,
  21 Fed. Appx. 910 (Fed. Cir. 2001)...............................................................................15

*Realtime Data, LLC v. Morgan Stanley*,
  554 F. App'x 923 (Fed. Cir. 2014) ......................................................................... *passim*

*Vasudevan Software, Inc. v. MicroStrategy, Inc.*
    782 F.3d 671 (Fed. Cir. 2015)..............................................................................2, 13

*Wang Labs., Inc. v. Oki Elec. Indus. Co., Ltd.*,
    15 F. Supp. 2d 166 (D. Mass. 1998) ............................................................................15

*Williamson v. Citrix Online, LLC,*
    792 F.3d 1339 (Fed. Cir. 2015) (*en banc*) ..............................................23, 24, 27

*WMS Gaming Inc. v. Int'l Game Tech.*,
    184 F.3d 1339 (Fed. Cir. 1999)..................................................................................26, 28

**Statutes**

35 U.S.C. § 112...................................................................................................... *passim*

42 U.S.C. § 1983..........................................................................................................13

## I.       INTRODUCTION

This case is about data compression - a technique that has been well-known and practiced since the 1970s. By Plaintiff's own admission, there is no new or specialized algorithm, software, or hardware for compressing data disclosed in *any* of the Asserted Patents. To date, Realtime's litigation campaign has been propped up by using a strained claim construction to distort the meaning and scope of a well-understood concept of data compression to encompass innovative technologies that were never contemplated by the Asserted Patents.[1]

To this end, the parties dispute the meaning of seven terms (the "Disputed Terms"), including two terms - compressed and compress[ion]/[ing] - that are case dispositive.  Some of these Disputed Terms have been raised in prior cases that Realtime brought against other defendants. In many of these cases, the parties have either agreed on how to construe certain terms, or the courts have construed them.[2] The end result is a mixed bag for Realtime - some results were favorable and others adverse. Realtime, however, would have this Court focus on favorable constructions while ignoring all the adverse ones - even those that have been affirmed by the Federal Circuit on related patents. *See e.g.*, *Realtime Data, LLC v. Morgan Stanley*, 554 F. App'x 923 (Fed. Cir. 2014) (affirming the construction of two terms at issue here, discussed *infra*). This is improper.

While Defendants acknowledge that some of the Disputed Terms were litigated in prior cases Realtime brought against *other* defendants, this Court should undertake its own analysis of the arguments of the parties instantly before it. First, "the fact that a claim construction was agreed

---

[1]  U.S. Patent Nos. 7,415,530 ("the '530 patent"), 9,116,908 ("the '908 patent), 9,054,728 ("the '728 patent"), and 8,717,204 ("the '204 patent") (collectively "Asserted Patents"). Proceedings on '204 patent specific issues are stayed. D.I. 79.

[2] This Court, however, has not previously construed any of the Disputed Terms.

to in the context of a different litigation is of little relevance or probative value . . . ." *Vasudevan Software, Inc. v. MicroStrategy, Inc.* 782 F.3d 671, 678 (Fed. Cir. 2015). Second, this Court is not bound to follow other district courts' claim construction decisions. *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case.") (internal citation omitted); *see also Aircraft Tech. Publishers v. Avantext, Inc.,* No. C 07-4154, 2009 WL 3817944, at *3 (N.D. Cal. Nov. 10, 2009) ("[O]ne district court is not bound to automatically accept the claim construction of another district court. Rather, this Court has an independent obligation to construe the claims in dispute, and to render its own independent claim construction.") (citation omitted).

Accordingly, for the reasons set forth herein, including the accompanying Declaration of Dr. Charles G. Boncelet Jr. ("Boncelet Decl."), Acronis and Carbonite respectfully request that the Court adopt Defendants' proposed claim constructions.

## II.     BACKGROUND

### A.     Data Compression vs. Deduplication[3]

The Asserted Patents relate to systems and methods for utilizing known data compression and decompression techniques. As noted above, there is no new or specialized algorithm, software, or hardware for compressing data disclosed in any of the Asserted Patents.[4] Instead, the Asserted Patents expressly state that the alleged invention is using more than one compression (or

---

[3] To be clear, Defendants are not asking the Court to resolve, at this stage of the case, whether deduplication is a type of data compression. Rather, this section is intended to provide context as to why proper construction of the "compression" terms is important and how the Court's construction may impact the overall case.

[4] *See, e.g.*, Ex. A at 11:5-10; Ex. C at 7:13-17; Ex. D at 11:31-36; Ex. B at 15:12-19.

"encoding") technique "currently well known within the art" in a single system. *See, e.g.*, Ex. C at 7:11-22.

Data compression has been used in computer technology since at least the 1970s to modify, encode, or convert the binary bit structure of data in such a way that it consumes less space for transmission and storage. *See* Ex. E; Ex. F at 4; *see also* Boncelet Decl., ¶18. A fundamental property of compression is the ability to reduce the size of the data and reconstruct the encoded data back to its original or expanded form. Ex. G at 405 ("Data compression . . . is the process of transforming a body of data into *a smaller form from which the original or some approximation of the original can be recovered at a later time*.")[5]; *see also* Boncelet Decl., ¶18. As such, compression has long been known to save storage capacity, speed up file transfer, and decrease storage hardware and network bandwidth costs. Ex. E at 2-3.

Here, Defendants' accused data backup/recovery products do not practice the multiple compression schemes required by the Asserted Patents. Unlike the Asserted Patents, Defendants' products use data deduplication, which does not compress data, but instead creates efficiencies by choosing not to transmit or store redundant data at all. Deduplication is never mentioned in any of the Asserted Patents. Realtime wrongly resorts to asserting that deduplication is a "compression technique" because "[p]erforming deduplication results in representation of data with fewer bits." *See* Amended Complaint against Acronis, D.I. 31 (lead), ¶¶14, 32; Complaint against Carbonite (1:17-cv-12499), D.I. 1 (consolidated), ¶¶17, 31.

Deduplication, however, is not a type of compression contemplated by the Asserted Patents, and is never mentioned in any of the Asserted Patents.  Data compression techniques modify the bit structure of data.  Deduplication does not modify data.  It refers to a technique for

---

[5] All emphasis in this briefing and the Boncelet Decl. has been added unless otherwise noted.

eliminating redundant data in a data set. In the Defendants' products, that means redundant data is excluded from data to be stored or transmitted. In the process of deduplication, extra copies of the same data are deleted, leaving only a single copy of the data to be stored. When data is deduplicated, a single instance of the original information is retained while the duplicate instances are replaced with pointers to this single copy. Thus, the duplicate data itself is never modified - instead it is not stored or transmitted at all.

A Zip file, for example, is a common way of performing data compression. *See* Boncelet Decl., ¶21. A user selects files to be compressed into a Zip file, the Zip program compresses (encodes) those files so as to collectively reduce their size in the Zip file, and the files can then be restored/decompressed (decoded) to their original form and size. Zip files do not de-duplicate - if the file contains duplicates, both duplicates are compressed, and the extra copy is not deleted.

### B.      Prior Constructions from Other Litigations

Realtime has brought over 100 patent infringement lawsuits. As such, a number of the Disputed Terms were raised in prior cases and have now been construed several times with inconsistent results. In some cases, for example, the parties reached an agreed-upon construction for certain terms.   In other cases, the terms were disputed and the court entered its own construction.[6]

As discussed below, Realtime selectively chooses constructions it negotiated with other defendants that Realtime believes are favorable to its positions in this case, while at the same time ignoring unfavorable prior constructions, including those that have been affirmed by the Federal Circuit. *See, e.g., Realtime Data, LLC v. Morgan Stanley*, 554 F. App'x 923 (Fed. Cir. 2014).

For example, two of the disputed terms in this case are (i) descriptor / token and (ii) data

---

[6] This Court, however, has not previously construed any of the disputed terms.

4

stream. *See Infra*. In the *Morgan Stanley* case, the Federal Circuit reviewed the district court's constructions for the parent patent of the asserted '728 patent.[7] There, the Federal Circuit affirmed that "descriptor" should be construed as "recognizable data that is appended to the encoded data for specifying [an encoder]." *See* 554 F. App'x at 930. Defendants have proposed a nearly identical construction for this term. Further, in the same case, the Federal Circuit construed "data stream" as "one or more blocks transmitted in sequence from an external source whose characteristics are not controlled by the data encoder or decoder." *Id.* Again, this is the same construction Defendants propose here. Realtime, however, invites legal error by asking this Court to disregard the Federal Circuit's constructions and instead focus on a handful of favorable ***non-binding*** constructions that Realtime obtained in district court rulings or Realtime's negotiations with parties in other cases.

## III.   LEGAL FRAMEWORK

Claim construction is a question of law. *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 372 (1996). The words of a claim "are generally given their ordinary and customary meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc) (citation omitted). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of . . . the effective filing date of the patent application." *Id.* at 1313.

In construing claim terms, courts look to "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* at 1314 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,* 381 F.3d 1111, 1116 (Fed. Cir.

---

[7] U.S. Patent No. 7,714,747 (the "Parent '747 patent"). The parent '747 patent and the asserted '728 patent share an identical specification.

2004)).

## IV.    ANALYSIS OF DISPUTED CLAIM TERMS[8]

Defendants' proposed constructions are supported by the intrinsic and extrinsic evidence, and reflect what a person of ordinary skill in the art would have understood as the meaning of the claim terms in the context of the Asserted Patents at the time of the invention.  Realtime's proposed constructions, on the other hand, are litigation-driven and ignore the evidence in an effort to manufacture infringement positions.  Accordingly, for the reasons set forth in detail below, Defendants' proposed constructions should be adopted.

### A.    "Compressed [data] / [data block] / [data stream] / [form]"

| Term | Plaintiff's Proposed Construction | Defendants Proposed Construction |
|---|---|---|
| "compressed [data] / [data block] / [data stream] / [form]"[9] | data that is represented with fewer bits<br><br>Alternatively: data that is reduced in size | data encoded to reduce its size, where the encoded data can be decoded to expanded form |

This is a case-dispositive claim term. At issue is whether data that is "compressed" must include at least a portion of the original content such that the *compressed* data can be reconstructed back to expanded form. As discussed above, data compression is the process of encoding the bit structure of data in such a way that it is reduced in size to take up less space for storage and transmission.[10] Ex. F at 4. The Asserted Patents use this term in the same manner. *See, e.g.*, Ex. C

---

[8] Defendants note that Plaintiff provided alternative constructions the day before this brief was due, and Defendants reserve the right to address them in the responsive brief.

[9]  While the Asserted Patents use various forms of the word "compressed," including "compressed data," "compressed data block," "compressed data stream," and "compressed form," unless otherwise stated, Defendants collectively refer to these terms as "compressed data" or the "compression" terms for purposes of claim construction.

[10]  Encoding refers to the process of converting data into a format required for information

at 7:25-31 ("Data compression is performed by encoder module 30 wherein each of the encoders E1 . . . En processes a given input data block and outputs a corresponding set of **encoded data blocks**."); *id.* at 2:1-3 ("Data compression is widely used to **reduce the amount of data** required to process, transmit, or store a given quantity of information.").

The term "compressed" is not a term unfamiliar to lay jurors. Indeed, the word "compressed" is used in ordinary parlance: compressed air, compressed cardboard, compressed cans, etc. In each instance, the term "compressed" is an adjective that describes a modified state of the subject noun that still retains at least some portion of the original content. For example, "compressed air" is air that takes up a smaller space because the air molecules were forced closer together. Similarly, "compressed cardboard" or "compressed cans" are just cardboard or aluminum cans that have been flattened. The same is true with the disputed term "compressed data." *See* Boncelet Decl., ¶¶18-20.

Even in the context of data processing, most everyone has some experience with "compression" and "compressed data." For instance, many individuals who use computers for work have Zip software to "compress" large files (*e.g.*, Microsoft Word documents) such that the "zipped file" is reduced in size, but can be restored back to its expanded form when "unzipped" (*i.e.*, decoded). *Id.*, ¶21. Even in this simple example, the "zipped file" (*i.e.*, "compressed data") includes the files that were originally compressed - it does not include a "representation" of files that were originally compressed.

### 1. Realtime's proposed construction improperly expands the scope of "compressed data" in an attempt to capture deduplication.

Realtime's litigation-driven claim construction that "compressed data" can be "data that is **represented with fewer bits**" is not how the term is understood in the art and disclosed in the

---

processing. *See* Boncelet Decl., ¶19.

Asserted Patents. Just as "compressed air" is not a representation of air, but air itself, the "compressed data" is not data that is *represented* by something other than the data itself. Instead, compressed data is data that is encoded in such a way to reduce its size while allowing the encoded data to be decoded back to its original or close to original, expanded form. Realtime's construction fails to impart any requirement that the "fewer bits" purportedly *representing* the original data carry sufficient information to decompress the data to expanded form. Contrary to Realtime's overly broad construction, the "compressed data" must retain at least some original information so that it can be restored to its expanded form at a later time. *See* Boncelet Decl., ¶¶22, 24.

Realtime invites legal error because it asks this Court to construe "compressed" in such broad terms that it may be argued to cover other data processing techniques, such as deduplication, that are not compression. As is outlined in the Background (*supra*), deduplication refers to a technique for eliminating redundant data in a data set. In the process of deduplication, duplicate copies of the same data are left out of the process of transmittal or storage to achieve processing efficiencies. In place of the duplicates, a reference ("pointer") may be used to point back to a single copy of the original data. However, no duplicate copy is compressed in the ordinary sense of that word.

### 2.    Plaintiff's construction is not supported by the intrinsic record.

As a threshold matter, Realtime's construction of "compressed data" as "data that is represented with fewer bits" is not disclosed *anywhere* in *any* of the Asserted Patents. Defendants expect Realtime to unreasonably rely on a single citation in only two of the four Asserted Patents.[11] *See* Ex. D at 2:16-19 ("data compression economizes on data storage and allows more information

---

[11] The '530 and '908 patents share the same specification. For simplicity, Defendants may cite to either patent specification with the understanding that the same disclosure also appears in the other patent, if not cited.

to be stored for a fixed memory size by representing information more efficiently."); Ex. A at 2:15-18; Boncelet Decl., ¶¶ 23-24.

First, this language is not in the '204 or '728 patents. Nothing in the '204 or '728 patents suggests that "compressed data" is data that is represented more efficiently, much less "data that is represented with fewer bits," as proposed by Realtime. These limited sound bites, from only two of the four Asserted Patents, are insufficient to alter the plain and ordinary meaning of "compressed data." Rather, when the full disclosure of the Asserted Patents is considered, as discussed more fully below, it is clear that Realtime's proposed construction is overly broad and departs significantly from how "compressed data" is understood in the art. Boncelet Decl., ¶¶ 23-24

Second, in contrast to Realtime's single citation, the Asserted Patents reference compression as a method of *encoding* that produces *encoded* data (*i.e.*, "compressed data") <u>266 times</u> across the four Asserted Patents. *See, e.g.*, Ex. C at 4:5-18 ("compression comprises: *encoding the data block* with a plurality of encoders to provide a plurality of *encoded data blocks*"); Ex. A at 6:45-47 ("Upon completion of the encoding of the input data block, the *encoded data block* is then stored in the data storage device"); Ex. B at 14:5-15 ("data compression advantageously applies the input data stream to each of a plurality of different encoders to, in effect, *generate a plurality of encoded* data streams. The plurality of encoders are preferably selected based on their ability to *effectively encode* different types of input data.").

Thus, as discussed in more detail below, because the intrinsic and extrinsic evidence overwhelmingly support Defendants' proposed construction, Realtime's reliance on a sole, out-of-context excerpt from less than all of the Asserted Patents is unavailing.

### 3. Both the intrinsic and extrinsic evidence support Defendants' construction.

Defendants' proposed construction of "compressed data"—"data encoded to reduce its

size, where the encoded data can be decoded to expanded form"—is supported by intrinsic evidence, extrinsic evidence, and Realtime's admissions in related cases.

a. <em>"data encoded to reduce its size"</em>

First, the Asserted Patents consistently refer to the output of the data compression system (*i.e.*, "compressed data") as "*encoded* data" or "*encoded* data blocks"—not "data that is represented by fewer bits." *See* Boncelet Decl., ¶¶25-28; *see also* Ex. C at 4:5-18 ("data compression comprises: **encoding the data block** with a plurality of encoders to provide a plurality of **encoded data blocks** . . . selecting for output **the encoded data block** having the highest compression ratio"), Ex. B at 14:5-13 ("data compression advantageously applies the input data stream to each of a plurality of different encoders to, in effect, generate a plurality of **encoded data stream**"); Ex. A at 6:45-47 ("Upon completion of the encoding of the input data block, the **encoded data block** is then stored in the data storage device"), Ex. D at 7:5-8.[12] Even the figures, shared in some variation in each Asserted Patents, refer to the output of the data compression system as "encoded data":



*See* Ex. B at FIG. 5; *see also* Exs. A and D at FIG. 8; Ex. C at FIGs. 2, 4, 6, 8, 9, 13B, 15B, 17B.

---

[12] *See also* Ex. C at 7:25-28, 8:5-10, 8:22-26, 8:27-31, 9:4-7, 10:2-10, 10:16-24, 11:42-44; Ex. B at 13:60-14:1, 16:4-9; Ex. A at 7:18-34, 9:30-33, 12:14-59, Ex. D at 7:45-61, 9:56-59.

However, despite the Asserted Patents' repeated and consistent reference to compressed data as "encoded data," Realtime has carefully avoided use of the term "encoded" in other cases because purportedly, "'encoding' is a word that may be more difficult to understand for a juror than the common word 'compressing.'" Ex. I at 3.  To the contrary, the term encode and its variants are used throughout the four Asserted Patents.  Importantly, there is no evidence that a lay juror would be confused or incapable of understanding the Asserted Patents' use of the term to describe what is meant by "compressed data."  Rather, the jury will benefit from the definition of "compressed data" employing the same terminology used in the Asserted Patents.  In particular, the patents explain that data is encoded to compress it to reduce the size (amount) of data, and then that data is decoded to restore it back to the original (lossless) or close to original (lossy) form. *See* Ex. C at 2:7-24; Ex. A at 1:56-2:11.  Realtime, in its proposed construction of "compression" ignores the concept of encoding in order to improperly broaden the scope of the term.

Second, both the intrinsic and extrinsic evidence support Defendants' proposal that "compressed data" is "data encoded to ***reduce its size***." For example, during the prosecution of the parent of the '204 patent, Realtime argued to the U.S.P.T.O. that "[c]ompression traditionally ***reduces the size of data*** such that the amount of data stored on a medium can be increased." Ex. J at 30. Additionally, each of the Asserted Patents consistently associate compression as a process to reduce the size / amount of data. [13] *See, e.g.*, Ex. A at 1:50-52 ("Data compression is widely used to ***reduce the amount of data*** required to process, transmit, or store given quantity of information."); *see also* Ex. C at 2:1-3; Ex. D at 1:51-53.  Realtime's prior statements further validate this position. *See* Ex. H at 6 ("[t]he intrinsic record is consistent with the ordinary meaning

---

[13]  As evidenced by Realtime's own statements, "reduc[ing] the ***size*** of the data" and "reducing the ***amount*** of data" refer to the same concept with reference to compression.  Exs. H-J.

of 'compressing' - *i.e.*, 'compressing' means ***actually reducing the amount of data***"); *see also* Ex. I at 1 ("running data through a compression system (or encoder, algorithm, or technique) . . . does not change the ordinary meaning of 'compressing,' which is ***reducing the amount of data***."); *see also* Boncelet Decl., ¶29.

> b.    *"where the encoded data can be decoded to expanded form"*

A fundamental property of data compression is the ability to reconstruct the encoded data back to its original or expanded form. Ex. G at 405 ("Data compression . . . is the process of transforming a body of data into a smaller form ***from which the original or some approximation of the original can be recovered at a later time***."); *see also* Boncelet Decl., ¶30.  The Asserted Patents recognize this known requirement of data compression. Specifically, the Asserted Patents note that under one compression technique (lossy compression), "the ***decoded (or reconstructed) data*** differs from the original unencoded/uncompressed data,"[14] while in another technique (lossless), "the ***decoded (or reconstructed) data*** is identical to the original unencoded/uncompressed data." Ex. C at 2:7-24; Ex. A at 1:56-2:11, Ex. D at 1:57-2:12. Additionally, in the '728 patent, Realtime incorporates by reference a disclosure that teaches that "[d]ata decompression is the conversion of a ***stream of compressed data back to its original expanded form***." *See* Ex. C at 3:20-24 (*incorporating* Ex. K at 3:23-24).

To be clear, Defendants' construction does not import the limitation or requirement that the compressed data be actually decoded. Instead, Defendants' construction simply clarifies that the "compressed data" is encoded in such a manner that it "***can*** be decoded to expanded form." Such clarification ensures against an overly broad construction that would otherwise capture unrelated data processing techniques such as deduplication.

---

[14] Lossy compression might be used on images, for example, to remove "extra" pixels in the image. The decoded copy might not be as sharp as the original, but it is the same picture.

In view of the above, Defendants' construction that "compressed data" is "data encoded to reduce its size, where the encoded data can be decoded to expanded form" is well-supported by the intrinsic and extrinsic evidence.

### 4. Realtime's prior constructions—either stipulated to or adopted by courts from other districts against other defendants—are not controlling here.

Finally, the Court should reject any argument from Realtime that this Court should adopt Realtime's flawed construction because either it was able to get other defendants in different cases to stipulate to that construction or another district court accepted its argument. First, the findings of a court from another district are not controlling here. *Camreta*, 563 U.S. at 709 n.7 ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case.")[15] (internal citation omitted); *see also Aircraft Tech.,* 2009 WL 3817944, at *3 (finding that "one district court is not bound to automatically accept the claim construction of another district court . . . . Rather, this Court has an independent obligation to construe the claims in dispute, and to render its own independent claim construction."). Additionally, that any other defendant in other cases may have stipulated to Realtime's construction is also irrelevant to the claim construction disputes and defendants here before the Court. *Vasudevan*, 782 F.3d at 678 (noting that "the fact that a claim construction was agreed to in the context of a different litigation is of little relevance or probative value here.").

Thus, for the aforementioned reasons, Defendants respectfully request that the Court adopt Defendants' proposed construction.

---

[15]  Although the Supreme Court in *Camreta* addressed a non-patent issue focused on 42 U.S.C. § 1983, the proposition that one district court is not bound by decisions of other district courts is equally relevant here with respect to claim construction.

**B.     "Compressing / Compression"**

| Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|------|-----------------------------------|-----------------------------------|
| "Compressing / Compression" | [Representing / representation of] data with fewer bits<br><br>Alternatively: [reducing / reduction of] the size of data | encoding to reduce the size of data, where the encoded data can be decoded to expanded form |

This is another case-dispositive term.  This term and "compressed data," discussed *supra* (collectively the "compression" terms), impact each of the asserted claims of the Asserted Patents. The arguments with respect to this term, however, are the same as those presented above. Therefore, for sake of brevity, Defendants incorporate by reference its earlier argument for "compressed data" and respectfully request that Defendants' proposed construction be adopted.

**C.     "Descriptor / token"**

| Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|------|-----------------------------------|-----------------------------------|
| "descriptor / token" | recognizable data | recognizable data that is appended to the compressed data that shows which encoder has been applied to the data block |

The Asserted Patents discuss "descriptor" and "token" in the context of "recognizable data *token* or *descriptor* that indicates which data encoding technique has been applied to the data." *See, e.g.,* Ex. C at 8:63-66. This term impacts three of the four Asserted Patents: the '728, '530, and '908 patents. The dispute here is whether the Court should adopt a claim construction that was affirmed by the Federal Circuit for a parent patent to an Asserted Patent.[16] Defendants' proposed

---

[16]  The term "parent patent" refers to the fact that the '728 and the Parent '747 patent are part of the same patent family sharing a common specification. Indeed, the '728 patent depends, via a series of continuations, from the Parent '747 patent.

construction tracks the construction that the Federal Circuit in the *Morgan Stanley* case endorsed for the term "descriptor," and relies on the same portions of the specification and figures as cited by the Federal Circuit. This Court should adopt Defendants' claim construction under both the doctrine of *stare decisis* and collateral estoppel.

First, if an underlying decision involving claim construction is appealed to the Court of Appeals for the Federal Circuit, as in the *Morgan Stanley* case, then the claim construction approved by the Federal Circuit is binding in future proceedings under the doctrine of *stare decisis*, regardless of whether the parties are the same or not, and regardless of whether the elements of issue preclusion are satisfied or not. *See Phonometrics, Inc. v. Choice Hotels Int'l, Inc.*, 21 Fed. Appx. 910, 911-12 (Fed. Cir. 2001) (plaintiff's bringing the same claim construction argument decided previously was deemed "simply baffling," as *stare decisis* bound the court and future panels to follow the construction previously set forth by the court); *Wang Labs., Inc. v. Oki Elec. Indus. Co., Ltd.*, 15 F. Supp. 2d 166, 175-76 (D. Mass. 1998) (applying *stare decisis* to Federal Circuit's prior claim construction).

Second, the doctrine of collateral estoppel also bars parties from contesting issues litigated and decided in a prior action. Adhering to this principle in patent cases, the Federal Circuit has held that "where a determination of the scope of patent claims was made in a prior case, and the determination was essential to the judgement there on the issue of infringement, there is a collateral estoppel in a later case on the scope of such claims." *Pfaff v. Wells Elec., Inc.,* 5 F.3d 514, 518 (Fed. Cir. 1993) (citation omitted); *see also Nestle USA, Inc. v. Steuben Foods, Inc.*, 884 F.3d 1350, 1351 (Fed. Cir. 2018) (holding that collateral estoppel applies to claim construction when an issue has been fully and fairly litigated by the challenging party). As discussed below, the Federal Circuit in the *Morgan Stanley* case affirmed the scope of patent claims for a parent patent

15

to the Asserted Patent that was essential to finding of non-infringement at summary judgment.

      **1.**      **The *Morgan Stanley* appeal to the Federal Circuit is on a related patent to the Asserted Patent in this case.**

In 2011, Realtime brought nine lawsuits in the Southern District of New York asserting patent infringement against 18 separate defendants that included major financial institutions, stock exchanges, and trading platforms. *See Realtime Data, LLC v. Morgan Stanley*, 554 F. App'x 923 (Fed. Cir. 2014). In that case, Realtime asserted infringement across three patents, including the Parent '747 patent (Ex. L), 7,417,568 ("the '568 patent"), and 7,777,651 ("the '651 patent"). *Id.* The Parent '747 patent is the parent of the '728 patent asserted in this case, and thus has the identical specification and figures. *Compare* Exs. C and L.

In *Morgan Stanley*, the Federal Circuit reviewed the district court's claim construction—the same construction proposed by Defendants here—that subsequently resulted in summary judgment of non-infringement for the defendants. Two of the terms reviewed by the Federal Circuit were "descriptor" and "data stream."[17]

During the appeal, Realtime suggested that the written description of the Parent '747 patent defines "descriptor" as "any recognizable data token or descriptor that indicates which data encoding technique has been applied to the data." *Morgan Stanley*, 554 F. App'x at 932 (*citing* Ex. L at 8:53-56). Realtime, however, argued that the district court erred by "requiring that the indicator be *appended* to the encoded data for the purposes of specifying the encoder used[.]" *Id.* The Federal Circuit rejected this argument because "the preceding sentence [to Realtime's citation] also teaches that '[a]n appropriate data compression type descriptor is *appended* [to the encoded data block].'" *Id.* (*citing* Ex. L at 8:52-53). "That requirement is further highlighted by figure 3b of

---

[17] "Data stream" is also a disputed term in this case and is separately discussed below.

the '747 patent, which shows an '***append*** corresponding descriptor' step after a step requiring selection of an encoded data block with the greatest compression ratio." *Id.*

Moreover, in *Morgan Stanley*, the Federal Circuit indicated that "the claims [also] require receiving a data packet and extracting from that packet the descriptors, which were previously selected based on an analysis of the content of the pre-encoded data blocks, highlighting that the descriptors must be sent with the block." *Id.* (*citing* Ex. L at 26:24-31). As such, the Federal Circuit concluded that the "district court thus did not err in construing the 'descriptor indicates' term . . . to mean '[r]ecognizable data that is appended to the encoded data for specifying [an encoder]." *Id.* Finally, even though the specification for the other two patents at issue (*i.e.*, the '568 and '651 patents) was slightly different from the Parent '747 patent, the Federal Circuit applied the same construction for all three patents. *Id.*

**2.     The Asserted Patents use the term "descriptor" and "token" interchangeably and thus should be given the same meaning.**

As an initial matter, the Asserted Patents use the terms "descriptor" and "token" interchangeably to describe the "recognizable data that is appended to the compressed data that shows which encoder has been applied to the data block." *See, e.g.*, Ex. C at 8:63-66 ("A data compression type descriptor is defined as any recognizable data ***token*** or ***descriptor*** that indicates which data encoding technique has been applied to the data."); Ex. A at 12:38-41; Ex. D at 12:64-67. The claims similarly interchange "descriptor" and "token" to capture the same concept. *See, e.g.*, Ex. C, claim 9 ("the processor is further configured to associate a data token indicative of the content dependent data compression applied to the data block to create a compressed data block"), Ex. A, claim 1 ("a first data descriptor is stored . . . indicative of said first compression technique").

Realtime appears to agree that the terms are used interchangeably, as no objection was raised to grouping the terms together. *See* JCCS, D.I. 76 at 2. Thus, Defendants respectfully submit

that the terms "descriptor" and "token" should be adjudicated together and given the same meaning.

### 3. The same evidence that the Federal Circuit cited in *Morgan Stanley* is equally applicable here.

The same intrinsic evidence relied upon by the Federal Circuit equally applies here to construing the "descriptor" / "token" terms with respect to the '728, '530, and '908 patents. As noted above, the Parent '747 patent at issue in *Morgan Stanley* is the parent of the '728 patent in this case. Thus, both the '728 and '747 patents share the same specification and figures that were relied upon by the Federal Circuit. *Compare* Exs. C and L. Furthermore, the '530 and '908 patents—although part of a different family than the '728 patent—also include the same relevant language that the Federal Circuit relied upon in *Morgan Stanley*.

Critically, each of the three patents that use "descriptor" / "token" in this case specify that the recognizable data is "***appended***" to the encoded data to show which encoder has been applied to the data block. *See* Ex. C at 8:63-64 ("An appropriate data compression type descriptor is then ***appended***"); Ex. A at 12:33-38 ("A description module 38 . . . ***appends*** a corresponding compression type descriptor to each encoded data block"); Ex. D at 12:59-64. Furthermore, the '728 patent also includes the same figure that the Federal Circuit cited in support of its construction that the recognizable data is appended to the encoded data. *See* Ex. C, FIG. 3b, el. 324.

Therefore, in sum, Defendants' construction that the "recognizable data is appended to the compressed data that shows which encoder has been applied to the data block" should be adopted by this Court because the intrinsic evidence supports Defendants' construction as already determined by the Federal Circuit.

### D.   "Data stream"

| Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "data stream" | one or more data blocks transmitted in sequence | one or more uncompressed blocks transmitted in sequence from an external source whose characteristics are not controlled by the data encoder or decoder |

This term impacts only the '530 patent. The dispute here is whether the one or more uncompressed blocks that are transmitted in sequence must be transmitted "***from an external source*** whose characteristics are not controlled by the data encoder or decoder." As noted above with respect to "descriptor," this is yet another term that was reviewed and affirmed by the Federal Circuit in the *Morgan Stanley* case. *Morgan Stanley*, 554 F. App'x at 933-34. The same evidence relied on by the Federal Circuit is applicable here.

In *Morgan Stanley*, Realtime argued—as it does now—that the term "data stream" should be construed as "one or more data blocks transmitted in sequence." 554 F. App'x at 933-34. The Federal Circuit rejected this broad construction because the record supported defendants' construction that the data blocks must be received from an external source. *Id*. In reaching this conclusion, the district court and the Federal Circuit both relied on statements made by Realtime's expert, Dr. Modestino, during reexamination of a non-asserted patent where Dr. Modestino "ma[de] clear that a person of ordinary skill would understand that a data stream . . . means a ***data stream received from an external source*.**" *Id*. at 934.

Specifically, during the reexamination of a patent that was not at issue in *Morgan Stanley*, Dr. Modestino had declared that for one of ordinary skill, the term "receiving a data stream" would "'imply a stream of data transmitted from a source (whose characteristics are therefore not controlled by the data compression system) and received at the input of a system or device.'" *Id.*

19

(internal citation omitted). Dr. Modestino further "described the process of 'receiving a data stream' from an ***external source*** as a 'passive one requiring no control over the characteristics of the received data stream by the receiver.'" *Id.* As such, the Federal Circuit concluded that "[a]lthough Dr. Modestino's declaration dealt, in part, with a narrower term 'receiving a data stream,' the declaration [still] makes clear that a person of ordinary skill would understand that a data stream . . . means a data stream received from an external source." *Id.*

Thus, given the prior declarations advanced by Realtime to the U.S.P.T.O. with respect to what one of ordinary skill in the art would consider "data stream," and the Federal Circuit's findings, Defendants respectfully request that this Court adopt Defendants' proposed construction. *Id.* ("In connection with patents that are part of an extended family of patents, a patentee's disclaimers made during prosecution are 'relevant' both as a statement made with regard to the patent at issue and with regard to related or 'sibling' patents." (*citing Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349-50 (Fed. Cir. 2004)).

### E.     "Excludes analyzing based solely on a descriptor"

| Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "excludes analyzing based solely on a descriptor that is indicative of the one or more parameters or attributes of the data within the data block" | No Construction Necessary | analyzing the content of the data within a data block using a technique in addition to using a file type descriptor |

Claim 1 of the '728 Patent uses this disputed terms in the following context:

> analyze data within a data block to identify one or more parameters or attributes of the data wherein the analyzing of the data within the data block to identify the one or more parameters or attributes of the data ***excludes analyzing based solely on a descriptor that is indicative of the one or more parameters or attributes of the data within the data block***

Ex. C, claim 1.

The issue here is whether the language "excludes analyzing **based solely on** a descriptor . . ." conveys that the descriptor itself is *also* analyzed in addition to the "data within a data block."[18] Defendants respectfully submit that the inclusion of the words "based solely on" in the claim language means that the analysis of the "data within a data block" (*i.e.*, the content of the data) is *in addition to* analyzing the descriptor (*i.e.*, file type descriptor). Indeed, had Realtime intended to completely exclude *any* consideration of the descriptor, Realtime could have simply omitted "based solely on" from the claim language such that the limitation would have been "excludes analyzing [] a descriptor that is indicative of the one or more parameters or attributes of the data within the data block." However, Realtime chose to include "based solely on" in the claim language, and as such these words must be given a meaning. *Merck & Co. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.").

### 1. Analyses of the "data within the data block" and "file type descriptor" is mutually inclusive.

One of the problems the '728 patent purports to address is that, at times, it may be difficult to determine the optimal compression technique that should be applied for any given set of input data. Ex. C at 2:65-67. "To combat this problem," the '728 Patent notes that one technique to identify the optimal encoder is reliance on "file type descriptors." *Id.* at 2:67-3:5. The "file type descriptors are typically appended to file names to describe the application programs that normally act upon the data contained with the file." *Id.*

As such, by analyzing the file type descriptors, "data types, data structures, and formats within a given file may be ascertained." *Id.* at 3:5-6. The '728 patent explains that reliance

---

[18] The '728 Patent uses the term "descriptor" here with respect to a file type descriptor differently than the earlier discussed "descriptor" that was a data compression type descriptor appended to the compressed data.

exclusively on the file type descriptors to identify the data types, data structures, and format also has limitations. *Id.* at 3:8-19. For example, some application programs "do not possess published or documented file formats, data structures, or data type descriptors." *Id.* Thus, as one solution, the '728 Patent proposes also "analyzing a data block of an input data stream to identify a data type of the data block[.]" *Id.* at 4:52-67. However, the analyses of the data block is not in absence of or in lieu of also considering the file type descriptor that is appended to the file names. Indeed, both the analysis of the "data within the data block" and the analysis of the "file type descriptor" that is appended to the file name can be mutually inclusive. *Id.* at 4:46-51.

### 2.    Realtime's inclusion of "based solely on" was purposeful

A plain reading of claim 1 of the '728 patent reveals that Realtime intended to capture the mutual inclusiveness of analyzing both the content of the data (*i.e.*, "data within the data block") and the file type descriptor that are appended to the data blocks. *See* Ex. C, claim 1. As noted above, if Realtime had intended to encompass the concept that *only* the content of the data is analyzed, but not the descriptor, the claim could have been drafted to simply omit the word "solely" from the disputed phrase. Indeed, in the parent of the '728 patent, U.S. Patent No. 8,933,825 ("the Parent '825 patent"), Realtime did just that. *See* Ex. M, claim 23.

Specifically, in independent claim 23 of the Parent '825 patent, Realtime claimed that "the determining ***excludes determining based upon a descriptor*** . . . ." Ex. M, claim 23. However, in a different independent claim of the Parent '825 patent, Realtime claimed that "analyzing of the data . . . excludes analyzing based ***only*** on a descriptor . . . ." *Id.*, claim 18. Thus, even within a single patent, Realtime purposefully differentiates the scope of the independent claims. The same is true for claim 1 of the '728 patent.

Therefore, for the foregoing reasons, Defendants respectfully submit that the phrase "excludes analyzing based solely on a descriptor that is indicative of the one or more parameters

22

or attributes of the data within the data block" should be construed as "analyzing the content of the data within a data block using a technique *in addition to* using a file type descriptor."  *Supra* (emphasis added).

## V.   DISPUTED CLAIM TERMS INVOKING MEANS-PLUS-FUNCTION CONSTRUCTION PURSUANT TO 35 U.S.C. § 112, ¶ 6

As set forth in the Joint Claim Construction Statement, another dispute between the parties is whether the functional phrases associated with the claim terms "data accelerator" and "processor" invoke means-plus-function construction in accordance with 35 U.S.C. § 112, ¶ 6.  *See* JCCS, D.I. 76 at 3-5 ("data accelerator") and 6-8 ("a processor / the processor is configured").  Due to page constraints, the parties' competing claim constructions for these terms are not shown in side-by-side comparison, as was done for the terms above.  However, in the sections below, Defendants have reproduced the relevant claim language for each term, identified the functional phrases at issue, and identified the corresponding structure (the computer-implemented algorithm) that is disclosed in the patent specification for each term.

An element of a patent claim "may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."  *See* 35 U.S.C. § 112, ¶ 6.[19]  There is a presumption that § 112, ¶ 6 applies when the claim language includes the word "means" and does not apply in the absence of this term.  *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347 (Fed. Cir. 2015) (*en banc*).  But *Williamson*, in overruling prior precedent which "resulted in a proliferation of functional claiming untethered to § 112, para. 6 and free of the strictures set forth in the statute," held that the absence of the word "means" does not create a "strong" presumption that § 112, ¶ 6

---

[19] All citations are to the pre-AIA version of 35 U.S.C. § 112.

treatment does not apply.  *Id.* at 1349.  In lowering the burden for § 112, ¶ 6 to apply, the Federal

Circuit explained:

> When a claim term lacks the word "means," the presumption can be overcome and
> § 112, para. 6 will apply if the challenger demonstrates that the claim term fails to
> "recite[] sufficiently definite structure [for performing the claimed function]" or
> else recites "function without reciting sufficient structure for performing that
> function."

*Id.* (citation omitted).

### A.    "Data Accelerator" and "Processor"

#### 1.    The terms invoke means-plus-function construction

As shown below, the term "data accelerator" is recited in claim 1 of the '530 patent and

claim 1 of the '908 patent.  Both patents ascribe "first" and "second" "compression" functions to

"data accelerator."[20]

| '530 Patent, claim 1 | '908 Patent, claim 1 |
|---|---|
| 1. A system comprising: a memory device; and a data accelerator, wherein said data accelerator is coupled to said memory device, a data stream is received by said data accelerator in received form, said data stream includes a first data block and a second data block, said data stream is compressed by said data accelerator to provide a compressed data stream by compressing said first data block with a first compression technique and said second data block with a second compression technique, said first and second compression techniques are different, said compressed data stream is stored on said | 1. A system comprising: a memory device; and a data accelerator configured to compress: (i) a first data block with a first compression technique to provide a first compressed data block; and (ii) a second data block with a second compression technique, different from the first compression technique, to provide a second compressed data block; |

The term "data accelerator" is merely an abstraction that describes only the result achieved from

performing the "compression" functions highlighted above.  As used in the claims, the term fails

to recite any structure, let alone sufficiently definite structure, for performing the claimed

---

[20] For the '530 patent, the  parties dispute whether a "receive" function is also attributable to "data
accelerator."  *See* JCCS, D.I. 76 at 3-4.  Although claim 1 of the '530 patent clearly describes the
"data accelerator" as performing the "receive" function, resolution of this dispute is not material
to whether the term invokes construction under § 112, ¶ 6 or identification of the corresponding
structure in the specification required to achieve the "compression" functions.

functions.  As a consequence, "data accelerator" is a means-plus-function term that invokes construction pursuant to 35 U.S.C. § 112, ¶ 6.  Indeed, absent such interpretation, "data accelerator" is a purely functional construct, unbounded by any reference to structure.  This is confirmed by the patent specification, which describes and illustrates the "data accelerator" in terms of functional block diagrams or "modules."  *See, e.g.*, Ex. D, Figs. 1 and 8 (element 10); 11:46-13:13 (describing the "data accelerator" as including certain functional "modules").  As opposed to disclosing specific hardware/structural components for the claimed "data accelerator"—an admitted coined term (discussed *infra*)—the patents disclose general purpose computing "modules" as implementing the purported invention.  *See, e.g.*, Ex. D at 4:48-5:1.[21] Hence, "data accelerator" should be construed in accordance with § 112, ¶ 6 because any presumption otherwise has been clearly rebutted.

In another of its cases, Realtime agreed that the same "data accelerator" term at issue here invokes means-plus-function construction.  *See* Ex. N at 14-15.  In still another case, Realtime similarly conceded that "data accelerator" is a coined term that would not have a commonly understood meaning to a person of ordinary skill in the art.  *See* Ex. O at 18.  Realtime is therefore collaterally estopped from challenging the applicability of § 112, ¶ 6 to "data accelerator" in this case.  *Nestle USA, Inc. v. Steuben Foods, Inc.*, 884 F.3d 1350 (Fed. Cir. 2018) (holding that collateral estoppel applies to claim construction when an issue has been fully and fairly litigated by the challenging party).

The term "processor" is recited in claims 1 and 24 of the '728 patent.  As shown below, claims 1 and 24 specify that "the processor is configured" to perform an "analyze" function and also certain "compression" functions based upon the results of the "analyze" function:

---

[21] As discussed above, the '530 and '908 patents share nearly identical specifications.

| '728 Patent, claim 1 | '728 Patent, claim 24 |
|---|---|
| wherein the processor is configured: <br> to analyze data within a data block to identify one or more parameters or attributes of the data wherein the analyzing of the data within the data block to identify the one or more parameters or attributes of the data excludes analyzing based solely on a descriptor that is indicative of the one or more parameters or attributes of the data within the data block; <br> to perform content dependent data compression with the one or more content dependent data compression encoders if the one or more parameters or attributes of the data are identified; and <br> to perform data compression with the single data compression encoder, if the one or more parameters or attributes of the data are not identified. | wherein the processor is configured: <br> to analyze data within a data block to identify one or more parameters or attributes of the data wherein the analyzing of the data within the data block to identify the one or more parameters or attributes of the data excludes analyzing based solely on a descriptor that is indicative of the one or more parameters or attributes of the data within the data block; and <br> to compress the data block to provide a compressed data block, wherein if one or more encoders are associated with the one or more parameters or attributes of the data, compressing the data block with at least one of the one or more data compression encoders, otherwise compressing the data block with the default data compression encoder. |

The parties dispute whether the presumption against the application of § 112, ¶ 6 is overcome because use of the term "processor" in the claims fails to connote sufficiently definite structure for performing the functions highlighted above.  Notably, in similar circumstances, the Patent Trial and Appeal Board ("PTAB") found the general recitation of "processor" in a claim to be a nonce word that invokes the application of § 112, ¶ 6.  *See, e.g.*, Exs. P-R.  Indeed, extrinsic dictionary definitions of "processor" confirm that the term is a general construct that would not be recognized by persons of skill in the art as connoting sufficiently definite structure for performing the claimed "analyze" and "compression" functionality.  *See* Ex. S (defining "processor" as "a computer" or "a central processing unit of a computer"); *see also* Exs. T-U.

The Federal Circuit recognizes a difference between a general purpose processor, such as the one recited in the claims above, and a special purpose processor programmed to perform particular functions pursuant to instructions from program software.  *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1348 (Fed. Cir. 1999).  In this regard, the Federal Circuit has explained that a software program operates to transform a general purpose computer into a special purpose computer.  *Id*. at 1348 n.3 (citing P.C. Magazine, attached as Ex. V).

Here, the specialized functions required by the claims go beyond the usual "processing,"

"receiving," and "storing" functionality understood to be inherent in a general purpose processor. *See In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1316 (Fed. Cir. 2011) (describing the capability of a general purpose processor without special programming). Without software/programming, a general purpose off-the-shelf processor is not capable of performing the "analyze" and "compression" functions recited by claims 1 and 24 of the '728 patent.[22] Indeed, the patent specification discloses that it is software that transforms the claimed "processor"—a general purpose device—into a special purpose processor to achieve the "analyze" and "compression" functionality:

> It is to be further understood that the present invention may be implemented in various forms of hardware, software, firmware, or a combination thereof. In particular, the system modules described herein are preferably implemented in software as an application program that is executable by, e.g., *a general purpose computer* or any machine or device having any suitable and preferred microprocessor architecture. . . . It is to be appreciated that *special purpose microprocessors* may be employed to implement the present invention.

Ex. C at 6:30-54. The excerpt above shows that the patentee understood a difference to exist between a "general purpose computer" and a "special purpose computer." Notably, the patentee chose to claim a "processor"—a general purpose device—that the patent specification expressly describes as requiring additional and *unclaimed* programming to achieve the claimed functionality. Accordingly, the presumption against the application of § 112, ¶ 6 is overcome because "processor," as recited in claims 1 and 24 of the '728 patent, fails to connote sufficiently definite structure for performing the claimed functions. *Williamson*, 792 F.3d at 1349.

---

[22] Moreover, claims 1 and 24 are devoid of any structural interconnections, characteristics, or configuration of the "processor," thus further evidencing that the claims fail to recite sufficiently definite structure for performing the recited functions and that construction in accordance with 35 U.S.C. § 112, ¶ 6 is warranted. For example, the claims do not specify any connections between the "processor" and other recited components, such as memory. Nor do the claims describe any signal processing or circuit configuration of the "processor." Moreover, the specification does not disclose any specific "processor," such as an Intel Pentium microprocessor, that would purportedly be sufficient to achieve the claimed functionality. *See, e.g.*, Ex. C at 6:24-57.

    2.    **The corresponding structure for computer-implemented functions is the algorithm disclosed in the specification**

"In cases involving a computer-implemented invention in which the inventor has invoked means-plus-function claiming, [the Federal Circuit] has consistently required the structure disclosed in the specification to be more than simply a general purpose computer or microprocessor." *Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008). Specifically, "in a means-plus-function claim 'in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm.'" *Id.* (quoting *WMS Gaming*, 184 F.3d at 1349).

As set forth above, "data accelerator" and "processor" are computer-implemented means-plus-function terms. The corresponding structure for these terms, as required by § 112, ¶ 6, is the algorithm disclosed in the specification for achieving the computer-implemented "compression" functionality recited in the claims. *See id.* (explaining that "the corresponding structure for a § 112 ¶ 6 claim for a computer-implemented function is the algorithm disclosed in the specification.") (citation omitted). An algorithm is defined as "a finite sequence of steps for solving a logical or mathematical problem or performing a task." *See* Ex. P (PTAB quoting the Microsoft Computer Dictionary). The Federal Circuit has held that an algorithm may be disclosed in any understandable terms, including flow charts and descriptive prose. *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008).

Each of the '530, '908, and '728 patents disclose a nearly identical algorithm for achieving the "compression" functions specified in the claims above. For example, each of the patents describes encoding a data block using different compression techniques to achieve "the greatest compression ratio" possible. *Compare* Ex. A at 12:46-49 *with* Ex. C at 19:1-5. The '530 and '908

patents include a description of the algorithm.  *See* Ex. A at 11:20-12:52; *see also* Ex. D at 11:46-13:8.  In addition to describing the algorithm, the '728 patent includes numerous figures illustrating the algorithm as a flow chart.  *See, e.g.*, Ex. C at 18:4-19:5; Figs. 14A-14D.  The '728 patent describes Figs. 14A-14D as illustrating "a data compression method using both content dependent and content independent data compression."  *See* Ex. C at 6:1-4, 18:6-9.

In the interest of brevity, the algorithm disclosed for achieving the computer-implemented "compression" functions is set forth in the table below.  The column on the left identifies the steps of the algorithm.  The column on the right identifies supporting citations from the Asserted Patents.  Accordingly, the Court should construe the "data accelerator" and "processor" terms to include the following corresponding structure (i.e., the algorithm disclosed in the Asserted Patents):

A processor programmed to compress data by:

| | |
|---|---|
| Counting the size of an incoming data block | Ex. C at Fig. 14A (element 1402), 18:15-21, Fig. 16A (element 1602), 21:5-7, Fig. 18A (element 1802), 23:60-62; Ex. A at Fig. 8 (element 20), 11:26-32 |
| Encoding the block with one or more encoders | Ex. C at Fig. 14B (element 1410), Fig. 14D (element 1438), 18:22-29, 19:19-27, Fig. 16B (element 1610), Fig. 16D (element 1638) 21:11-15, 22:4-12, Fig. 18B (element 1810), Fig. 18D (element 1842) 23:66-24:6, 25:62-25:10; Ex. A at Fig. 8 (element 25), 11:40-12:13 |
| Counting the size of the encoded data block(s) | Ex. C at Fig. 14B (element 1414), Fig. 14D (element 1442), 18:29-33, 19:27-31, Fig. 16B (element 1614), Fig. 16D (element 1642), 21:15-19, 22:12-16, Fig. 18B (element 1814), Fig. 18D (element 1846), 24:6-10, 25:10-14; Ex. A at Fig. 8 (element 30), 12:14-20 |
| Calculating a compression ratio for each encoded data block | Ex. C at Fig. 14B (element 1416), Fig. 14D (element 1444), 18:34-38, 19:32-36, Fig. 16B (element 1616), Fig. 16D (element 1644), 21:20-24, 22:17-21, Fig. 18B (element 1816), Fig. 18D (element 1848), |

| | 24:11-15, 25:15-19; Ex. A at Fig. 8 (element 35), 12:20-25 |
|---|---|
| Comparing the calculated compression ratio(s) against a pre-specified threshold | Ex. C at Fig. 14B (element 1418), Fig. 14D (element 1448), 18:38-52, 19:36-52, Fig. 16B (element 1618), Fig. 16D (element 1648), 21:24-38, 22:21-37, Fig. 18B (element 1818), Fig. 18D (element 1850), 24:15-29, 25:19-35; Ex. A at Fig. 8 (element 35), 12:25-33 |
| Selecting an encoded data block having the greatest compression ratio if the threshold limit is exceeded by at least one encoded data block | Ex. C at Fig. 14C (element 1422), 19:1-5, Fig. 16C (element 1622), 21:54-58, Fig. 18C (element 1822), 25:51-55; Ex. A at 12:46-49 |

Accordingly, Defendants respectfully request that the Court apply 35 U.S.C. § 112, ¶ 6 to construe the claimed "data accelerator" and "data processor" functions as requiring the corresponding structure of a processor programmed to compress data in accordance with the algorithm described above.

## VI.   CONCLUSION

For the foregoing reasons, Defendants respectfully request that their proposed constructions be adopted.

Dated: March 19, 2019                          Respectfully submitted,

/s/ *Janine A. Carlan*
Janine A.  Carlan (*Pro Hac Vice*)
Jasjit S. Vidwan (*Pro Hac Vice*)
**ARENT FOX LLP**
1717 K Street, NW
Washington, DC 20036-5344
Telephone: (202) 857-6000
janine.carlan@arentfox.com
jasjit.vidwan@arentfox.com

Allen N. David, BBO #115000
Elizabeth A. Houlding, BBO #645981
**PEABODY & ARNOLD LLP**
Federal Reserve Plaza
600 Atlantic Avenue
Boston, MA 02210
Telephone: (617) 951-2100
adavid@peabodyarnold.com
ehoulding@peabodyarnold.com

*Attorneys for Defendant Acronis, Inc.*

/s/ *Wasif H. Qureshi*
Irwin B. Schwartz (BBO# 548763)
ischwartz@blaschwartz.com
**BLA SCHWARTZ, PC**
One University Ave., Suite 302B
Westwood, Massachusetts 02090
Phone:  781-636-5000
Fax:  781-636-5090

Wasif H. Qureshi
wqureshi@jw.com
Chris N. Cravey
ccravey@jw.com
**JACKSON WALKER, LLP**
1401 McKinney Street, Suite 1900
Houston, TX  77010
Tel: (713) 752-4200

*Attorneys for Defendant Carbonite, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

  I, Jasjit S. Vidwan, do hereby certify that I have, this 19th day of March, 2019, served the foregoing document on all counsel of record, by causing a copy thereof, to be sent electronically to the registered participants in this case as identified on the Notice of Electronic Filing (NEF).


              */s/ Jasjit S. Vidwan* _____

32