IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| REALTIME DATA LLC d/b/a IXO., <br><br> Plaintiff, <br><br> v. <br><br> ACRONIS, INC., <br><br> Defendant. | C.A. No. 1:17-CV-11279-IT <br><br> (Lead Case) |
| v. <br><br> CARBONITE, INC., <br><br> Defendant. | C.A. NO. 1:17-CV-12499-IT <br><br> (CONSOLIDATED) |

**DECLARATION OF PROFESSOR CHARLES G. BONCELET JR.**

I, Charles G. Boncelet Jr., hereby declare the following:

**I.      INTRODUCTION**

1.      I have been retained in this action by the counsel for Defendants Acronis, Inc. ("Acronis") and Carbonite, Inc. ("Carbonite") to offer my independent expert opinion concerning the meaning of certain claim terms in U.S. Patent Nos. 7,415,530 ("the '530 patent"), 9,116,908 ("the '908 patent), 9,054,728 ("the '728 patent"), and 8,717,204 ("the '204 patent") (collectively "Patents-in-Suit").

2.      I have been asked by counsel for Acronis and Carbonite to analyze the claim terms relating to data compression. This declaration discloses the opinions I have formed as a result of my analysis.

3.      For my time and effort in researching, reviewing, forming my opinions, and preparing this declaration, I am being paid at a rate of $400 per hour. No part of the compensation is tied in any way to the opinions expressed in this declaration or the outcome of the claim construction.

**II.     BACKGROUND**

4.      I am a Professor in the Departments of Electrical & Computer Engineering (ECE) and Computer & Information Sciences (CIS) at the University of Delaware. My educational background, professional experience, and a list of my publications are set forth in my *curriculum vitae*, attached to this report as **Appendix A**.

5.      I earned a Doctor of Philosophy (Ph.D.) and Master of Science (M.S.) in Electrical Engineering and Computer Science from Princeton University in 1984 and 1981, respectively. I also earned a Bachelor of Science (B.S.) in Applied and Engineering Physics from Cornell University in 1980.

6. I have been a Professor at the University of Delaware since 1984. During that time, I have served as an Associate Chair of the ECE department from 2004-2006 and again from 2009-2016. I have also served as a visiting professor at number of universities, including the University of Michigan, Tampere University of Technology, Australian Defense Force Academy, and University of Electrical Science and Technology of China.

7. I have conducted extensive research in the field of data compression, including block arithmetic coding (BAC), lossless image compression, Bi-Level image compression, and quadtree data structure for lossless and lossy image compression.

8. I have published or contributed to a number of books, including a chapter on "Binary Image Compression" in *Document and Image Compression*, M. Barni, Ed., CRC Press, 2006. I have also published articles on data compression as outlined in my *curriculum vitae*. I also have three issued patents in the field of computer and electrical arts: U.S. Patent Nos. 6,557,103; 6,556,689; and 8,770,998.

9. I have served as an associate editor for the Institute of Electrical and Electronics Engineers (IEEE) Transactions on Image Processing. I have also served as a member of the IEEE Signal Processing Society Publication Board.

III. **MATERIALS CONSIDERED**

10. As part of my work in connection with this matter, I have studied the Patents-in-Suit, including the respective written descriptions, figures, claims, and the file histories. I have reviewed portions of the parent patent to the '204 patent. I have reviewed the dictionaries and technical treatises that are cited below. I have also reviewed the parties' claim construction proposals.

IV. **LEVEL OF A PERSON HAVING ORDINARY SKILL IN THE ART**

11. I was asked to provide my opinion as to the level of skill of a person having

ordinary skill in the art of the Patents-in-Suit at the time of the claimed inventions. In determining the characteristics of a hypothetical person of ordinary skill in the art, I was told to consider several factors, including the type of problems encountered in the art, the solutions to those problems, the rapidity with which innovations are made in the field, the sophistication of the technology, and the education level of active workers in the field at that time.

12. In my opinion, a person of ordinary skill in the art at the time of the claimed inventions would have been a person having at least a bachelor's degree, or equivalent, in Computer and Electrical Engineering, Computer Science, or a closely related program of study, and one to two years of industry or graduate experience. Such a person would have been capable of understanding the Patents-in-Suit.

13. Based on my education, training, and professional experience in the field of the claimed invention, I am familiar with the level and abilities of a person of ordinary skill in the art at the time of the alleged claimed invention. Additionally, I meet at least these minimum qualifications to be a person having ordinary skill in the art at the time of the claimed inventions.

**V.   LEGAL STANDARD**

14. I am neither a patent lawyer nor an expert in patent law. Counsel has informed me that the following law is applicable to the relevant issues in this case, and I have relied upon these legal principles in forming the opinions set forth in this declaration.

15. I understand that the construction of claim terms is a question of law and the words of a claim are generally given their ordinary and customary meaning. The ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the effective filing date of the patent application.

16. I understand that courts begin the claim construction analysis with the claims themselves, and that claims must be read in view of the specification, of which they are a part. I understand the specification is the single best guide to the meaning of a disputed term. In construing claim terms, courts also consider the patent's prosecution history. Courts also may rely on extrinsic evidence, which could include expert and inventor testimony, dictionaries, and learned treatises.

## VI.     BACKGROUND AND STATE OF THE ART

### A.     Data Compression

17. All of the Patents-in-Suit relate to systems and methods for compressing data. There is no new algorithm, software, or hardware for compressing data disclosed in any of the Patents-in-Suit.[1] Instead, the alleged invention is using more than one of these known compression (or "encoding") techniques in a single system. *See e.g.,* Ex. C at 7:11–22.

18. Data compression is the process of modifying, encoding or converting the bit structure of data in such a way that the data consumes less space for storage and transmission. Ex. F at 4. Data compression has been widely used in computer technology since at least the 1970s. *See* Ex. E. A fundamental property of compression is the ability to reduce the size of the data and reconstruct the encoded data back to its original or expanded form. Ex. G at 405 ("Data compression . . . is the process of transforming a body of data into a smaller form *from which the original or some approximation of the original can be recovered at a later time*."). Compression has long been known to save storage capacity, speed up file transfer, and decrease storage hardware and network bandwidth costs. Ex. E at 2–3.

---

[1] *See e.g.*, Ex. A at 11:5–10; Ex. C at 7:13–17; Ex. D at 11:31–36; Ex. B at 15:12–19.

19.     "Compressed [data] / [data block] / [data stream] / [form]," "Compressing," and "Compression" are claim terms that I understand are at issue in this case. As I previously discussed, data compression is the process of encoding the bit structure of data in such a way that it is reduced in size to take up less space for storage and transmission. Ex. G at 405 ("Data compression . . . is the process of transforming a body of data into a smaller form *from which the original or some approximation of the original can be recovered at a later time*."); *see also* Ex. F at 4. Encoding refers to the process of converting data into a format required for information processing. The Patents-in-Suit use this term in the same manner, and do not give any special definition to the term. *See e.g.,* Ex. C at 7:25–31 ("Data compression is performed by the encoder module 30 wherein each of the encoders E1 . . . En processes a given input data block and outputs a corresponding set of *encoded data blocks*."); *id.* 2:1–3 ("Data compression is widely used to *reduce the amount of data* required to process, transmit, or store a given quantity of information.").

20.     The term "compressed" has its ordinary meaning here. In fact, the word "compressed" is used by ordinary people in everyday life: compressed air, compressed cardboard, compressed cans, compressed sponge, compressed work week, etc. In each instance, the term "compressed" refers to a modified state of the subject that still retains at least some portion of the original content. For example, "compressed air" is air that takes up a smaller space because the air molecules were forced closer together. Similarly, "compressed cardboard" or "compressed cans" are just cardboard or aluminum cans that have been flattened. Compressed sponges are just sponges that expand to normal size upon "decompression" by the action of water. In the instance of compressed work week, a person works a normal 40 hours in four days

as opposed to five. To a person of ordinary skill of the art, the term "compressed data" has that same concept.

21.     Even in the context of data processing, almost everyone has some experience with "compression" and "compressed data." For instance, almost everyone today has used Zip software to "compress" large files (e.g., word documents) such that the "zipped file" is reduced in size, but can be restored back to its expanded form when "unzipped" (i.e., decoded). Thus, in this every-day use example, document(s) are encoded to reduce their size so they take up less room, but can be restored to their expanded form when they are unzipped (decoded).

22.     I understand that Realtime proposes that "compressed data" can be "data that is *represented with fewer bits*." *See* D.I. 76-1 at 1. In my opinion, Realtime's proposal expands the scope of the Patents-in-Suit. Just as "compressed air" in an earlier example is not a representation of air, but air itself, the "compressed data" is not data that is *represented* by something other than the data itself. Instead, compressed data is data that is encoded in such a way to reduce its size while allowing the encoded data to be decoded back to expanded form. In other words, the "compressed data" must include sufficient information such that the data can be restored (i.e., decoded) to its expanded form at a later time

23.     I note that Realtime's proposed construction of "compressed data" as "data that is represented with fewer bits" is not included in the specifications of the Patents-in-Suit. The closest reference that I found is in the '530 and the '908 patents, which state that "data compression economizes on data storage and allows more information to be stored for a fixed memory size by representing information more efficiently." *See* Ex. D at 2:16–19; *see also* Ex. A at 2:15–18. However, this passing reference is not how a person of ordinary skill in the art would

understand compression and compressed data. Critically, this language is also not included anywhere in the '204 or the '728 patents.

24.     Therefore, it is my opinion that simply stating that compression is "representing information more efficiently" does not actually capture how a skilled artisan would think of compression. Compression is generally understood by those of ordinary skill as the process of *encoding* data by one or more encoders. Therefore, the "compressed data" that is produced by the encoding is generally understood as "encoded data" that has been reduced in size, but can be decoded back to its expanded form. As I explain above, one of the fundamental properties of compression is the ability to reconstruct the encoded data back to its original or expanded form. Ex. G at 405 ("Data compression . . . is the process of transforming a body of data into a smaller form *from which the original or some approximation of the original can be recovered at a later time*.").

25.     More relevant to a person of ordinary skill in the art, the Patents-in-Suit reference compression as a method of encoding that produces encoded data (i.e., "compressed data") 266 times across the four Patents-in-Suit. *See e.g.,* Ex. C at 4:6–8 ("compression comprises: encoding the data block with a plurality of encoders to provide a plurality of encoded data blocks"); Ex. A at 6:45–47 ("Upon completion of the encoding of the input data block, the encoded data block is then stored in the data storage device . . . ."); Ex. B at 14:11–15 ("data compression advantageously applies the input data stream to each of a plurality of different encoders to, in effect, generate a plurality of encoded data streams. The plurality of encoders are preferably selected based on their ability to effectively encode different types of input data."). Therefore it is my opinion that the plain and ordinary meaning of "compressed data" is "data encoded to reduce its size, where the encoded data can be decoded to expanded form." D.I. 76-1 at 1.

7

Similarly, my opinion is that "compressing" and "compression" have the plain and ordinary meaning of "encoding to reduce the size of data, where the encoded data can be decoded to expanded form." D.I. 76-1 at 1. As my opinions below further illustrate, encoding was a well-known concept at the time of the alleged invention of the Patents-in-Suit.

26.  The Patents-in-Suit consistently refer to the output of the data compression system (i.e., "compressed data") as "*encoded* data" or "*encoded* data blocks" – not "data that is represented by fewer bits." *See e.g.,* Ex. C at 4:6–15 ("data compression comprises: ***encoding the data block*** with a plurality of encoders to provide a plurality of ***encoded data blocks*** . . . selecting for output ***the encoded data blocks*** having the highest compression ratio"), Ex. B at 14:11–13 ("data compression advantageously applies the input data stream to each of a plurality of different encoders to, in effect, generate a plurality of ***encoded data*** streams"); Ex. A at 6:45–47 ("Upon completion of the encoding of the input data block, the ***encoded data block*** is then stored in the data storage device . . . ."), Ex. D at 7:5–8.[2] Even the figures, shared in some variation in each Patents-in-Suit, refer to the output of the data compression system as "encoded data":



---

[2]  *See also* Ex. C at 7:25–28, 8:5–10, 8:22–26, 8:27–31, 9:4–7, 10:2–10, 10:16–24, 11:42–44; Ex. B at 13:60–14:1, 16:4–9; Ex. A at 7:18–34, 9:30–33, 12:14–59, Ex. D at 7:45–61, 9:56–59.

*See* Ex. B, FIG. 5; *see also* Exs. A and D, FIG. 8; Ex. C, FIGs. 2, 4, 6, 8, 9, 13B, 15B, 17B.

27.     Other portions of the figures in the Patents-in-Suit similarly refer to the output of the encoders as "encoded data." For example, the '728 Patent always refers to the compression process as encoding data to produce encoded data:



FIG. 3a

*See* Ex. B, FIG. 3A.

9



*Id.*, FIG. 3B.

28. The '530 and the '908 Patents also use "compressed data" in similar manner:



FIGURE 13

*See* Exs. A and D, FIG. 13.

| Time Interval | T1 | T2 | T3 | T4 | Ti |
|---|---|---|---|---|---|
| Receive Data Block | Recieve Data Block 1 | Receive Data Block 2 | Receive Data Block 3 | Receive Data Block 4 | Receive Data Block i |
| **METHOD 1** | | | | | |
| Compress Data Block | Compress Data Block 1 | Compress Data Block 2 | Compress Data Block 3 | Compress Data Block 4 | Compress Data Block i |
| Store Encoded Data Block | Store Encoded Data Block 1 | Store Encoded Data Block 2 | Store Encoded Data Block 3 | Store Encoded Data Block 4 | Store Encoded Data Block i |
| **METHOD 2** | | | | | |
| Compress Data Block | | Compress Data Block 1 | Compress Data Block 2 | Compress Data Block 3 | Compress Data Block (i-1) |
| Store Encoded Data Block | | | Store Encoded Data Block 1 | Store Encoded Data Block 2 | Store Encoded Data Block (i-2) |

FIGURE 4a

*Id.*, FIG. 4a.

29.  The Patents-in-Suit also show that "compressed data" is "data encoded to *reduce its size*" from the original size. *See e.g.,* Ex. A at 1:50–52 ("Data compression is widely used to *reduce the amount of data* required to process, transmit, or store a given quantity of information."); *see also* Ex. C at 2:1–3; Ex. D at 1:51–53. During the prosecution of the parent patent to the asserted '204 patent, Realtime argued to the Patent and Trademark Office that "[c]ompression traditionally *reduces the size of data* such that the amount of data stored on a medium can be increased." Ex. J at 30. It is my opinion that, as used in the Patents-in-Suit, the Patentee uses the phrase "reduces the size of data" and "reduce the amount of data" interchangeably to refer to the same concept of compression.

30.  Furthermore, a fundamental property of compression is the ability to reconstruct

the encoded data back to expanded form. Ex. G at 405 ("Data compression . . . is the process of transforming a body of data into a smaller form *from which the original or some approximation of the original can be recovered at a later time*."). Indeed, data that cannot be decoded or recovered is worthless – defeating the purpose of compressing the data to begin with. Thus, the encoded data must be capable of being decoded or reconstructed to an expanded form. The Patents-in-Suit recognize this requirement. Specifically, the Patents-in-Suit note that under one compression technique (lossy compression), "the *decoded (or reconstructed) data* differs from the original unencoded/uncompressed data," while in another technique (lossless), "the *decoded (or reconstructed) data* is identical to the original unencoded/uncompressed data." Ex. C at 2:7–24; Ex. A at 1:56–2:7, Ex. D at 1:57–2:8. Additionally, in the specification of the '728 patent, Realtime incorporates by reference a disclosure that teaches that "[d]ata decompression is the conversion of a *stream of compressed data back to its original expanded form*." *See* Ex. C at 3:20–24 (*incorporating* Ex. K at 3:23–24).

## VII. CONCLUSION

31. For the reasons above, I believe that a person of ordinary skill in the art would construe the term "compressed data" as "data encoded to reduce its size, where the encoded data can be decoded to expanded form." The skilled artisan would also have construed the corresponding "compressing / compression" as "encoding to reduce the size of data, where the encoded data can be decoded to expanded form."

32. I declare that all statements made herein of my knowledge are true, and that all statements made on information and belief are believed to be true, and that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

Content:
Date: March 18, 2019

By: *[signature]*