UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| REALTIME DATA LLC d/b/a IXO, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 1:17-cv-11279-IT |
| | * | |
| ACRONIS, INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |
| REALTIME DATA LLC d/b/a IXO, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 1:17-cv-12499-IT |
| | * | |
| CARBONITE, INC., and EVAULT, INC., | * | |
| | * | |
| Defendants. | * | |
| | * | |
| REALTIME DATA LLC d/b/a IXO, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 1:18-cv-12227-IT |
| | * | |
| SUNGARD AVAILABILITY SERVICES, | * | |
| LP, and SUNGARD AVAILABILITY | * | |
| SERVICES TECHNOLOGY, LLC, | * | |
| | * | |
| Defendants. | * | |

ORDER ON CLAIM CONSTRUCTION

December 21, 2021

TALWANI, D.J.

Plaintiff Realtime Data, LLC d/b/a IXO ("Realtime") filed suit against Carbonite, Inc.,

and EVault, Inc. (collectively, "Carbonite") asserting infringement of Realtime's rights to U.S.

Patent Nos. 7,415,530 ("the '530 patent"), 8,717,204 ("the '204 patent"), 9,054,728 ("the '728 patent"), and 9,116,908 ("the '908 patent"). Realtime also filed an action against Acronis, Inc. ("Acronis"), asserting infringement of the same four patents. The two cases were consolidated with the parties' consent ("*Acronis* action"). See Tr. of Sched. Conf. 4-7 [#60]; Order Consolidating Cases [#59].[1] On January 21, 2021, the court granted the parties' joint motion to dismiss all claims of the '204 patent as moot in light of the Patent Trial and Appeal Board's final decision finding the claims of the '204 patent unpatentable. See Joint Mot. & Stip. [#108]; Order [#109].

Meanwhile, Realtime filed a third suit against Sungard Availability Services, LP, and Sungard Availability Services Technology, LLC (collectively, "Sungard"), asserting infringement of the '530 patent, the '728 patent, the '908 patent, and U.S. Patent No. 9,667,751 ("the '751 patent") ("*Sungard* action").

The parties in the *Acronis* and *Sungard* actions submitted claim terms for construction.[2] Given the substantial overlap in the disputed terms, the court held a joint claim construction hearing. See Elec. Clerk's Notes, *Sungard* Action [#65]. For the reasons stated herein, the court adopts the constructions set forth below.

---

[1] Unless otherwise specified, citations to the docket refer to the *Acronis* action.

[2] The parties in the *Acronis* action originally identified nine disputed terms, see Joint Claim Construction Statement [#76], but these were narrowed down prior to the claim construction hearing, see Joint Notice Regarding Claim Construction [#107].

The parties in the *Sungard* action originally identified ten disputed terms. See Joint Claim Construction and Prehearing Statement, *Sungard* Action [#40]. However, eight of the terms overlapped with those in the *Acronis* action, and the parties agreed that any construction for those terms in the *Acronis* action would apply in the *Sungard* action. See Joint Notice and Stipulation Regarding Claim Construction, *Sungard* Action [#76]. The parties also agreed that the two remaining terms did not require construction. Id.

## I.    Claim Construction Principles

The construction of claim terms is a question of law. <u>Markman v. Westview Instruments,</u> <u>Inc.</u>, 517 U.S. 370, 372 (1996) ("the construction of a patent, including terms of art within its claim, is exclusively within the province of the court"). "[T]he words of a claim 'are generally given their ordinary and customary meaning.'" <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting <u>Vitronics Corp. v. Conceptronic, Inc.</u>, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of . . . the effective filing date of the patent application." <u>Id.</u> at 1313. In construing claim terms, courts look to "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." <u>Id.</u> at 1314 (quoting <u>Innova/Pure Water, Inc. v. Safari Water</u> <u>Filtration Sys., Inc.</u>, 381 F.3d 1111, 1116 (Fed. Cir. 2004)). The court briefly reviews how these sources are used in claim construction as relevant here.

A.    *Language of the Claims*

Because "the claims of a patent define the invention to which the patentee is entitled the right to exclude," the claim construction analysis begins with the claims themselves. <u>Phillips</u>, 415 F.3d at 1312 (quoting <u>Innova</u>, 381 F.3d at 1115). "[T]he context in which a term is used in the asserted claim can be highly instructive." <u>Id.</u> at 1314; <u>see also</u> <u>id.</u> ("This court's cases provide numerous . . . examples in which the use of a term within the claim provides a firm basis for construing the term"). For example, "[b]ecause claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." <u>Id.</u>

B.     *Specification*

The claims "do not stand alone" but "are part of a fully integrated written instrument consisting principally of a specification." Phillips, 415 F.3d at 1315 (internal citation omitted). "For that reason, claims 'must be read in view of the specification, of which they are a part.'" Id. (quoting Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995)).

"[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" Id. (quoting Vitronics, 90 F.3d at 1582). "[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." Id. at 1316; see also CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1366 (Fed. Cir. 2002) (stating that an inventor may "act[] as his own lexicographer" by "clearly set[ting] forth a definition of the disputed claim term in . . . the specification"). "In other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor." Phillips, 415 F.3d at 1316. Nevertheless, the court must be careful to "us[e] the specification [only] to interpret the meaning of a claim" and not to "import[] limitations from the specification into the claim." Id. at 1323; see also id. ("although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments"). While this distinction "can be a difficult one to apply in practice[,] . . . the line between construing terms and importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains on understanding how a person of ordinary skill in the art would understand the claim terms." Id.

C.     *Patent Prosecution History*

Courts should also consider the patent's prosecution history if it is in evidence. Id. at

1317. Prosecution history comprises the record of the proceedings before the United States

Patent and Trademark Office ("USPTO"), both pre- and post-issuance proceedings, and prior art

cited during the examination of the patent. Id.; see also Aylus Networks, Inc. v. Apple Inc., 856

F.3d 1353, 1360 (Fed. Cir. 2017) ("Extending the prosecution disclaimer doctrine to [inter partes

review] proceedings will ensure that claims are not argued one way in order to maintain their

patentability and in a different way against accused infringers"). "Like the specification, the

prosecution history provides evidence of how the USPTO and the inventor understood the

patent." Phillips, 415 F.3d at 1317. The prosecution history can also provide evidence as to

"whether the inventor limited the invention in the course of prosecution, making the claim scope

narrower than it would otherwise be." Id. "Yet because the prosecution history represents an

ongoing negotiation between the USPTO and the applicant, rather than the final product of that

negotiation, it often lacks the clarity of the specification and thus is less useful for claim

construction purposes." Id. As a result, courts must "not rely on the prosecution history to

construe the meaning of the claim to be narrower than it would otherwise be unless a patentee

limited or surrendered claim scope through a clear and unmistakable disavowal." 3M Innovative

Props. Co. v. Tredegar Corp., 725 F.3d 1315, 1322 (Fed. Cir. 2013); see Aylus Networks, 856

F.3d at 1359 ("when the patentee unequivocally and unambiguously disavows a certain meaning

to obtain a patent, the doctrine of prosecution history disclaimer narrows the meaning of the

claim consistent with the scope of the claim surrendered") (citing Biogen Idec, Inc. v.

GlaxoSmithKline LLC, 713 F.3d 1090, 1095 (Fed. Cir. 2013)).

D.    *Means Plus Function Analysis*

Patent claims typically define the structure of an invention. A patentee is also free,

however, to claim an invention by the function that it performs rather than by the structure that

performs that function. See 35 U.S.C. § 112(f) ("An element in a claim for a combination may be

expressed as a means or step for performing a specified function without the recital of structure,

material, or acts in support thereof, and such claim shall be construed to cover the corresponding

structure, material, or acts described in the specification and equivalents thereof"). But in such

cases, the patentee must clearly communicate what is and is not encompassed by the claim. See

Northrop Grumman Corp. v. Intel Corp., 325 F.3d 1346, 1350–51 (Fed. Cir. 2003) (explaining

construction of means-plus-function claims). This is because functional claims—unmoored from

any structure—risk preempting all possible ways of performing a specific function, including

those that the patentee never conceived of, and hindering innovation. See Aristocrat Techs.

Australia Pty Ltd. v. Int'l Game Tech., 521 F.3d 1328, 1333 (Fed. Cir. 2008). The scope of the

claimed "means" must therefore be restricted to only those structures disclosed in the

specification as corresponding to the function. See Med. Instrumentation & Diagnostics Corp. v.

Elekta AB, 344 F.3d 1205, 1219 (Fed. Cir. 2003) ("The requirement that structure must be

clearly linked or associated with the claimed function is the quid pro quo for the convenience of

claiming in functional terms").

Construing a claim suspected of falling into means-plus-function territory is a two-step

process. See Apple Inc. v. Motorola, Inc., 757 F.3d 1286, 1296 (Fed. Cir. 2014), overruled on

other grounds by Williamson v. Citrix Online, LLC, 792 F.3d 1339 (Fed. Cir. 2015). First, the

court must determine whether a claim limitation is expressed in means-plus-function language.

Id. Use of the word "means" followed by functional language creates a presumption that the

limitation is a means-plus-function limitation, while a claim limitation that does not use the word "means" triggers a presumption that the limitation is not a means-plus-function limitation. Williamson, 792 F.3d at 1348. However, both presumptions are rebuttable. Id. And in the latter case, "the essential inquiry is . . . whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." Id. The court must therefore consider whether the claim contains a generic "nonce" word, such as "module" or "device," that is effectively just a substitute for "means." Id. at 1350.

If the claim is found to be a means-plus-function claim, the court proceeds to the second step, which entails determining "what structure, if any, disclosed in the specification corresponds to the claimed function." Id. at 1351. A structure is corresponding "only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc., 248 F.3d 1303, 1311 (Fed. Cir. 2001). The focus of this inquiry is not just whether a structure is capable of performing the claimed function, but rather whether the corresponding structure is "clearly linked or associated with the [recited] function." Id.

## II.    Analysis of the Disputed Terms

### A.    *"compressed [data] / [data block] / [data stream] / [form]" and "compressing / compression"*

The parties request construction of the terms "compressed data," "compressed data block," "compressed data stream," or "compressed form" as they are used in claims 9, 10, 15, 20, 24, and 25 of the '728 patent; claims 1 and 4 of the '530 patent; claims 1, 2, 4, 6, 21, 22, and 25 of the '908 patent; and claims 1, 23-25, 47, 48 of the '751 patent. See Proposed Constructions [#86-1].

| "compressed [data] / [data block] / [data stream] / [form]" | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| "data that is represented with fewer bits"<br><br>*Alternatively:* "data that is reduced in size" | "data encoded to reduce its size, where the encoded data can be decoded to expanded form" |

The parties also request construction of the terms "compressing" or "compression" as they are used in claims 1, 4-6, 9, 10, 15, 20, 24, and 25 of the '728 patent; claims 1 and 18 of the '530 patent; claims 1, 2, 4, 6, 21, 22, and 25 of the '908 patent; and claims 1, 22-25, and 46-48 of the '751 patent. Id.

| "compressing / compression" | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| "[representing / representation of] data with fewer bits"<br><br>*Alternatively:* "[reducing / reduction of] the size of data" | "encoding to reduce the size of data, where the encoded data can be decoded to expanded form" |

Realtime contends that the asserted patents use the term "compressed" in its ordinary sense, specifically, "represented with fewer bits." Pl.'s Brief 5-6 [#82]. Realtime further contends that the meaning of "compressed" has been uncontroversial throughout prior litigation related to the same or similar patents. Id. at 6. Defendants counter that Realtime's definition is overly broad and not how the term is understood in the art. Defs.' Brief 7-8 [#81]. They suggest that compression should be understood instead as a method of encoding data such that it can be decoded to expanded form. Id. at 8. In response, Realtime argues that Defendants' definition

"injects ambiguity into the plain term 'compress' by inserting extraneous language absent from the claims—'decoded to expanded form.'" Pl.'s Brief 7 [#82].

The court begins with the language of the claims. The parties agree that all of the asserted patents use the terms "compressed," "compressing," and "compression," in the same manner, Defs.' Brief 6 [#81]; Pl.'s Brief 5 [#82], so the court focuses its analysis on the '728 patent as representative. Claim 1 of the '728 patent recites:

> 1. A system for <u>compressing</u> data comprising:
> a processor;
> one or more content dependent data <u>compression</u> encoders; and
> a single data <u>compression</u> encoder;
> wherein the processor is configured:
> to analyze data within a data block to identify one or more parameters or attributes of the data wherein the analyzing of the data within the data block to identify the one or more parameters or attributes of the data excludes analyzing based solely on a descriptor that is indicative of the one or more parameters or attributes of the data within the data block;
> to perform content dependent data <u>compression</u> with the one or more content dependent data <u>compression</u> encoders if the one or more parameters or attributes of the data are identified; and
> to perform data <u>compression</u> with the single data <u>compression</u> encoder, if the one or more parameters or attributes of the data are not identified.

'728 Patent at 26:29-48 (disputed term emphasized). The claim describes a series of steps for compressing data. First, the patent teaches "content dependent data compression," wherein incoming data blocks are analyzed to identify certain "attributes" or "parameters" of the data they contain. <u>Id.</u> Next, the data blocks are compressed with one or more "encoders" that are associated with these identified parameters or attributes. <u>Id.</u> If, however, the analysis of the data block did not reveal any parameters or attributes of the data, the patent teaches compression of the block with a "single data compression encoder." <u>Id.</u> Several dependent claims elaborate that the compression achieved by these encoders may be "lossy" or "lossless." <u>Id.</u> at 27:12-25.

Claim 24 is similar and recites:

24. A system for <u>compressing</u> data comprising;
a processor;
one or more data <u>compression</u> encoders; and
a default data <u>compression</u> encoder;
wherein the processor is configured:
to analyze data within a data block to identify one or more parameters or attributes of the
data wherein the analyzing of the data within the data block to identify the one or more
parameters or attributes of the data excludes analyzing based solely on a descriptor
that is indicative of the one or more parameters or attributes of the data within the data
block; and
to <u>compress</u> the data block to provide a <u>compressed</u> data block, wherein if one or more
encoders are associated with the one or more parameters or attributes of the data,
<u>compressing</u> the data block with at least one of the one or more data <u>compression</u>
encoders, otherwise <u>compressing</u> the data block with the default data <u>compression</u>
encoder.

<u>Id.</u> at 28:12-30 (disputed terms emphasized). Like claim 1, claim 24 describes compression as a

process that involves the use of "one or more data compression encoders." <u>Id.</u>

Claim 25 captures equivalent ideas but claims a method rather than a system:

25. A computer implemented method comprising:
analyzing, using a processor, data within a data block to identify one or more parameters
or attributes of the data within the data block;
determining, using the processor, whether to output the data block in a received form or
in a <u>compressed</u> form; and
outputting, using the processor, the data block in the received form or the <u>compressed</u>
form based on the determination,
wherein the outputting the data block in the <u>compressed</u> form comprises determining
whether to <u>compress</u> the data block with content dependent data <u>compression</u> based on
the one or more parameters or attributes of the data within the data block or to
<u>compress</u> the data block with a single data <u>compression</u> encoder; and
wherein the analyzing of the data within the data block to identify the one or more
parameters or attributes of the data excludes analyzing based only on a descriptor that
is indicative of the one or more parameters or attributes of the data within the data
block.

<u>Id.</u> at 28:31-51 (disputed terms emphasized). Again, as with the other independent claims of the

'728 patent, the method uses an "encoder" to achieve compression. <u>Id.</u>

The '728 patent specification helps clarify the meaning of "encoder" and, in turn,

"compression." The specification begins with some background: with the proliferation of digital

data, the need has arisen to process, store, and transmit that data more efficiently. Id. at 1:64-2:1. Data compression technology can be used to achieve those goals. Id. at 2:1-3. "In general, there are two types of data compression techniques that may be utilized . . . to encode/decode data: lossless and lossy." Id. at 2:3-6. Lossy compression works by removing unnecessary or less important data and seeks to "exploit various traits within the human senses to eliminate otherwise imperceptible data." Id. at 2:7-20. For example, if the data are a recording of a song, a lossy compression technique might discard the frequencies that the human ear is unlikely to detect. See id. As a result, lossy techniques can reconstruct only an approximation of the original data: in the given example, the inaudible frequencies are no longer part of the decoded data. See id.

By contrast, lossless compression reduces data size without a loss of information. Id. at 2:21-28. Lossless techniques can therefore reconstruct exactly the original data from the compressed data. Id. Lossless compression techniques may have content-sensitive behavior; for example, the same lossless compression technique may have very different results in terms of the amount of compression achieved if used on a text document versus a photograph. See id. at 2:29-40. To address that challenge, the patent proposes systems and methods that, as described above, use "a plurality of encoders applying a plurality of compression techniques on an input data stream." Id. at 5:59-62.

Taking the claim language and the specification together, the court concludes that "compression" refers to the use of "encoders," which may be either "lossy" or "lossless." The critical importance of these two types of encoders is what happens when the data are decoded. Accordingly, the ability to decode data—whether as an exact replica of the original data or an approximation—is intricately tied up with the idea of compression. The court therefore agrees in

part with Defendants' proposed construction. However, the court also concludes that the phrase

"to expanded form" in Defendants' construction risks limiting compression to only lossless

compression techniques, as "expanded form" could be understood to mean "original form." The

court therefore construes "compressed [data]" as "[data] encoded to reduce its size, such that the

encoded [data] can be decoded to reconstruct the original [data] exactly or approximately."

     B.    *"descriptor / token"*

The parties request construction of the terms "descriptor" or "token" as they are used in

claims 9, 10, and 20 of the '728 patent; claims 1 through 3 of the '530 patent; and claims 2, 4,

and 22 of the '908 patent. See Proposed Constructions [#86-1].

| "descriptor / token" | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| "recognizable data" | "recognizable data that is appended to the compressed data that shows which encoder has been applied to the data block" |

The parties agree that the terms "descriptor" and "token" are synonymous, and they also

agree on the first portion of the proposed construction for the term "descriptor" or "token":

"recognizable data." Defendants, however, have suggested additional language that limits the

type of recognizable data encompassed by the term: "that is appended to the compressed data

that shows which encoder has been applied to the data block." Defendants argue that the court

should adopt their construction as a matter of stare decisis and collateral estoppel. Defs.' Brief 14

[#81]. They explain that their proposed construction tracks the one that was affirmed by the

Federal Circuit for a "parent" patent to the '728 patent. Id. at 14-15 and n.16 (citing Realtime

Data, LLC v. Morgan Stanley, 554 F. App'x 923, 932 (Fed. Cir. 2014)).

In <u>Realtime Data, LLC v. Morgan Stanley</u>, 875 F. Supp. 2d 276 (S.D.N.Y. 2012), <u>aff'd</u>, 554 F. App'x 923 (Fed. Cir. 2014), Realtime asserted that eighteen defendants had infringed its rights to three patents, including U.S. Patent No. 7,714,747 ("the '747 Patent"). The '747 patent and the '728 patent share an identical specification and figures, and the '728 depends, via a series of continuations, from the '747 patent. The Federal Circuit considered the term "descriptor indicates" and upheld the district court judge's construction—"[r]ecognizable data that is appended to the encoded data for specifying [an encoder]"—based largely, if not entirely, on its analysis of the '747 patent claims and specification. <u>Id.</u>

Realtime argues that neither stare decisis nor collateral estoppel can apply in this case where (1) only the term "token," not the term "descriptor," is at issue regarding the '728 patent, and (2) the term "descriptor" is at issue regarding the '530 and '908 patents, which belong to different patent families that were not considered by the court in <u>Morgan Stanley</u>. Pl.'s Reply 6-9 [#85]. The court agrees. It is a "well-understood notion that claims of unrelated patents must be construed separately." <u>e.Digital Corp. v. Futurewei Techs., Inc.</u>, 772 F.3d 723, 727 (Fed. Cir. 2014). Because the Federal Circuit did not construe the term "token" in the '747 patent and because the term "descriptor" is used in two asserted patents that are not related to the '747 patent, the court will not apply the Federal Circuit's construction to the terms at issue here.

Realtime next argues that Defendants' proposed definition adds two improper limitations to the definition of token or descriptor: that the recognizable data (1) be "appended to the compressed data" and (2) "show[] which encoder has been applied to the data block." Pl.'s Mem. 8 [#52]. The court agrees that Defendants' proposed construction contains improper limitations and is unnecessary given the way that the terms are used in the patents.

Beginning with the language of the claims, the term "token" is used in three claims of the

'728 patent. They recite as follows:

> 9. The system of claim 1, wherein the processor is further configured to associate a data
> <u>token</u> indicative of the content dependent data compression applied to the data block to
> create a compressed data block.

> 10. The system of claim 1, wherein the processor is further configured to associate a data
> <u>token</u> indicative of the single data compression encoder applied to the data block to create
> a compressed data block.

> 20. The system of claim 1, wherein the processor is further configured to output a
> compressed data block with a <u>token</u> representative of a compression technique used to
> compress the data block.

'728 Patent at 27:4-11, 27:49-52 (disputed term emphasized). In claims 9 and 10, the processor

"associates" a token with a compressed data block, and in claim 20, the processor "outputs" the

compressed data block with a token. <u>Id.</u> The purpose of associating or outputting compressed

data blocks with these tokens is to indicate the compression technique used. <u>Id.</u>

The term "descriptor" is also used in claims 1 through 3 of the '530 patent, and claim 1,

recites, in part, "a first data descriptor is stored on said memory device indicative of said first

compression technique, and said first descriptor is utilized to decompress the portion of said

compressed data stream associated with said first data block." '530 Patent at 18:38-42. The '908

patent uses similar language, stating in claim 2 that "the data accelerator stores a first data

descriptor on the memory device indicative of the first compression technique such that the first

descriptor is capable of being utilized to decompress at least a portion of the first data block."

'908 Patent at 18:63-67.

Taken together, the claim language teaches that a descriptor can be associated or output

with a data block or stored on a memory device. The term "appended" is never used. The idea

that the token or descriptor can be "appended" to the compressed data is found in the

specifications of the '728, '530, and '908 patents. <u>See e.g.</u>, '728 Patent at 8:5-10; '530 Patent at

14

12:33-38; '908 Patent at 12:59-64. But while the specifications suggest "appending" as one method of indicating the encoding technique used to compress a data block, they do not suggest that it is only the method of doing so. The court accordingly agrees with Realtime that Defendants' construction imports an improper limitation by using the word "append."

What is clear from the relevant claims is that the purpose of the token or descriptor is to identify in some way which encoding technique has been applied to a given data block. But that is stated in each of the claims at issue. For example, in claim 9 of the '729 patent, "token" is followed immediately by "indicative of the content dependent data compression applied." '728 Patent at 27:4-7. Defendants' construction would therefore create redundancy. In addition, the specifications support the idea that the token or descriptor identifies the *encoding technique* that has been applied, not the specific *encoder*. '728 Patent at 8:64-9:4; '530 Patent 12:38-46; '908 Patent 12:64-13:5. So, Defendants' proposed construction is not only unnecessary; it also improperly limits the patent claims. The court therefore adopts Realtime's proposed construction of "descriptor" or "token" as "recognizable data."

   C.      *"data stream"*

The parties next request construction of the term "data stream" as it is used in claim 1 of the '530 patent. See Proposed Constructions [#86-1].

| "data stream" | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| "one or more data blocks transmitted in sequence" | "one or more uncompressed blocks transmitted in sequence from an external source whose characteristics are not controlled by the data encoder or decoder" |

The parties agree that a "data stream" refers to "one or more data blocks transmitted in sequence," but they dispute whether the data blocks in the stream must be (1) "uncompressed" and (2) transmitted "from an external source whose characteristics are not controlled by the data encoder or decoder." Defendants again argue that the Federal Circuit's decision in Morgan Stanley controls, Defs.' Mem. 12-13 [#84], but as Realtime correctly points out, the Federal Circuit did not consider the '530 patent nor any patent related to the '530 patent in construing the term "data stream," Pl.'s Reply 9-10 [#85]. The court accordingly turns to the text of the patent.

Claim 1 of the '530 patent recites:

> 1. A system comprising:
> a memory device; and
> a data accelerator, wherein said data accelerator is coupled to said memory device, a data stream is received by said data accelerator in received form, said data stream includes a first data block and a second data block, said data stream is compressed by said data accelerator to provide a compressed data stream by compressing said first data block with a first compression technique and said second data block with a second compression technique, said first and second compression techniques are different, said compressed data stream is stored on said memory device, said compression and storage occurs faster than said data stream is able to be stored on said memory device in said received form, a first data descriptor is stored on said memory device indicative of said first compression technique, and said first descriptor is utilized to decompress the portion of said compressed data stream associated with said first data block.

'530 Patent at 18:24-42 (disputed term emphasized). Realtime argues that the requirement that the data stream be uncompressed is "contradicted by the claim itself," where the claim refers to "a compressed data stream." Pl.'s Mem. 13 [#82]. But the court finds the opposite to be true: the fact that "data stream" is modified by "compressed" in certain instances suggests that where "data stream" is not so modified, it does not refer to compressed data. The process described in the claim lends further support to that reading: it indicates that the "data stream" is "received" and then "compressed" by the data accelerator. '530 Patent at 18: 24-42.

The specification also supports this construction. The idea that animates the '530 patent is that, in modern computing, the processor, i.e., the component that receives and executes instructions, is fast, and the memory is much slower. Id. at 2:19-54. What this means for data compression is that the processor can execute compression on data much faster than the data can be retrieved from and returned to memory. Id. As a result, the memory creates a bottleneck, and the processor idles while waiting for the next bit of data to work on. Id. The '530 patent seeks to solve that problem by using a "data accelerator" to decrease the time necessary to store and retrieve data from memory. Id. at 2:58-62. By using different compression techniques to compress blocks of data, the data accelerator allows data to be compressed *and* stored in memory faster than the uncompressed data could be simply stored. Id. at 2:58-3:58.

The specification then states that, in one aspect, the invention consists of a method that

> comprises the steps of:
> receiving a data stream at an input data transmission rate which is greater than a data
>     storage rate of a target storage device;
> compressing the data stream at a compression ratio which provides a data compression
>     rate that is greater than the data storage rate;
> storing the compressed data stream in the target storage device;
> retrieving the compressed data stream from the target storage device at a rate equal to a
>     data access rate of the target storage device; and
> decompressing the compressed data at a decompression ratio to provide an output data
>     stream having an output transmission rate which is greater than the data access rate of
>     the target storage device.

Id. at 2:64-3:12. This supports a reading of the claim language that the "data stream," as it is "received" by the data accelerator, is uncompressed.

The court does not find the same support for the second limitation suggested by Defendants—that the data stream must be transmitted "from an external source whose characteristics are not controlled by the data encoder or decoder." Defendants have not pointed to any language in the patent claims or specification that support such construction. The court

accordingly construes "data stream" as "one or more uncompressed data blocks transmitted in sequence."

      D.     *"excludes analyzing based solely on a descriptor that is indicative of the one or more parameters or attributes of the data within the data block"*

The next phrase requiring construction is "excludes analyzing based solely on a descriptor that is indicative of the one or more parameters or attributes of the data within the data block" as it is used in claim 1 of the '728 patent. See Proposed Constructions [#86-1].

| "excludes analyzing based solely on a descriptor that is indicative of the one or more parameters or attributes of the data within the data block" | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary. | "analyzing the content of the data within a data block using a technique in addition to using a file type descriptor" |

The phrase at issue appears only in claim 1 of the '728 patent, which, again, recites:

1. A system for compressing data comprising;
a processor;
one or more content dependent data compression encoders; and
a single data compression encoder;
wherein the processor is configured:
to analyze data within a data block to identify one or more parameters or attributes of the
    data wherein the analyzing of the data within the data block to identify the one or more
    parameters or attributes of the data <u>excludes analyzing based solely on a descriptor</u>
    <u>that is indicative of the one or more parameters or attributes of the data within the data</u>
    <u>block;</u>
to perform content dependent data compression with the one or more content dependent
    data compression encoders if the one or more parameters or attributes of the data are
    identified; and
to perform data compression with the single data compression encoder, if the one or more
    parameters or attributes of the data are not identified.

'728 Patent at 26:29-48 (disputed term emphasized). Realtime argues that the phrase requires no construction. Pl.'s Mem. 12-13 [#82]. Defendants counter that "inclusion of the words 'based solely on' in the claim language means that the analysis of the 'data within a data block' (i.e., the

content of the data) is in addition to analyzing the descriptor (i.e., file type descriptor)." Defs.' Mem. 21 [#81].

The court agrees with Realtime that the phrase is written in plain, albeit awkward, English. "Excludes analyzing based solely on" means that the analysis undertaken to identify the optimal compression technique does not rely *only* on a "file type descriptor." Such compression *may* rely on the file type descriptor in addition to other means of analysis, as Defendants suggest, but it also means that such compression may rely on other means of analysis without reference to the file type descriptor; nothing in the claim language *requires* analysis of the file type descriptor.

The specification lends additional support to this reading. As previously discussed, the '728 patent contemplates compression of data blocks based on the attributes or parameters of the data they contain. According to the specification, content-dependent compression is important for several reasons. Files generally have "file type descriptors"—not to be confused with the "tokens" or "data compression type descriptors" discussed above—such as .mpg, .jpg, and .docx. '728 Patent at 3:2-6. These file type descriptors identify the "data types, data structures, and formats" of a given data block and allow an optimal compression technique to be ascertained. Id. at 2:65-3:6. But with the constant expansion of new applications and their attendant file formats, it can be hard for suppliers of data compression software to keep up and to update their algorithms accordingly. Id. at 3:7-19. For these novel file formats, or in cases where a file may not have a descriptor at all, another way of determining the optimal compression algorithm is necessary. Id. at 3:37-55. And an alternative method could be useful even for data blocks with familiar descriptors, since such data blocks may contain multiple different data types—for example a Word document with a photograph in it. See id.

To solve those problems, the '728 patent teaches that its method of content-dependent compression is based not solely on analysis of the file type descriptor but rather on analysis of the content of the data in the data block. Id. at 26:35-41. The claim language conveys this concept in plain English without the need for further construction. That is particularly the case where the specification asserts that, in some cases, files may not have a file type descriptor at all. Id. at 3:37-55. Defendants' proposed construction therefore imports a limitation not supported by the claim language or the specification.

E.      *"data accelerator"*

The final term for which the parties request construction is "data accelerator" as it is used in claims 1-3 of the '530 patent and claims 1-4 and 6 of the '908 patent. See Proposed Constructions [#86-1].

| "data accelerator" | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| "hardware or software with one or more compression encoders"<br><br>*Alternatively:*<br><br>**Structure**: hardware or software with one or more compression encoders<br><br>**Function:** ('908 patent, cl. 1) compress: (i) a first data block with a first compression technique to provide a first compressed data block; and (ii) a second data block with a second compression technique, different from the first compression technique, to provide a second compressed data block; ('530 patent, cl.1) compressing said first data block with a first compression technique and said second data block with a second compression technique, said first and second compression techniques are different | **Structure:** A processor programmed to compress data by:<br>• Counting the size of an incoming data block<br>• Encoding the block with one or more encoders<br>• Counting the size of the encoded data block(s)<br>• Calculating a compression ratio for each encoded data block<br>• Comparing the calculated compression ratio(s) against a pre-specified threshold<br>• Selecting an encoded data block having the greatest compression ratio if the threshold limit is exceeded by at least one encoded data block<br><br>**Function:** ('908 Patent, cl. 1) to compress: (i) a first data block with a first compression technique to provide a first compressed data block; and (ii) a second data block with a second compression technique, different from the first compression technique, to provide a second compressed data block<br><br>**Function:** ('530 Patent, cl. 1) a data stream is received by said data accelerator in received form, said data stream includes a first data block and a second data block, said data stream is compressed by said data accelerator to provide a compressed data stream by compressing said first data block with a first compression technique and said second data block with a second compression technique, said first and second compression techniques are different |

The parties dispute whether "data accelerator" is a means-plus-function term. The claims do not use the word "means," creating a presumption that means-plus-function does not apply. See Williamson, 792 F.3d at 1348. Realtime relies on its expert, Dr. Kenneth Zeger, to argue that a person of ordinary skill in the art would understand the meaning of "data accelerator" in the context of the asserted patents. Zeger Decl. ¶¶ 28-30 [#82-12]. At the claim construction hearing, Realtime conceded that the term "data accelerator" is not a term of art, but it argues that a person of ordinary skill in the art "would rely on the specific input, output, coupling, and objective of the 'data accelerator' to understand the claimed structures." Pl.'s Mem. 15 [#82]. Defendants counter that "[t]he term 'data accelerator' is merely an abstraction that describes only the result achieved from performing the 'compression' functions" and that, "[a]s used in the claims, the term fails to recite any structure, let alone sufficiently definite structure, for performing the claimed functions." Pl's Mem. 24-25 [#81].

The court agrees with Defendants that "data accelerator" is a nonce word that requires means-plus-function analysis. As discussed with regard to the '530 patent above, the '530 and '908 patents are directed at the idea that the time needed to store and retrieve data from memory holds up compression, and both patents propose a way to solve that problem. Claim 1 of the '530 recites:

> 1. A system comprising:
> a memory device; and
> a data accelerator, wherein said data accelerator is coupled to said memory device, a data
>     stream is received by said data accelerator in received form, said data stream includes
>     a first data block and a second data block, said data stream is compressed by said data
>     accelerator to provide a compressed data stream by compressing said first data block
>     with a first compression technique and said second data block with a second
>     compression technique, said first and second compression techniques are different,
>     said compressed data stream is stored on said memory device, said compression and
>     storage occurs faster than said data stream is able to be stored on said memory device
>     in said received form, a first data descriptor is stored on said memory device indicative
>     of said first compression technique, and said first descriptor is utilized to decompress

the portion of said compressed data stream associated with said first data block.

'530 Patent at 18:24-42 (disputed term emphasized). And claim 1 of the '908 patent recites:

> 1. A system comprising:
> a memory device; and
> a <u>data accelerator</u> configured to compress: (i) a first data block with a first compression technique to provide a first compressed data block; and (ii) a second data block with a second compression technique, different from the first compression technique, to provide a second compressed data block;
> wherein the compressed first and second data blocks are stored on the memory device, and the compression and storage occurs faster than the first and second data blocks are able to be stored on the memory device in uncompressed form.

'908 Patent at 18:49-62 (disputed term emphasized). The main difference between these claims is that the '530 patent requires the compressed data blocks to be stored with a data compression type descriptor or token. <u>Compare</u> '530 Patent at 18:24-42 <u>with</u> '908 Patent at 18:49-62.

In both patents, the data accelerator is one component comprising the claimed systems, and the patents teach that the data accelerator is configured to compress and store compressed data faster than uncompressed data can be stored. But nothing in the claims explains how this result is to be accomplished: "occurs faster than" is just a logical condition.

The specification provides little additional guidance. The patents permit use of any known compression technique and then impose, without explanation, a speed requirement. <u>See</u> <u>e.g.</u>, '530 Patent at 16:23-28; '908 Patent at 16:49–54. This is further demonstrated by the figures and flowcharts included in the specifications, which depict the "data accelerator" or "acceleration process" as a black box that somehow accelerates data storage and retrieval using generic compression techniques. '530 and '908 Patents at Fig 1-7b, 10-12, 14. In short, a "data accelerator," as used in the asserted patents, stands in for the abstract idea that certain combinations of known compression techniques can speed up storage and retrieval. Because the patents provide no direction regarding how the proposed speed result is to be achieved, the court

concludes that the term "data accelerator" is purely functional as used in the claims and invokes means-plus-function construction pursuant to 35 U.S.C. § 112. The court therefore turns to what structure disclosed in the specification corresponds to this claimed acceleration function.

Realtime argues that the specifications disclose sufficient structure where they state that a data accelerator is one or more compression encoders. Pl.'s Mem. 16 [#82]. The court disagrees. To accelerate data storage and retrieval, a data accelerator must be more than generic compression encoders; something has to perform the function of selecting the data block with a compression ratio that exceeds the prespecified threshold, such that it can be stored and retrieved faster than the uncompressed data can be stored and retrieved. Realtime further argues that Defendants' definition improperly limits the invention to hardware, where the specification states that "the present invention may be implemented in various forms of hardware, software, firmware, or a combination thereof." Id. (citing '530 Patents at 4:47-50). But "[f]or computer-implemented means-plus-function claims where the disclosed structure is a computer programmed to implement an algorithm"—which the court concludes is the case here—"'the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm.'" Finisar Corp. v. DirecTV Grp., Inc., 523 F.3d 1323, 1340 (quoting WMS Gaming, Inc. v. Int'l Game Tech., 184 F.3d 1339, 1349 (Fed. Cir. 1999)). In addition, "[s]imply reciting 'software' without providing some detail about the means to accomplish the function is not enough" to limit the claimed function. Id. at 1340-41.

As explained above, the claims clearly state that the function consists of accelerating data storage and retrieval from memory by requiring that compression and storage together occur faster than storage of the uncompressed data alone. '530 Patent at 18:24-42; '908 Patent at 18:49-62. Because this function is computer-implemented, the patent must disclose an algorithm

that the computer can perform to accomplish this function. See Harris Corp. v. Ericsson Inc., 417

F.3d 1241, 1253 (Fed. Cir. 2005) ("A computer-implemented means-plus-function term is

limited to the corresponding structure disclosed in the specification and equivalents thereof, and

the corresponding structure is the algorithm"). The required "algorithm" can be disclosed at

various levels of abstraction; it may be in "any understandable terms including as a mathematical

formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure."

Finisar, 523 F.3d at 1340. In this case, the only structure that meets those requirements is that set

forth by Defendants, which outlines the steps or "algorithm" used by a processor to execute the

claimed acceleration function. Specifically, the court concludes that the structure is a processor

programmed to

1. count the size of an incoming data block, see '530 Patent at Fig. 8 (element 20), 11:23-32; '908 Patent at Fig. 8 (element 20), 11:49-58;

2. encode the data block with one or more encoders, see '530 Patent at Fig. 8 (element 25), 11:40-12:13; '908 Patent at Fig. 8 (element 25), 11:65-12:39;

3. count the size of the encoded data block or blocks, see '530 Patent at Fig. 8 (element 30), 12:14-20; '908 Patent at Fig. 8 (element 30), 12:40-46;

4. calculate a compression ratio for each encoded data block, see '530 Patent at Fig. 8 (element 35), 12: 20-25; '908 Patent at Fig. 8 (element 35), 12:46-51;

5. compare the calculated compression ratio or ratios against a prespecified threshold, see '530 Patent at Fig. 8 (element 35), 12: 25-33; '908 Patent at Fig. 8 (element 35), 12:51-59; and

6. select the encoded data block having the greatest compression ration if the threshold limit is exceeded by at least one encoded data block, see '508 Patent at 12:46-49; '908 Patent at 13:5-8.

**III.    Conclusion**

For the foregoing reasons, the court construes the disputed claim language in the matter set forth above.

IT IS SO ORDERED.

December 21, 2021                                          /s/ Indira Talwani
                                                                   United States District Judge